# LEASE TO PURCHASE

Entered into this 26th day of June _____ , 2025 at Bensenville, Illinois between:

**LESSOR:**

**Lessor Name: REX TRUCKING INC**

**Lessor Address: 205 W. Grand Ave., Suite 123**

**City/State/Zip: Bensenville, IL 60106**

                                **AND**

**LESSEE:**

                MARY LOIS CHARITIES
**Lessee Name :**_____

                2950 E NORTH ST APT 600L
**Address:** _____

                GREENVILLE, SC 29615
**City/State/:** _____

**EQUIPMENT:**

**Year:** 2025 _____

**Make:** VOLVO _____

**Model:**

**VIN#** 4V4NC9EJ4SN695385 _____

**PRICE:**

**Lease Price:** $182,000.00 _____

**Down Payment:**$ 0 _____ **(if applicable)**

**Payments:** $ 700 _____

**Total # of Payments:** 260 _____

**Manufacturer Warranty Included (where applicable, limited to the manufacturer specifications regarding milage and/or years)**

**\*\*\*\* PLEASE NOTE, IF ANY REQUIRED DOWN PAYMENT IS NOT MADE AFTER THE LEASE TO PURCHASE AGREEMENT IS EXECUTED, THE LEASE TO PURCHASE WILL BE AMENDED TO DECLARE ZERO DOWN PAYMENT, AND NO DOWN PAYMENT WILL BE ACCEPTED BY LESSOR\*\*\*\*\***

**\*\*\*\* AS A CONDITION PRECEDENT TO THIS LEASE TO PURCHASE, PURCHASER MUST AGREE TO LEASE THE PURCHASED EQUIPMENT TO LESSOR'S MOTOR CARRIER FOR A MINIMUM OF ONE YEAR BEFORE ANY BUY-OUT OF THE LEASE TO PURCHASE CAN BE INITIATED \*\*\*\*\***

Doc ID: 872f33664ebf95a24523c3475664b812956f6ebc

*****TITLE TRANSFER TO TAKE PLACE NO LATER THAN 45 DAYS FROM FINAL PAYOUT OF ALL SUMS DUE UNDER THE LEASE TO PURCHASE AND THE ATTACHED EQUIPMENT LEASE AGREEMENT. LESSOR MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO LEASED EQUIPMENT.*****

*DISCLAIMER: NO TITLE TRANSFER SHALL OCCUR UNTIL THE LESSEE SATISFIES ALL OBLIGATIONS AND OUTSTANDING BALANCES OWED TO LESSOR, SUCH AS BUT NOT LIMITED TO, MAINTENANCE REPAIRS, TOLL VIOLATIONS, ETC.*

MANAGER SIGNATURE        LESSEE / LESSEE SIGNATURE

Kyle Jordan Smith ( MARY LOIS CHARITIES )

ALEKSANDRA ZIVIC
MANAGER PRINTED NAME        LESSEE / LESSEE PRINTED NAME

IN THE STATE OF ILLINOIS:

COUNTY OF DU PAGE:

The above-referenced parties, personally present before me, did set their hands and seals to the foregoing document this _____ day of _____ at Bensenville, Illinois.

_____(SEAL)

Notary Public, State of Illinois

My Keaton Commission Expires:__/_____/____

Doc ID: 872f33664ebf95a24523c3475664b812956f6ebc

# EQUIPMENT LEASE TO PURCHASE AGREEMENT

This **EQUIPMENT LEASE AGREEMENT** is hereby entered on this _26th_day of _June_____,2025 between_____MARY LOIS CHARITIES_____SS#/**FEIN**: _88-2250418_____

("Lessee") and REX TRUCKING INC, a CORPORATION organized under the laws of the State of Illinois ("Lessor").   Lessor and Lessee shall collectively be known here in as "the Parties".

**WITNESSETH:**

**WHEREAS,** Lessor leases to the Lessee and the Lessee leases from the Lessor, the exclusive use of the Equipment described below for the Term of this Lease.

**WHEREFORE,** for good consideration and mutual promises, the Parties, intending to be legally bound hereby, agree and contract as follows:

**Leased Equipment:**

Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the following described equipment (the "Leased Equipment"):
Year: _2025____ Make: _VOLVO_____VIN# _4V4NC9EJ4SN695385_____

**Lease Terms:**

This lease agreement shall be for a term of _____ months or _260_____weeks, commencing on _06_/_26_/2025. Lessee's obligation to pay the Lease Payments and other Lease obligations is absolute and unconditional and is not subject to cancellation (except as provided below), reduction, setoff or counterclaim. This Lease shall continue until all Monthly Payments have been made whether or not Lessee retains possession of the Equipment.

**Purchase Option: $1.00** at the end of the Lease Term provided that Lessee is not in default.

**Lease Payments:**

Lease payments shall be $_700_____ per _month or ✔week. The initial down payment due upon execution is $_0_____ (if applicable). Under this lease agreement a total of ____ monthly or _260_ weekly payments in the amount of $_700_____ shall be due to Lessor from Lessee. After the first monthly payment Lessee shall continue making lease payments every ____month or ✔week with payment due on the same day of each subsequent month or week as the first payment. The initial down payment is non-refundable in case this agreement is terminated for any reason.

**Lessor's Direction for Delivery of Lease Payments:**

Lessee shall pay to Lessor all payments by the way of ACH or Wire Transfer. If, in a week, for any reason whatsoever, including but not limited to, breakdown, disrepair or accident, Lessee shall not work, the payment for that week shall still be due. Lessor may hereafter change this direction to Lessee for delivery of lease payments by serving Lessee with written notice containing new payment instructions.

Doc ID: 872f33664ebf95a24523c3475664b812956f6ebc

**Exclusivity:**

During the Lease period and until all payments have been satisfied under this agreement or at Lessee's termination of the agreement, the Lessee is obligated to exclusively haul loads for the Lessor's Motor Carrier. Failure to do so will result in a breach of this agreement.

**Delivery & Acceptance:**

Lessee agrees to accept the Equipment on or after __06__ / __26__ /2025. Lessee is responsible for the inspection of the Equipment prior to its use. By using the Equipment, Lessee acknowledges that it has inspected the Equipment, that it is in good operating order and fit for Lessee's intended use and that the Equipment operates to the satisfaction of the Lessee.

**Payment Terms for Leased Equipment:**

Lessee agrees to make payments to Lessor for the equipment under the terms of this agreement as stated previously. Should Lessor have to make any repairs to the unit, based on Lessee's failure to do so, those sums will be deducted from Lessee's revenue statements or be deducted from any sums held by the Motor Carrier at termination of the Lease Agreement (by Lessor or Lessee) or at Pay-Off of the Leased Equipment.

**Drivers and Restrictions on Use:**

Lessee and Lessor agree that the Lessor has an interest in protecting its interest in the Equipment by ensuring that the Lessee engages in the safe operation of the Equipment and in ensuring that Lessee performs regular and adequate State and Federally-mandated maintenance of the Equipment. Lessee shall not use the Equipment in violation of any Federal, State, or local statutes, laws, ordinances, rules or regulations, or contrary to the provisions of any applicable insurance policy, including, but not limited to, Department of Transportation Hours of Service Regulations, and Vehicle Inspection and Maintenance Regulations. Any violations of Federal, State or local statutes by Lessee including, but not limited to, Department of Transportation Hours of Service Regulations, and Vehicle Inspection and Maintenance Regulations shall constitute a material breach of this Lease. Lessee's use of the Equipment shall comply with all insurance requirements, all applicable laws and regulations concerning the maintenance and operation of such Equipment in interstate commerce and all applicable manufacturer recommendations concerning the maintenance and operation of the Equipment. Lessee agrees to have all manufacturer service bulletins and recalls performed on the Equipment during the term of the Lease and bear all expenses related thereto. Lessee agrees that Lessee will not materially alter or modify the Equipment during the Lease period without prior written notice to and written approval from the Lessor.

**Removal of Logos and Signs**

Unless otherwise agreed, the Lessee is prohibited from removing, altering, or destroying any logos or signs from any equipment belonging to the Lessor. This includes but is not limited to the Lessor logos placed on trailers or on the side of the trucks. Violation of this clause constitutes a breach of this agreement, and the Lessee will be responsible for the replacement cost of any damaged or altered company logo or sign.

**Repairs and Maintenance:**

Doc ID: 872f33664ebf95a24523c3475664b812956f6ebc

Lessee is required, at Lessee's own cost and expense, to keep the Equipment in good repair, condition and working order, except for ordinary wear and tear, and Lessee will supply and bear the expense of all parts and labor required to keep the Equipment in good repair and condition. All replacement parts used or installed and repairs made to the Equipment will become Lessor's property. All replacement parts used or installed and repairs made to the Equipment shall be of the same type and quality as those furnished by Lessor. If the Equipment is covered by a manufacturer warranty at the time of the execution of this agreement, only then will the Lessee not be responsible for the repairs, parts, mechanisms or devices installed on the Equipment that are covered under the warranty. The Lessee is responsible for amounts due above and beyond the warranty coverage. Should Lessor have to make any repairs to the Equipment based on Lessee's failure to do so, those sums will be deducted from Lessee's revenue statements or from any sums held by the Motor Carrier at termination of the Lease Agreement by either party or at the Pay-Off of the Leased Equipment.

LESSEE ACKNOWLEDGES THAT LESSOR IS NOT RESPONSIBLE FOR PROVIDING ANY REQUIRED MAINTENANCE AND/OR REPAIRS FOR THE EQUIPMENT DURING THE TERM OF THE LEASE.

All Truck Leases require that the Lessee change the oil on said unit every 35,000 miles with Rotella T5 10W30 Semi Synthetic oil or Delvac Mobil 10W30. Each oil change shall be done at either TA, Loves, Speedco, Pilot or the dealership, no exceptions. We cannot accept paid receipts/invoices from any shop other than the ones listed. Any Lessee that performs work outside of the approved shops, or that performs the required oil change may be held accountable for any loss or unnecessary wear on the components of the unit, and any cost to repair or replace parts due to bad oil quality or oil changes made at unauthorized shops will be the full and total cost of Lessee and shall be due and payable, on demand, at Lessor's election. Furthermore, repeated oil changes made not using the listed oil, or done at the listed shops, may be cause for termination of the Lease whereby all remedies afforded to and available to Lessor may be executed and/or any sums due and owing to Lessee may be forfeited for failure to adhere to this provision.

**Warranty:**

Lessor is leasing the Equipment to Lessee "AS - IS" and Lessee acknowledges that Lessor is not the manufacturer of the Equipment or an agent of the manufacturer of the Equipment. LESSOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR TITLE. IN NO EVENT SHALL LESSOR HAVE ANY LIABILITY FOR NOR SHALL LESSEE HAVE A CLAIM OR REMEDY AGAINST LESSOR FOR CONSEQUENTIAL, SPECIAL, INCIDENTAL, OR PUNTIVE DAMAGES, OR FOR ANY LOSS OF PROFITS OR SAVINGS, LOSS OF USE OR ANY OTHER COMMERCIAL OR ECONOMIC LOSS. Lessor is not responsible for any repairs to or the performance of the Equipment or for any maintenance or service to the Equipment. If a warranty exists from the manufacturer of the Leased Equipment, Lessor shares its rights to said warranty with Lessee for the duration of the agreement.

**Loss and Damage:**

Lessee is solely responsible for all loss, destruction or damage to the Equipment and Lessee agrees to assume the risk of all such loss, destruction or damage to the Equipment. No such loss, destruction or damage to or loss of use of the Equipment shall relieve Lessee from any obligation under this Lease including, but not limited to, Lessee's continuing duty to make Lease payments. In the event of loss

or damage to the equipment, Lessee shall, at the Lessor's discretion; (i) replace or repair the Equipment to the Lessor's acceptable satisfaction or (ii) pay the replacement cost of the Equipment to the Lessor.

**Insurance:**

If the vehicle/Lessee is involved in any "total loss" accident during the lease term, all amounts still due to Lessor shall be satisfied first. If there is any excess money after what is due to Lessor, the same shall be paid out to Lessee and the contract shall be terminated due to impossibility to complete any future performance of stated terms. If the vehicle/Lessee is involved in any accident which is less than a total loss, then Lessee shall pay any deductible due to the insurance company from Lessor, and Lessor shall fix the unit with any insurance monies paid. Lessor shall fix the unit so as to be in as good as condition as the unit was in prior to the loss, but shall not be obligated to fix the unit so as to add any additional value in the unit then what was previously the value.

**Indemnity of Lessor against third-party claims:**

Lessor is not and shall not be responsible for any losses or injuries caused by the manufacture, acquisition, delivery, ownership, use, lease, possession, maintenance or operation of the Equipment or defects in the Equipment. Lessee agrees to indemnify and hold harmless the Lessor and any affiliated companies, including their owners, successors, heirs and assigns, directors, officers, agents, attorneys, employees, representatives, and insurers, jointly and severally, from and against any and all losses, costs, damages, claims or expense, including, without limitation, attorneys' fees, incurred by the Lessee and other indemnitees, or any of them, arising out of the manufacture, acquisition, delivery, ownership, use, lease, possession, maintenance or operation of the Equipment or defects in the Equipment. Lessee further agrees to indemnify Lessor and other indemnitees, or any of them, for any attorneys' fees expended in enforcement of this paragraph.

**Taxes and Fees:**

Lessee agrees to pay or ensure that the motor carrier under whose authority Lessee is leased pays all license and registration fees, sales and use taxes, personal property taxes and all other taxes and charges related to the ownership, leasing, rental, purchase, possession or use of the Equipment (except those based on Lessor's net income) in addition to the Monthly Payment as billed by Lessor to Lessee. Lessee agrees that if Lessor pays any taxes or charges on Lessee's behalf, Lessee will reimburse Lessor for all such payments and will pay Lessor 18% interest or at the maximum rate legally allowable and a late charge on such payments with the next Monthly Payment, plus such reasonable costs incurred in collecting and administering any taxes, assessments or fees and remitting them to the appropriate authorities.

**Purchase Option & Surrender:**

Effective at the end of the Lease Term, provided that the Lessee is not in Default under this Agreement, Lessee shall have the option to purchase the Equipment for $1.00. Lessee shall provide written notice of its election to purchase the Equipment no later than the last day of the Lease Term. In the event Lessee does not elect to purchase the Equipment on or before the last day of the Lease Term or in the event the Lessee is in Default of the agreement, Lessee shall return the Equipment to Lessor at the location designated by Lessor, freight prepaid, in as good condition as when the Equipment was received by Lessee, less ordinary wear and tear. The vehicle will be returned to the same location where it was picked up at or at the location designated by the Lessor.

In any event, whenever the Equipment is returned to Lessor under this Agreement for any reason, the Equipment shall be in a condition compliant with all Department of Transportation guidelines and requirements and in a condition under which it may be safely and legally operated on the public highways. Lessee shall return the Equipment at the location specified by the Lessor, and agrees to be solely responsible for paying the parts and labor costs for any and all repairs or replacement of parts necessary to restore the Equipment to the condition in which the Equipment was provided to Lessee.

At the time of early termination, all payments made towards the purchase shall be converted to "rental payments" and shall be retained, in full, by Lessor. If Lessor must arrange to repossess the equipment, the cost of repossession shall be paid by the Lessee.

**Default & Termination:**

Lessee shall be in default of this Lease in the event any of the following occurs; (a) Lessee fail to make any Monthly payment or other payment when due; (b) Lessee breaches any obligation under this Lease, or any other agreement with Lessor; (c) Lessee or any guarantor dies; (d) Lessee becomes insolvent or unable to pay Lessee's debts when due; (e) Lessee stops doing business as a going concern; (f) Lessee transfers all or substantially all of Lessee's assets; (g) Lessee makes an assignment for the benefit of creditors; (h) Lessee or a guarantor voluntarily files for bankruptcy or has bankruptcy involuntarily filed against Lessee; (i) a trustee, receiver, or liquidator is appointed for Lessee or a guarantor; or (j) Lessee violates any Federal, State or local law or regulation governing the operation of the Equipment including, but not limited to, Department of Transportation Hours of Service Regulations, and Vehicle Inspection and Maintenance Regulations. If the Lessee is terminated for any reason by the Lessor or an affiliate company, the Lessor reserves the right to terminate this agreement and all payments made towards the vehicle will be converted into rental payments. Lessor reserves the right to terminate this Agreement if Lessee violates any provision or if Lessor has reasonable belief that Lessee is hauling loads for other carriers.

**Remedies:**

If Lessee fails to make any payment or violates any provision of this agreement, the Lessor may, but is not required to give written notice to the breaching party. The Leese shall have (10) days from the receipt of notice to cure the default (Cure Period). In the event that the default is not cured, the Lessor shall then have the right to exercise any one or more of the following remedies: (1) Lessor may declare the entire balance of the unpaid Monthly Payments for the full term and all other amounts then due immediately due and payable; (2) Lessor may sue for and receive all Monthly Payments and other payments then accrued or accelerated under this Lease, including but not limited to late fees, expenses and other charges. All accelerated Monthly Payments shall accrue interest at a rate of eighteen percent (18%) per year; (3) Lessor may terminate the Lease; (4) Lessor may require Lessee to return the Equipment to Lessor and, in the event, Lessee fails to return the Equipment, Lessor may enter upon Lessee's premises peaceably with or without legal process where the Equipment is located and repossess the Equipment. Such return or repossession of the Equipment will not constitute a termination of this Lease unless Lessor expressly notifies Lessee of such in writing. Lessee shall continue to be liable for the contractual lease payments due under this agreement. In the event the Equipment is returned to Lessor or repossessed by Lessor and, unless Lessor has terminated this Lease, Lessor may sell or re-lease the Equipment to any persons upon any terms Lessor may choose in its sole discretion, with or without notice to Lessee. Should Lessor elect to repossess the Leased Equipment, Lessee shall be liable to Lessor for all costs and expenses associated with such repossession; or (5) Lessor may set-off the funds due to Lessor under this Lease against any amounts owed by Lessor to Lessee or held by Lessor for the benefit of Lessee including,

but not limited to, amounts held by Lessor in escrow and amounts held by Lessor as security deposit under this Lease. If the vehicle is repossessed by the Lessor for any reason, the Lessor may, but is not obligated to hold in storage for 10 days any personal items belonging to the Lessee.

**Acceleration:**

A. **Acceleration of Lease Payments.** Should Lessee be in default, fail to cure the default prior to expiration of the Cure Period, and Lessor take possession of the Leased Equipment prior to expiration of the Lease Term (or has made a written demand upon Lessee for return of the Leased Equipment for which Lessee failed to comply with), all payments due to Lessor during the life of this equipment lease agreement shall be accelerated, thus becoming immediately due and payable by Lessee to Lessor as of the date of expiration of the Cure Period. This shall be known as the "Acceleration Clause."

B. **Present Value Discount of Accelerated Lease Payments.** Should the Acceleration Clause apply, the amount payable by Lessee under the Acceleration Clause shall be discounted from the future due date of the lease payment (as originally required under the Lease Agreement) to the present value at the date of collection by Lessor using a discount rate of 8%.

C. **Re-Lease or Sale of Leased Equipment after Repossession.** Should Lessor find a new lessee or buyer of the Leased Equipment prior the expiration of the Lease Term, any payments received from the new lessee or buyer during the Lease Term shall be first netted against Lessor's expenses incurred effecting the rental or sale of the Lease Equipment, and then offset against amounts owed by Lessee to Lessor under this equipment Lease Agreement. Should the amount collected by Lessor from any new lessee or buyer of the Leased Equipment (after net of releasing or sales expenses) exceed the amount then owed by Lessee to Lessor, the excess (if any shall be refunded to Lessee. Any amounts received by Lessor through re-lease or sale of the Leased Equipment **after** expiration of the Lease Term shall not be offset against amounts owed by Lessee to Lessor under this lease agreement and shall not otherwise be refunded to Lessee.

**Attorney Fees and Expenses:**

Lessee agrees to pay all expenses incurred by Lessor in connection with the enforcement of any remedies under this Lease, including but not limited to, expenses of repossessing, storing, shipping, repairing and selling the Equipment and attorneys' fees.

**Joint and Several Liabilities:**

If there is more than one Lessee, (or if the Lessee is a Corporation) all lessees hereby agree to be jointly and severally liable for any breach of the terms of this agreement. The Lessee understands that they are obligated both personally and through their company for the faithful performance of all covenants of this agreement.

**Bankruptcy:**

Neither this Lease, nor any interest therein, is assignable or transferable by operation of law. If any proceeding under the Bankruptcy Act, as amended, is commenced by or against the Lessee, or if the Lessee is adjudged insolvent, or if Lessee makes any assignment for the benefit of his creditors, or if a writ of attachment or execution is levied on the Equipment and is not released or satisfied within ten ( 10 ) days thereafter, or if a receiver is appointed in any proceeding or action to which the Lessee is a party with authority to take possession or control of the Equipment, Lessor may exercise any one or more of the remedies mentioned previously. If Lessor elects to terminate the agreement, this Lease shall not be treated as an asset of Lessee.

Doc ID: 872f33664ebf95a24523c3475664b812956f6ebc

**Ownership:**

During the Lease Term, the Lessor owns and retains title to the Equipment and Lessee has the right to use the Equipment for the full Lease term provided Lessee complies with all of the terms and conditions of this Lease. Lessee agrees not to permit a lien of any kind to be placed on the Equipment. In the event Lessee permits a lien to be placed on the Equipment, such will constitute a breach of the Lease and Lessee agrees that Lessor may, but is not required to, satisfy the lien in Lessor's own discretion and Lessee shall be responsible for compensating the Lessor for any payments so made.

**Assignment:**

Lessee agrees that Lessee shall not transfer, sell, sublease, assign, pledge or encumber either the Equipment or any rights under this Lease without the prior written consent of the Lessor. Lessee is to retain possession of the Leased Equipment at all times during this agreement except upon demand of surrender by Lessor or repossession by Lessor. Lessor shall have the unilateral right to assign its interest in this lease to a third-party.

**Acknowledgement And Subordination Language:**

Lessee acknowledges and agrees that all of its rights under the Lease Agreement with Lessor in and to the Property, including Lessee's right to possession of the property, are subordinate, junior and subject to the rights and claims of any assignee of Lessor ("Assignee") against the Property under any financing documents or security agreement, whether now existing or hereafter created, including but not limited to the right of Assignee to take possession of the Property. Lessee consents and agrees to the assignment of (i) all monies due or to become due to Lessor under the Lease Agreement and (ii) all right and privileges of Lessor under the Lease Agreement. Lessee promises and agrees to settle all claims against Lessor directly with Lessor and hereby waives, relinquishes and disclaims as to Assignee all counterclaims, rights of set-off, and defenses Lessee may have against Lessor, including any right to withhold payments of or refrain from paying, any monies that are due to become due under the terms of the Lease Agreement; except that Lessee shall not be liable to Assignee for monies paid to Lessor prior to the time Assignee notifies lessee to pay Assignee directly.

**Hazmat And Telematics Language:**

Lessee further agrees that throughout the term of this Agreement (a) it will not permit the Property to be used for the transportation of passengers or for the digging, hauling, loading, storing or transporting of material designated as hazardous, radioactive, toxic, flammable, explosive or environmentally hazardous, unsafe or dangerous under any federal, state or local law or rule; and (b) it will not interfere with the operation of any telematics system in any Property; and that Assignee may monitor or access the Property's utilization, location and other information or reports contained in or generated by any such telematics system to ensure compliance with any Agreement related to the Property; or for any other lawful purpose; and may use any telematics system or information generated by the telematics system to locate the Property.

**Additional Documents:**

If Lessor shall so request, Lessee shall execute and deliver to Lessor such documents as Lessor shall deem necessary or desirable for purposes of recording or filing to protect the interest of Lessor in the Equipment including, but not limited to UCC financing statement.

**Notices:**

All notices, demands and communications required or desired to be given in connection with this Lease shall be in writing and shall be deemed to have been duly given on the date received if delivered personally, by courier service, or by electronic means or, if mailed, on the third day after mailing upon the party shown below.

**Integration:**

This Agreement sets forth the entire agreement between the Parties with regard to the subject matter hereof. All prior agreements, and covenants, express or implied, oral or written, with respect to the subject matter hereof, are hereby superseded by this agreement. This is an integrated agreement.

**Severability:**

In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provision of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

**Modification:**

Except as otherwise provided in this document, this Agreement may be modified, superseded, or voided *only* upon the written and signed Agreement of the Parties. Further, the physical destruction or loss of this document shall not be constructed as modification or termination of the agreement contained herein.

**Non-Disparagement**

The Lessee acknowledges and agrees that the Lessee will not defame or criticize the services, business, integrity, veracity, or personal or professional reputation of the Lessor or any of its directors, officers, employees, affiliates, or agents of any of the foregoing in either a professional or personal manner either during the term of this agreement or thereafter.

**Acknowledgments:**

Each party acknowledges that he or she had an adequate opportunity to read and study this Agreement, to consider it, and to consult with an attorney if he/she does so desire. Each party understands and acknowledges that this is a legally binding agreement and that they are entering into the same with full knowledge of all of the terms, conditions and covenants contained herein.

**Exclusive Jurisdiction for Suit:**

The parties entering into this agreement submit to personal jurisdiction in Du Page or Cook County, Illinois for adjudication or any disputes and/or claims between the parties under this agreement. Furthermore, the parties hereby agree that the courts of Du Page County or Cook County, Illinois (at Lessor's choice) shall have exclusive jurisdiction over any disputes between parties relative to this agreement, whether said dispute sounds in contract, tort, or other areas in the law.

Doc ID: 872f33664ebf95a24523c3475664b812956f6ebc

**State Law:**

This Agreement shall be constructed under the laws of the State of Illinois.

**IN WITHESS WHEROF**, and acknowledging acceptance and agreement to the foregoing. **LESSOR** and **LESSEE** affix their signature hereto as of the date written on page 1 hereof:

**MANAGER**                                    **LESSEE**

.....................................          .....................................

Authorized representative                      **Owner/Operator**

**REX TRUCKING INC**                                   2950 E North ST APT 600L

                                               Address: _____

                                                       Greenville, SC
                                               City/State: _____

                                                       9129151256
                                               Phone#: _____

                                                       88-2250418
                                               SS# or FEIN#: _____

In the State of Illinois:
County of Du Page:

The above parties, personally present before me, did set their hands and seals to the foregoing document this _____ day of _____ 20____ at Bensenville, Illinois.

_____    (SEAL)
Notary Public, State of Illinois
My Commission Expires: ___/___/_____

06 / 26 / 2025

Doc ID: 872f33664ebf95a24523c3475664b812956f6ebc

**⋈ Dropbox** Sign                                                    Audit trail

| | |
|---|---|
| Title | Lease to purchase for truck without DDF - Kyle Jordan Smith... |
| File name | Lease_to_purchase_truck_without_DDF.pdf |
| Document ID | 872f33664ebf95a24523c3475664b812956f6ebc |
| Audit trail date format | MM / DD / YYYY |
| Status | Signed |

## Document History

**⟲**
SENT
**06 / 26 / 2025**
13:39:14 UTC

Sent for signature to Kyle Jordan Smith ( MARY LOIS CHARITIES ) (smithkyle914@gmail.com) from bos@eurofreightservices.com
IP: 79.101.96.106

**◎**
VIEWED
**06 / 26 / 2025**
14:31:23 UTC

Viewed by Kyle Jordan Smith ( MARY LOIS CHARITIES ) (smithkyle914@gmail.com)
IP: 185.98.168.32

**⤵**
SIGNED
**06 / 26 / 2025**
14:36:00 UTC

Signed by Kyle Jordan Smith ( MARY LOIS CHARITIES ) (smithkyle914@gmail.com)
IP: 185.98.168.32

**✓**
COMPLETED
**06 / 26 / 2025**
14:36:00 UTC

The document has been completed.

Powered by ⋈ Dropbox Sign

# LEASE TO PURCHASE

Entered into this _20th_ day of _February_ , 2025 at Bensenville, Illinois between:

**LESSOR:**

Lessor Name: REX TRUCKING INC

Lessor Address: 205 W. Grand Ave., Suite 123

City/State/Zip: Bensenville, IL 60106

                                        AND

**LESSEE:**

Lessee Name : ___MARY LOIS CHARITIES___

Address: ___2950 E NORTH ST APT 600L___

City/State/: ___GREENVILLE, SC 29615___

**EQUIPMENT:**

Year:_2025_

Make: _VANGUARD_

Model: _Dry van_

VIN# _5V8VC5324SM509105_

**PRICE:**

Lease Price: $ _54,600.00_

Down Payment:$_0_ (if applicable)

Payments: $ _300_

Total # of Payments:_182_

Warranty Included (Factory): _No_

**** PLEASE NOTE, IF ANY REQUIRED DOWN PAYMENT IS NOT MADE AFTER THE LEASE TO PURCHASE AGREEMENT IS EXECUTED, THE LEASE TO PURCHASE WILL BE AMENDED TO DECLARE ZERO DOWN PAYMENT, AND NO DOWN PAYMENT WILL BE ACCEPTED BY LESSOR*****

**** AS A CONDITION PRECEDENT TO THIS LEASE TO PURCHASE, PURCHASER MUST AGREE TO LEASE THE PURCHASED EQUIPMENT TO LESSOR'S MOTOR CARRIER FOR A MINIMUM OF ONE YEAR BEFORE ANY BUY-OUT OF THE LEASE TO PURCHASE CAN BE INITIATED *****

Doc ID: 611b216988319ab2cfa33d3a599203f38065ff4b

*****TITLE TRANSFER TO TAKE PLACE NO LATER THAN 45 DAYS FROM FINAL PAYOUT OF ALL SUMS DUE UNDER THE LEASE TO PURCHASE AND THE ATTACHED EQUIPMENT LEASE AGREEMENT. LESSOR MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO LEASED EQUIPMENT.*****

*DISCLAIMER: NO TITLE TRANSFER SHALL OCCUR UNTIL THE LESSEE SATISFIES ALL OBLIGATIONS AND OUTSTANDING BALANCES OWED TO LESSOR, SUCH AS BUT NOT LIMITED TO, MAINTENANCE REPAIRS, TOLL VIOLATIONS, ETC.*

_____

MANAGER SIGNATURE                    LESSEE / LESSEE SIGNATURE

Kyle Jordan Smith ( MARY LOIS CHARITIES )

ALEKSANDRA ZIVIC                     _____

MANAGER PRINTED NAME                 LESSEE / LESSEE PRINTED NAME


IN THE STATE OF ILLINOIS:

COUNTY OF DU PAGE:


The above-referenced parties, personally present before me, did set their hands and seals to the foregoing document this _____ day of _____ at Bensenville, Illinois.


_____(SEAL)

Notary Public, State of Illinois

My Keaton Commission Expires:\_\_/_____/\_\_\_\_\_

Doc ID: 611b216988319ab2cfa33d3a599203f38065ff4b

# TRAILER EQUIPMENT LEASE TO PURCHASE AGREEMENT

This **EQUIPMENT LEASE AGREEMENT** is hereby entered on this 20th day of
February____,2025 between_____MARY LOIS CHARITIES_____SS#/FEIN: 88-2250418_____

("Lessee") and  REX TRUCKING INC , a LIMITED  LIABILITY  COMPANY , a CORPORATION organized under the laws of the State of Illinois ("Lessor").  Lessor and Lessee shall collectively be known herein as "the Parties".

**WITNESSETH:**

**WHEREAS,** Lessor leases to the Lessee and the Lessee leases from the Lessor, the exclusive use of the Equipment described below for the Term of this Lease.

**WHEREFORE,** for good consideration and mutual promises, the Parties, intending to be legally bound hereby, agree and contract as follows:

**Leased Equipment:**

Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the following described equipment (the "Leased Equipment"):
Year: 2025____  Make: ____VANGUARD_____VIN# 5V8VC5324SM509105_____

**Lease Terms:**

This lease agreement shall be for a term of _____ months or _182_____weeks, commencing on 02 /20 /2025. Lessee's obligation to pay the Lease Payments and other Lease obligations is absolute and unconditional and is not subject to cancellation (except as provided below), reduction, setoff or counterclaim. This Lease shall continue until all Monthly Payments have been made whether or not Lessee retains possession of the Equipment.

**Purchase Option: $1.00** at the end of the Lease Term provided that Lessee is not in default.

**Lease Payments:**

Lease payments shall be $ 300_____ per __month or ✔week. The initial down payment due upon execution is $ 0_____ (if applicable). Under this lease agreement a total of _____monthly or _182_ weekly payments in the amount of $ 300_____ shall be due to Lessor from Lessee. After the first monthly payment Lessee shall continue making lease payments every _____month or __✔___week with payment due on the same day of each subsequent month or week as the first payment.

**Lessor's Direction for Delivery of Lease Payments:**

Lessee shall pay to Lessor all payments by way of automatic deduction from weekly revenue statement. If, in any week, Lessee does not work, the payment for that week shall still be due, creating a negative statement balance that shall be deducted on the next revenue statement following the negative week. The Lessee will be notified by written notice if the Lessor makes any changes to the payment method.
**Exclusivity:**

Doc ID: 611b216988319ab2cfa33d3a599203f38065ff4b

During the Lease period and until all payments have been satisfied under this agreement or at Lessee's termination of the agreement, the Lessee is obligated to exclusively haul loads for the Lessor's Motor Carrier. Failure to do so will result in a breach of this agreement.

**Delivery & Acceptance:**

Lessee agrees to accept the Equipment on or after _02_ / _20_ /2025. Lessee is responsible for the inspection of the Equipment prior to its use. By using the Equipment, Lessee acknowledges that it has inspected the Equipment, that it is in good operating order and fit for Lessee's intended use and that the Equipment operates to the satisfaction of the Lessee.

**Payment Terms for Leased Equipment:**

Lessee agrees to make payments to Lessor for the equipment under the terms of this agreement as stated previously. Should Lessor have to make any repairs to the unit, based on Lessee's failure to do so, those sums will be deducted from Lessee's revenue statements or be deducted from any sums held by the Motor Carrier after termination of the Lease Agreement (by Lessor or Lessee) or at Pay-Off of the Leased Equipment.

**GPS Tracking:**

Lessee agrees that during the Lease Term, Lessor may install a GPS Tracking device on the Equipment. The Lessee is prohibited from removing/altering the GPS Tracking device and will comply with all company policies regarding such device.

**Drivers and Restrictions on Use:**

Lessee and Lessor agree that the Lessor has an interest in protecting its interest in the Equipment by ensuring that the Lessee engages in the safe operation of the Equipment and in ensuring that Lessee performs regular and adequate State and Federally-mandated maintenance of the Equipment. Lessee shall not use the Equipment in violation of any Federal, State, or local statutes, laws, ordinances, rules or regulations, or contrary to the provisions of any applicable insurance policy, including, but not limited to, Department of Transportation Hours of Service Regulations, and Vehicle Inspection and Maintenance Regulations. Any violations of Federal, State or local statutes by Lessee including, but not limited to, Department of Transportation Hours of Service Regulations, and Vehicle Inspection and Maintenance Regulations shall constitute a material breach of this Lease. Lessee's use of the Equipment shall comply with all insurance requirements, all applicable laws and regulations concerning the maintenance and operation of such Equipment in interstate commerce and all applicable manufacturer recommendations concerning the maintenance and operation of the Equipment. Lessee agrees to have all manufacturer service bulletins and recalls performed on the Equipment during the term of the Lease and bear all expenses related thereto. Lessee agrees that Lessee will not materially alter or modify the Equipment during the Lease period without prior written notice to and written approval from the Lessor.

**Repairs:**

Lessee is required, at Lessee's own cost and expense, to keep the Equipment in good repair, condition and working order, except for ordinary wear and tear, and Lessee will supply and bear the expense of all parts and labor required to keep the Equipment in good repair and condition. All replacement parts used or installed and repairs made to the Equipment will become Lessor's property. All replacement parts used or

Doc ID: 611b216988319ab2cfa33d3a599203f38065ff4b

installed and repairs made to the Equipment shall be of the same type and quality as those furnished by Lessor. If the Equipment is covered by a manufacturer warranty at the time of the execution of this agreement, only then will the Lessee not be responsible for the repairs, parts, mechanisms or devices installed on the Equipment that are covered under the warranty. The Lessee is responsible for amounts due above and beyond the warranty coverage. Should Lessor have to make any repairs to the Equipment based on Lessee's failure to do so, those sums will be deducted from Lessee's revenue statements or from any sums held by the Motor Carrier at termination of the Lease Agreement by either party or at the Pay-Off of the Leased Equipment.

LESSEE ACKNOWLEDGES THAT LESSOR IS NOT RESPONSIBLE FOR PROVIDING ANY REQUIRED MAINTENANCE AND/OR REPAIRS FOR THE EQUIPMENT DURING THE TERM OF THE LEASE.

**Warranty:**

Lessor is leasing the Equipment to Lessee "AS - IS" and Lessee acknowledges that Lessor is not the manufacturer of the Equipment or an agent of the manufacturer of the Equipment. LESSOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR TITLE. IN NO EVENT SHALL LESSOR HAVE ANY LIABILITY FOR NOR SHALL LESSEE HAVE A CLAIM OR REMEDY AGAINST LESSOR FOR CONSEQUENTIAL, SPECIAL, INCIDENTAL, OR PUNTIVE DAMAGES, OR FOR ANY LOSS OF PROFITS OR SAVINGS, LOSS OF USE OR ANY OTHER COMMERCIAL OR ECONOMIC LOSS. Lessor is not responsible for any repairs to or the performance of the Equipment or for any maintenance or service to the Equipment. If a warranty exists from the manufacturer of the Leased Equipment, Lessor shares its rights to said warranty with Lessee for the duration of the agreement.

**Loss and Damage:**

Lessee is solely responsible for all loss, destruction or damage to the Equipment and Lessee agrees to assume the risk of all such loss, destruction or damage to the Equipment. No such loss, destruction or damage to or loss of use of the Equipment shall relieve Lessee from any obligation under this Lease including, but not limited to, Lessee's continuing duty to make Lease payments. In the event of loss or damage to the equipment, Lessee shall, at the Lessor's discretion; (i) replace or repair the Equipment to the Lessor's acceptable satisfaction or (ii) pay the replacement cost of the Equipment to the Lessor.

**Insurance:**

If the vehicle/Lessee is involved in any "total loss" accident during the lease term, all amounts still due to Lessor shall be satisfied first. If there is any excess money after what is due to Lessor, the same shall be paid out to Lessee and the contract shall be terminated due to impossibility to complete any future performance of stated terms. If the vehicle/Lessee is involved in any accident which is less than a total loss, then Lessee shall pay any deductible due to the insurance company from Lessor, and Lessor shall fix the unit with any insurance monies paid. Lessor shall fix the unit so as to be in as good as condition as the unit was in prior to the loss, but shall not be obligated to fix the unit so as to add any additional value in the unit then what was previously the value. Lessee shall be required to pay $25.00 (more or less dependent on cost to Lessor) per week for Physical Damage on the unit though Lessor's insurer. The payment of the insurance is due together with the lease payment. Lessee may also retain additional insurance of their own however; they are required, at a minimum to pay

Doc ID: 611b216988319ab2cfa33d3a599203f38065ff4b

for and maintain a policy of Physical Damage through Lessor's insurer at the rate of $25.00 per week, which will be increased or decreased based on Lessor's cost in supplying said insurance.

Lessee grants to Lessor an irrevocable power of attorney to make claim for and receive and endorse all checks and other documents received as payment under such insurance policies. Lessee agrees that it shall comply with all the terms and conditions of its policies of insurance, including the immediate reporting of all accidents to the Lessor and Lessee's Insurer.

**Indemnity of Lessor against third-party claims:**

Lessor is not and shall not be responsible for any losses or injuries caused by the manufacture, acquisition, delivery, ownership, use, lease, possession, maintenance or operation of the Equipment or defects in the Equipment. Lessee agrees to indemnify and hold harmless the Lessor and any affiliated companies, including their owners, successors, heirs and assigns, directors, officers, agents, attorneys, employees, representatives, and insurers, jointly and severally, from and against any and all losses, costs, damages, claims or expense, including, without limitation, attorneys' fees, incurred by the Lessor and other indemnitees, or any of them, arising out of the manufacture, acquisition, delivery, ownership, use, lease, possession, maintenance or operation of the Equipment or defects in the Equipment. Lessee further agrees to indemnify Lessor and other indemnitees, or any of them, for any attorneys' fees expended in enforcement of this paragraph.

**Taxes and Fees:**

Lessee agrees to pay or ensure that the motor carrier under whose authority Lessee is leased pays all license and registration fees, sales and use taxes, personal property taxes and all other taxes and charges related to the ownership, leasing, rental, purchase, possession or use of the Equipment (except those based on Lessor's net income) in addition to the Monthly Payment as billed by Lessor to Lessee. Lessee agrees that if Lessor pays any taxes or charges on Lessee's behalf, Lessee will reimburse Lessor for all such payments and will pay Lessor 18% interest or at the maximum rate legally allowable and a late charge on such payments with the next Monthly Payment, plus such reasonable costs incurred in collecting and administering any taxes, assessments or fees and remitting them to the appropriate authorities.

**Purchase Option & Surrender:**

Effective at the end of the Lease Term, provided that the Lessee is not in Default under this Agreement, Lessee shall have the option to purchase the Equipment for $1.00. Lessee shall provide written notice of its election to purchase the Equipment no later than the last day of the Lease Term. In the event Lessee does not elect to purchase the Equipment on or before the last day of the Lease Term or in the event Lessee is in Default at the end of the Lease Term, Lessee shall return the Equipment to Lessor at the location designated by Lessor, freight prepaid, in as good condition as when the Equipment was received by Lessee, less ordinary wear and tear. If Lessee elects to terminate the lease (or stop hauling for Lessor's Motor Carrier) then Lessee shall have the option to purchase the Equipment, out right, for the full amount then due under the Lease, plus any amounts still due to the Lessor's Motor Carrier as a result of the previous hauling contracts (including, but not limited to, advances, efs, fuel, IFTA, toll violations) within fifteen (15) working days. Only CERTIFIED FUNDS for the "buy-out" will be acceptable.

In any event, whenever the Equipment is returned to Lessor under this Agreement for any reason, the Equipment shall be in a condition compliant with all Department of Transportation guidelines and requirements and in a condition under which it may be safely and legally operated on the public

Doc ID: 611b216988319ab2cfa33d3a599203f38065ff4b

highways. Lessee shall return the Equipment at the location specified by the Lessor, and agrees to be solely responsible for paying the parts and labor costs for any and all repairs or replacement of parts necessary to restore the Equipment to the condition in which the Equipment was provided to Lessee.

At the time of early termination, all payments made towards the purchase shall be converted to "rental payments" and shall be retained, in full, by Lessor. If Lessor must arrange to repossess the equipment, the cost of repossession shall be paid by the Lessee.

### Default:

Lessee shall be in default of this Lease in the event any of the following occurs; (a) Lessee fail to make any Monthly payment or other payment when due; (b) Lessee breaches any obligation under this Lease, or any other agreement with Lessor; (c) Lessee or any guarantor dies; (d) Lessee becomes insolvent or unable to pay Lessee's debts when due; (e) Lessee stops doing business as a going concern; (f) Lessee transfers all or substantially all of Lessee's assets; (g) Lessee makes an assignment for the benefit of creditors; (h) Lessee or a guarantor voluntarily files for bankruptcy or has bankruptcy involuntarily filed against Lessee; (i) a trustee, receiver, or liquidator is appointed for Lessee or a guarantor; or (j) Lessee violates any Federal, State or local law or regulation governing the operation of the Equipment including, but not limited to, Department of Transportation Hours of Service Regulations, and Vehicle Inspection and Maintenance Regulations. Lessor reserves the right to terminate this Agreement if Lessee violates any provision or if Lessor has reasonable belief that Lessee is hauling loads for other carriers.

### Remedies:

If Lessee fails to make any payment or violates any provision of this agreement, the Lessor may, but is not required to give written notice to the breaching party. The Leese shall have (10) days from the receipt of notice to cure the default (Cure Period). In the event that the default is not cured, the Lessor shall then have the right to exercise any one or more of the following remedies: (1) Lessor may declare the entire balance of the unpaid Monthly Payments for the full term and all other amounts then due immediately due and payable; (2) Lessor may sue for and receive all Monthly Payments and other payments then accrued or accelerated under this Lease, including but not limited to late fees, expenses and other charges. All accelerated Monthly Payments shall accrue interest at a rate of eighteen percent (18%) per year; (3) Lessor may terminate the Lease; (4) Lessor may require Lessee to return the Equipment to Lessor and, in the event Lessee fails to return the Equipment, Lessor may enter upon Lessee's premises peaceably with or without legal process where the Equipment is located and repossess the Equipment. Such return or repossession of the Equipment will not constitute a termination of this Lease unless Lessor expressly notifies Lessee of such in writing. Lessee shall continue to be liable for the contractual lease payments due under this agreement. In the event the Equipment is returned to Lessor or repossessed by Lessor and, unless Lessor has terminated this Lease, Lessor may sell or re-lease the Equipment to any persons upon any terms Lessor may choose in its sole discretion, with or without notice to Lessee. Should Lessor elect to repossess the Leased Equipment, Lessee shall be liable to Lessor for all costs and expenses associated with such repossession; or (5) Lessor may set-off the funds due to Lessor under this Lease against any amounts owed by Lessor to Lessee or held by Lessor for the benefit of Lessee including, but not limited to, amounts held by Lessor in escrow and amounts held by Lessor as security deposit under this Lease.

Doc ID: 611b216988319ab2cfa33d3a599203f38065ff4b

**Acceleration:**

A. **Acceleration of Lease Payments.** Should Lessee be in default, fail to cure the default prior to expiration of the Cure Period, and Lessor take possession of the Leased Equipment prior to expiration of the Lease Term (or has made a written demand upon Lessee for return of the Leased Equipment for which Lessee failed to comply with), all payments due to Lessor during the life of this equipment lease agreement shall be accelerated, thus becoming immediately due and payable by Lessee to Lessor as of the date of expiration of the Cure Period. This shall be known as the "Acceleration Clause."

B. **Present Value Discount of Accelerated Lease Payments.** Should the Acceleration Clause apply, the amount payable by Lessee under the Acceleration Clause shall be discounted from the future due date of the lease payment (as originally required under the Lease Agreement) to the present value at the date of collection by Lessor using a discount rate of 8%.

C. **Re-Lease or Sale of Leased Equipment after Repossession.** Should Lessor find a new lessee or buyer of the Leased Equipment prior the expiration of the Lease Term, any payments received from the new lessee or buyer during the Lease Term shall be first netted against Lessor's expenses incurred effecting the rental or sale of the Lease Equipment, and then offset against amounts owed by Lessee to Lessor under this equipment Lease Agreement. Should the amount collected by Lessor from any new lessee or buyer of the Leased Equipment (after net of releasing orsales expenses) exceed the amount then owed by Lessee to Lessor, the excess (if any shall be refunded to Lessee. Any amounts received by Lessor through re-lease or sale of the Leased Equipment **after** expiration of the Lease Term shall not be offset against amounts owed by Lessee to Lessor under this lease agreement and shall not otherwise be refunded to Lessee.

**Attorney Fees and Expenses:**

Lessee agrees to pay all expenses incurred by Lessor in connection with the enforcement of any remedies under this Lease, including but not limited to, expenses of repossessing, storing, shipping, repairing and selling the Equipment and attorneys' fees.

**Joint and Several Liabilities:**

If there is more than one Lessee, (or if the Lessee is a Corporation) all lessees hereby agree to be jointly and severally liable for any breach of the terms of this agreement. The Lessee understands that they are obligated both personally and through their company for the faithful performance of all covenants of this agreement.

**Bankruptcy:**

Neither this Lease, nor any interest therein, is assignable or transferable by operation of law. If any proceeding under the Bankruptcy Act, as amended, is commenced by or against the Lessee, or if the Lessee is adjudged insolvent, or if Lessee makes any assignment for the benefit of his creditors, or if a writ of attachment or execution is levied on the Equipment and is not released or satisfied within ten ( 10 ) days thereafter, or if a receiver is appointed in any proceeding or action to which the Lessee is a party with authority to take possession or control of the Equipment, Lessor may exercise any one or more of the remedies mentioned previously. If Lessor elects to terminate the agreement, this Lease shall not be treated as an asset of Lessee.

**Assignment:**

Lessee agrees that Lessee shall not transfer, sell, sublease, assign, pledge or encumber either the Equipment or any rights under this Lease without the prior written consent of the Lessor. Lessee is to retain possession of the Leased Equipment at all times during this agreement except upon demand of surrender by Lessor or repossession by Lessor. Lessor shall have the unilateral right to assign its interest in this lease to a third-party.

**Additional Documents:**

Lessee shall provide at the request of Lessor any and all documents necessary for the purpose of recording and filing to protect the interest of the Lessor in the Equipment. These documents may include a USS financial statement.

**Ownership:**

During the Lease Term, the Lessor owns and retains title to the Equipment and Lessee has the right to use the Equipment for the full Lease term provided Lessee complies with all of the terms and conditions of this Lease. Lessee agrees not to permit a lien of any kind to be placed on the Equipment. In the event Lessee permits a lien to be placed on the Equipment, such will constitute a breach of the Lease and Lessee agrees that Lessor may, but is not required to, satisfy the lien in Lessor's own discretion and Lessee shall be responsible for compensating the Lessor for any payments so made.

**Hazmat And Telematics Language:**

Lessee further agrees that throughout the term of this Agreement (a) it will not permit the Property to be used for the transportation of passengers or for the digging, hauling, loading, storing or transporting of material designated as hazardous, radioactive, toxic, flammable, explosive or environmentally hazardous, unsafe or dangerous under any federal, state or local law or rule; and (b) it will not interfere with the operation of any telematics system in any Property; and that Assignee may monitor or access the Property's utilization, location and other information or reports contained in or generated by any such telematics system to ensure compliance with any Agreement related to the Property; or for any other lawful purpose; and may use any telematics system or information generated by the telematics system to locate the Property.

**Notices:**

All notices, demands and communications required or desired to be given in connection with this Lease shall be in writing and shall be deemed to have been duly given on the date received if delivered personally, by courier service, or by electronic means or, if mailed, on the third day after mailing upon the party shown below.

**Integration:**

This Agreement sets forth the entire understanding of the parties hereto and supersedes all prior agreements, whether oral or written, pertaining to the subject matter hereof. This is an integrated agreement.

Doc ID: 611b216988319ab2cfa33d3a599203f38065ff4b

**Severability:**

In the event any of the terms of this Lease are determined to be invalid or unenforceable, no other terms shall be affected and the unaffected terms shall remain valid and enforceable as written. The representations, rights and obligations of the parties hereunder, including but not limited to Lessor's right to recover Lease Payments shall survive termination of this Lease for any reason.

**Removal of Logos and Signs**

Unless otherwise agreed, the Lessee is prohibited from removing, altering, or destroying any logos or signs from any equipment belonging to the Lessor. This includes but is not limited to the Lessor logos placed on trailers or on the side of the trucks. Violation of this clause constitutes a breach of this agreement, and the Lessee will be responsible for the replacement cost of any damaged or altered company logo or sign.

**Non-Waiver:**

Neither the failure of Lessor to exercise any right, power or privilege under this Lease, nor its delay in any such exercise, shall operate as a waiver of that right, power or privilege.

**Non-Disparagement:**

The Lessee acknowledges and agrees that the Lessee will not defame or criticize the services, business, integrity, veracity, or personal or professional reputation of the Lessor or any of its directors, officers, employees, affiliates, or agents of any of the foregoing in either a professional or personal manner either during the term of this agreement or thereafter.

**Modification:**

No provision of the Agreement may be modified, except by a writing duly signed and acknowledged by each of the parties hereto. Lessee agrees, however, that Lessor is authorized to supply missing information or correct obvious errors in this Lease.

**Acknowledgement And Subordination Language:**

Lessee acknowledges and agrees that all of its rights under the Lease Agreement with Lessor in and to the Property, including Lessee's right to possession of the property, are subordinate, junior and subject to the rights and claims of any assignee of Lessor ("Assignee") against the Property under any financing documents or security agreement, whether now existing or hereafter created, including but not limited to the right of Assignee to take possession of the Property. Lessee consents and agrees to the assignment of (i) all monies due or to become due to Lessor under the Lease Agreement and (ii) all right and privileges of Lessor under the Lease Agreement. Lessee promises and agrees to settle all claims against Lessor directly with Lessor and hereby waives, relinquishes and disclaims as to Assignee all counterclaims, rights of set-off, and defenses Lessee may have against Lessor, including any right to withhold payments of or refrain from paying, any monies that are due to become due under the terms of the Lease Agreement; except that Lessee shall not be liable to Assignee for monies paid to Lessor prior to the time Assignee notifies lessee to pay Assignee directly.

Doc ID: 611b216988319ab2cfa33d3a599203f38065ff4b

**Venue and Personal Jurisdiction:**

Lessee consents to and agree that the Courts located in the State of Illinois shall have personal jurisdiction over Lessee. Lessee agrees that venue for any action related to the Equipment or any action interpreting or enforcing any of the terms of this Lease shall lie solely in the State and Federal Courts located in DuPage and/or Cook Counties in the State of Illinois.

**Choice of Law:**

This Agreement shall be constructed under the laws of the State of Illinois.

**IN WITHESS WHEROF**, and acknowledging acceptance and agreement to the foregoing. **LESSOR** and **LESSEE** affix their signature hereto as of the date written on page 1 hereof:

**MANAGER**                                                  **LESSEE**

..............................                               ..............................

Authorized representative                                    **Owner/Operator**
**REX TRUCKING INC**
                                                             2950 E north st apt 600L
                                                             Address: _____
                                                             Greenville, SC
                                                             City/State: _____
                                                             912-915-1256
                                                             Phone#: _____
                                                             88-2250418
                                                             SS# or FEIN#: _____

In the State of Illinois:
County of Du Page:

The above parties, personally present before me, did set their hands and seals to the foregoing document this _____ day of _____ 20____ at Bensenville, Illinois.

_____     (SEAL)
Notary Public, State of Illinois
My Commission Expires: ___/___/_____

02 / 20 / 2025

**≭ Dropbox** Sign

Audit trail

| | |
|---|---|
| Title | Lease to purchase for trailer-Kyle Jordan Smith ( MARY LOIS... |
| File name | Lease_to_purchase_trailer.pdf |
| Document ID | 611b216988319ab2cfa33d3a599203f38065ff4b |
| Audit trail date format | MM / DD / YYYY |
| Status | Signed |

## Document History

| | | |
|---|---|---|
| SENT | 02 / 21 / 2025 00:05:37 UTC | Sent for signature to Kyle Jordan Smith ( MARY LOIS CHARITIES ) (smithkyle914@gmail.com) from bos@floydlogistics.com IP: 91.150.68.254 |
| VIEWED | 02 / 21 / 2025 03:12:44 UTC | Viewed by Kyle Jordan Smith ( MARY LOIS CHARITIES ) (smithkyle914@gmail.com) IP: 172.59.226.96 |
| SIGNED | 02 / 21 / 2025 03:18:10 UTC | Signed by Kyle Jordan Smith ( MARY LOIS CHARITIES ) (smithkyle914@gmail.com) IP: 172.59.226.96 |
| COMPLETED | 02 / 21 / 2025 03:18:10 UTC | The document has been completed. |

Powered by **≭ Dropbox** Sign

# LEASE TO PURCHASE

Entered into this __23rd__ day of __October__ , 2024 at Bensenville, Illinois between:

**LESSOR:**

Lessor Name: REX TRUCKING INC

Lessor Address: 205 W. Grand Ave., Suite 123

City/State/Zip: Bensenville, IL 60106

AND

**LESSEE:**          MARY LOIS CHARITIES

Lessee Name :_____

2950 E NORTH ST APT 600L

Address: _____

City/State/: __GREENVILLE, SC 29615__

**EQUIPMENT:**

Year: __2023__

Make: __Kenworth__

Model:

VIN# __1XKYDP9X6PJ238668__

**PRICE:**

Lease Price: $ __124,800.00__

Down Payment:$ __0__          (if applicable)

Payments: $ __600__

Total # of Payments:__208__

Manufacturer Warranty Included (where applicable, limited to the manufacturer specifications regarding milage and/or years)

**** PLEASE NOTE, IF ANY REQUIRED DOWN PAYMENT IS NOT MADE  AFTER THE LEASE TO PURCHASE AGREEMENT IS  EXECUTED, THE LEASE TO PURCHASE WILL BE AMENDED TO DECLARE ZERO DOWN PAYMENT, AND NO DOWN PAYMENT WILL BE ACCEPTED BY LESSOR*****

**** AS A CONDITION PRECEDENT TO THIS LEASE TO PURCHASE, PURCHASER MUST AGREE TO LEASE THE PURCHASED EQUIPMENT TO LESSOR'S MOTOR CARRIER FOR A MINIMUM OF ONE YEAR BEFORE ANY BUY-OUT OF THE LEASE TO PURCHASE CAN BE INITIATED *****

Doc ID: 180fe6198ddda40fa443c2cd10d77c2f5dc19b72

*****TITLE TRANSFER TO TAKE PLACE NO LATER THAN 45 DAYS FROM FINAL PAYOUT OF ALL SUMS DUE UNDER THE LEASE TO PURCHASE AND THE ATTACHED EQUIPMENT LEASE AGREEMENT. LESSOR MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO LEASED EQUIPMENT.*****

DISCLAIMER: NO TITLE TRANSFER SHALL OCCUR UNTIL THE LESSEE SATISFIES ALL OBLIGATIONS AND OUTSTANDING BALANCES OWED TO LESSOR, SUCH AS BUT NOT LIMITED TO, MAINTENANCE REPAIRS, TOLL VIOLATIONS, ETC.

_____

MANAGER SIGNATURE                    LESSEE / LESSEE SIGNATURE

                                     Kyle Jordan Smith ( MARY LOIS
                                     CHARITIES )
                                     _____

ALEKSANDRA ZIVIC                     LESSEE / LESSEE PRINTED NAME
MANAGER PRINTED NAME

IN THE STATE OF ILLINOIS:

COUNTY OF DU PAGE:

The above-referenced parties, personally present before me, did set their hands and seals to the foregoing document this _____ day of _____ at Bensenville, Illinois.

_____(SEAL)

Notary Public, State of Illinois

My Keaton Commission Expires:__/_____/____

Doc ID: 180fe6198ddda40fa443c2cd10d77c2f5dc19b72

# EQUIPMENT LEASE TO PURCHASE AGREEMENT

This **EQUIPMENT LEASE AGREEMENT** is hereby entered on this 23rd day of October ____,2024 between_____MARY LOIS CHARITIES_____SS#/FEIN: 88-2250418_____ ("Lessee") and REX TRUCKING INC, a CORPORATION organized under the laws of the State of Illinois ("Lessor"). Lessor and Lessee shall collectively be known here in as "the Parties".

**WITNESSETH:**

**WHEREAS,** Lessor leases to the Lessee and the Lessee leases from the Lessor, the exclusive use of the Equipment described below for the Term of this Lease.

**WHEREFORE,** for good consideration and mutual promises, the Parties, intending to be legally bound hereby, agree and contract as follows:

**Leased Equipment:**

Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the following described equipment (the "Leased Equipment"): VIN# 1XKYDP9X6PJ238668_____

Year: 2023_____ Make: Kenworth_____

**Lease Terms:**

This lease agreement shall be for a term of _____ months or 208_____ weeks, commencing on 10 / 23 /2024. Lessee's obligation to pay the Lease Payments and other Lease obligations is absolute and unconditional and is not subject to cancellation (except as provided below), reduction, setoff or counterclaim. This Lease shall continue until all Monthly Payments have been made whether or not Lessee retains possession of the Equipment.

**Purchase Option:** $1.00 at the end of the Lease Term provided that Lessee is not in default.

**Lease Payments:**

Lease payments shall be $ 600_____ per __month or ✔week. The initial down payment due upon execution is $0_____ (if applicable). Under this lease agreement a total of _____ monthly or 208_ weekly payments in the amount of $ 600_____ shall be due to Lessor from Lessee. After the first monthly payment Lessee shall continue making lease payments every _____month or ✔week with payment due on the same day of each subsequent month or week as the first payment. The initial down payment is non-refundable in case this agreement is terminated for any reason.

**Lessor's Direction for Delivery of Lease Payments:**

Lessee shall pay to Lessor all payments by the way of ACH or Wire Transfer. If, in a week, for any reason whatsoever, including but not limited to, breakdown, disrepair or accident, Lessee shall not work, the payment for that week shall still be due. Lessor may hereafter change this direction to Lessee for delivery of lease payments by serving Lessee with written notice containing new payment instructions.

**Exclusivity:**

During the Lease period and until all payments have been satisfied under this agreement or at Lessee's termination of the agreement, the Lessee is obligated to exclusively haul loads for the Lessor's Motor Carrier. Failure to do so will result in a breach of this agreement.

**Delivery & Acceptance:**

Lessee agrees to accept the Equipment on or after 10 / 23 /2024. Lessee is responsible for the inspection of the Equipment prior to its use. By using the Equipment, Lessee acknowledges that it has inspected the Equipment, that it is in good operating order and fit for Lessee's intended use and that the Equipment operates to the satisfaction of the Lessee.

**Payment Terms for Leased Equipment:**

Lessee agrees to make payments to Lessor for the equipment under the terms of this agreement as stated previously. Should Lessor have to make any repairs to the unit, based on Lessee's failure to do so, those sums will be deducted from Lessee's revenue statements or be deducted from any sums held by the Motor Carrier at termination of the Lease Agreement (by Lessor or Lessee) or at Pay-Off of the Leased Equipment.

**Drivers and Restrictions on Use:**

Lessee and Lessor agree that the Lessor has an interest in protecting its interest in the Equipment by ensuring that the Lessee engages in the safe operation of the Equipment and in ensuring that Lessee performs regular and adequate State and Federally-mandated maintenance of the Equipment. Lessee shall not use the Equipment in violation of any Federal, State, or local statutes, laws, ordinances, rules or regulations, or contrary to the provisions of any applicable insurance policy, including, but not limited to, Department of Transportation Hours of Service Regulations, and Vehicle Inspection and Maintenance Regulations. Any violations of Federal, State or local statutes by Lessee including, but not limited to, Department of Transportation Hours of Service Regulations, and Vehicle Inspection and Maintenance Regulations shall constitute a material breach of this Lease. Lessee's use of the Equipment shall comply with all insurance requirements, all applicable laws and regulations concerning the maintenance and operation of such Equipment in interstate commerce and all applicable manufacturer recommendations concerning the maintenance and operation of the Equipment. Lessee agrees to have all manufacturer service bulletins and recalls performed on the Equipment during the term of the Lease and bear all expenses related thereto. Lessee agrees that Lessee will not materially alter or modify the Equipment during the Lease period without prior written notice to and written approval from the Lessor.

**Removal of Logos and Signs**

Unless otherwise agreed, the Lessee is prohibited from removing, altering, or destroying any logos or signs from any equipment belonging to the Lessor. This includes but is not limited to the Lessor logos placed on trailers or on the side of the trucks. Violation of this clause constitutes a breach of this agreement, and the Lessee will be responsible for the replacement cost of any damaged or altered company logo or sign.

**Repairs and Maintenance:**

Doc ID: 180fe6198ddda40fa443c2cd10d77c2f5dc19b72

Lessee is required, at Lessee's own cost and expense, to keep the Equipment in good repair, condition and working order, except for ordinary wear and tear, and Lessee will supply and bear the expense of all parts and labor required to keep the Equipment in good repair and condition. All replacement parts used or installed and repairs made to the Equipment will become Lessor's property. All replacement parts used or installed and repairs made to the Equipment shall be of the same type and quality as those furnished by Lessor. If the Equipment is covered by a manufacturer warranty at the time of the execution of this agreement, only then will the Lessee not be responsible for the repairs, parts, mechanisms or devices installed on the Equipment that are covered under the warranty. The Lessee is responsible for amounts due above and beyond the warranty coverage. Should Lessor have to make any repairs to the Equipment based on Lessee's failure to do so, those sums will be deducted from Lessee's revenue statements or from any sums held by the Motor Carrier at termination of the Lease Agreement by either party or at the Pay-Off of the Leased Equipment.

LESSEE ACKNOWLEDGES THAT LESSOR IS NOT RESPONSIBLE FOR PROVIDING ANY REQUIRED MAINTENANCE AND/OR REPAIRS FOR THE EQUIPMENT DURING THE TERM OF THE LEASE.

All Truck Leases require that the Lessee change the oil on said unit every 35,000 miles with Rotella T5 10W30 Semi Synthetic oil or Delvac Mobil 10W30. Each oil change shall be done at either TA, Loves, Speedco, Pilot or the dealership, no exceptions. We cannot accept paid receipts/invoices from any shop other than the ones listed. Any Lessee that performs work outside of the approved shops, or that performs the required oil change may be held accountable for any loss or unnecessary wear on the components of the unit, and any cost to repair or replace parts due to bad oil quality or oil changes made at unauthorized shops will be the full and total cost of Lessee and shall be due and payable, on demand, at Lessor's election. Furthermore, repeated oil changes made not using the listed oil, or done at the listed shops, may be cause for termination of the Lease whereby all remedies afforded to and available to Lessor may be executed and/or any sums due and owing to Lessee may be forfeited for failure to adhere to this provision.

### Warranty:

Lessor is leasing the Equipment to Lessee "AS - IS" and Lessee acknowledges that Lessor is not the manufacturer of the Equipment or an agent of the manufacturer of the Equipment. LESSOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR TITLE. IN NO EVENT SHALL LESSOR HAVE ANY LIABILITY FOR NOR SHALL LESSEE HAVE A CLAIM OR REMEDY AGAINST LESSOR FOR CONSEQUENTIAL, SPECIAL, INCIDENTAL, OR PUNTIVE DAMAGES, OR FOR ANY LOSS OF PROFITS OR SAVINGS, LOSS OF USE OR ANY OTHER COMMERCIAL OR ECONOMIC LOSS. Lessor is not responsible for any repairs to or the performance of the Equipment or for any maintenance or service to the Equipment. If a warranty exists from the manufacturer of the Leased Equipment, Lessor shares its rights to said warranty with Lessee for the duration of the agreement.

### Loss and Damage:

Lessee is solely responsible for all loss, destruction or damage to the Equipment and Lessee agrees to assume the risk of all such loss, destruction or damage to the Equipment. No such loss, destruction or damage to or loss of use of the Equipment shall relieve Lessee from any obligation under this Lease including, but not limited to, Lessee's continuing duty to make Lease payments. In the event of loss

or damage to the equipment, Lessee shall, at the Lessor's discretion; (i) replace or repair the Equipment to the Lessor's acceptable satisfaction or (ii) pay the replacement cost of the Equipment to the Lessor.

**Insurance:**

If the vehicle/Lessee is involved in any "total loss" accident during the lease term, all amounts still due to Lessor shall be satisfied first. If there is any excess money after what is due to Lessor, the same shall be paid out to Lessee and the contract shall be terminated due to impossibility to complete any future performance of stated terms. If the vehicle/Lessee is involved in any accident which is less than a total loss, then Lessee shall pay any deductible due to the insurance company from Lessor, and Lessor shall fix the unit with any insurance monies paid. Lessor shall fix the unit so as to be in as good as condition as the unit was in prior to the loss, but shall not be obligated to fix the unit so as to add any additional value in the unit then what was previously the value.

**Indemnity of Lessor against third-party claims:**

Lessor is not and shall not be responsible for any losses or injuries caused by the manufacture, acquisition, delivery, ownership, use, lease, possession, maintenance or operation of the Equipment or defects in the Equipment. Lessee agrees to indemnify and hold harmless the Lessor and any affiliated companies, including their owners, successors, heirs and assigns, directors, officers, agents, attorneys, employees, representatives, and insurers, jointly and severally, from and against any and all losses, costs, damages, claims or expense, including, without limitation, attorneys' fees, incurred by the Lessee and other indemnitees, or any of them, arising out of the manufacture, acquisition, delivery, ownership, use, lease, possession, maintenance or operation of the Equipment or defects in the Equipment. Lessee further agrees to indemnify Lessor and other indemnitees, or any of them, for any attorneys' fees expended in enforcement of this paragraph.

**Taxes and Fees:**

Lessee agrees to pay or ensure that the motor carrier under whose authority Lessee is leased pays all license and registration fees, sales and use taxes, personal property taxes and all other taxes and charges related to the ownership, leasing, rental, purchase, possession or use of the Equipment (except those based on Lessor's net income) in addition to the Monthly Payment as billed by Lessor to Lessee. Lessee agrees that if Lessor pays any taxes or charges on Lessee's behalf, Lessee will reimburse Lessor for all such payments and will pay Lessor 18% interest or at the maximum rate legally allowable and a late charge on such payments with the next Monthly Payment, plus such reasonable costs incurred in collecting and administering any taxes, assessments or fees and remitting them to the appropriate authorities.

**Purchase Option & Surrender:**

Effective at the end of the Lease Term, provided that the Lessee is not in Default under this Agreement, Lessee shall have the option to purchase the Equipment for $1.00. Lessee shall provide written notice of its election to purchase the Equipment no later than the last day of the Lease Term. In the event Lessee does not elect to purchase the Equipment on or before the last day of the Lease Term or in the event the Lessee is in Default of the agreement, Lessee shall return the Equipment to Lessor at the location designated by Lessor, freight prepaid, in as good condition as when the Equipment was received by Lessee, less ordinary wear and tear. The vehicle will be returned to the same location where it was picked up at or at the location designated by the Lessor.

In any event, whenever the Equipment is returned to Lessor under this Agreement for any reason, the Equipment shall be in a condition compliant with all Department of Transportation guidelines and requirements and in a condition under which it may be safely and legally operated on the public highways. Lessee shall return the Equipment at the location specified by the Lessor, and agrees to be solely responsible for paying the parts and labor costs for any and all repairs or replacement of parts necessary to restore the Equipment to the condition in which the Equipment was provided to Lessee.

At the time of early termination, all payments made towards the purchase shall be converted to "rental payments" and shall be retained, in full, by Lessor. If Lessor must arrange to repossess the equipment, the cost of repossession shall be paid by the Lessee.

## Default & Termination:

Lessee shall be in default of this Lease in the event any of the following occurs; (a) Lessee fail to make any Monthly payment or other payment when due; (b) Lessee breaches any obligation under this Lease, or any other agreement with Lessor; (c) Lessee or any guarantor dies; (d) Lessee becomes insolvent or unable to pay Lessee's debts when due; (e) Lessee stops doing business as a going concern; (f) Lessee transfers all or substantially all of Lessee's assets; (g) Lessee makes an assignment for the benefit of creditors; (h) Lessee or a guarantor voluntarily files for bankruptcy or has bankruptcy involuntarily filed against Lessee; (i) a trustee, receiver, or liquidator is appointed for Lessee or a guarantor; or (j) Lessee violates any Federal, State or local law or regulation governing the operation of the Equipment including, but not limited to, Department of Transportation Hours of Service Regulations, and Vehicle Inspection and Maintenance Regulations. If the Lessee is terminated for any reason by the Lessor or an affiliate company, the Lessor reserves the right to terminate this agreement and all payments made towards the vehicle will be converted into rental payments. Lessor reserves the right to terminate this Agreement if Lessee violates any provision or if Lessor has reasonable belief that Lessee is hauling loads for other carriers.

## Remedies:

If Lessee fails to make any payment or violates any provision of this agreement, the Lessor may, but is not required to give written notice to the breaching party. The Leese shall have (10) days from the receipt of notice to cure the default (Cure Period). In the event that the default is not cured, the Lessor shall then have the right to exercise any one or more of the following remedies: (1) Lessor may declare the entire balance of the unpaid Monthly Payments for the full term and all other amounts then due immediately due and payable; (2) Lessor may sue for and receive all Monthly Payments and other payments then accrued or accelerated under this Lease, including but not limited to late fees, expenses and other charges. All accelerated Monthly Payments shall accrue interest at a rate of eighteen percent (18%) per year; (3) Lessor may terminate the Lease; (4) Lessor may require Lessee to return the Equipment to Lessor and, in the event, Lessee fails to return the Equipment, Lessor may enter upon Lessee's premises peaceably with or without legal process where the Equipment is located and repossess the Equipment. Such return or repossession of the Equipment will not constitute a termination of this Lease unless Lessor expressly notifies Lessee of such in writing. Lessee shall continue to be liable for the contractual lease payments due under this agreement. In the event the Equipment is returned to Lessor or repossessed by Lessor and, unless Lessor has terminated this Lease, Lessor may sell or re-lease the Equipment to any persons upon any terms Lessor may choose in its sole discretion, with or without notice to Lessee. Should Lessor elect to repossess the Leased Equipment, Lessee shall be liable to Lessor for all costs and expenses associated with such repossession; or (5) Lessor may set-off the funds due to Lessor under this Lease against any amounts owed by Lessor to Lessee or held by Lessor for the benefit of Lessee including,

Doc ID: 180fe6198ddda40fa443c2cd10d77c2f5dc19b72

but not limited to, amounts held by Lessor in escrow and amounts held by Lessor as security deposit under this Lease. If the vehicle is repossessed by the Lessor for any reason, the Lessor may, but is not obligated to hold in storage for 10 days any personal items belonging to the Lessee.

**Acceleration:**

A. **Acceleration of Lease Payments.** Should Lessee be in default, fail to cure the default prior to expiration of the Cure Period, and Lessor take possession of the Leased Equipment prior to expiration of the Lease Term (or has made a written demand upon Lessee for return of the Leased Equipment for which Lessee failed to comply with), all payments due to Lessor during the life of this equipment lease agreement shall be accelerated, thus becoming immediately due and payable by Lessee to Lessor as of the date of expiration of the Cure Period. This shall be known as the "Acceleration Clause."

B. **Present Value Discount of Accelerated Lease Payments.** Should the Acceleration Clause apply, the amount payable by Lessee under the Acceleration Clause shall be discounted from the future due date of the lease payment (as originally required under the Lease Agreement) to the present value at the date of collection by Lessor using a discount rate of 8%.

C. **Re-Lease or Sale of Leased Equipment after Repossession.** Should Lessor find a new lessee or buyer of the Leased Equipment prior the expiration of the Lease Term, any payments received from the new lessee or buyer during the Lease Term shall be first netted against Lessor's expenses incurred effecting the rental or sale of the Lease Equipment, and then offset against amounts owed by Lessee to Lessor under this equipment Lease Agreement. Should the amount collected by Lessor from any new lessee or buyer of the Leased Equipment (after net of releasing or sales expenses) exceed the amount then owed by Lessee to Lessor, the excess (if any shall be refunded to Lessee. Any amounts received by Lessor through re-lease or sale of the Leased Equipment **after** expiration of the Lease Term shall not be offset against amounts owed by Lessee to Lessor under this lease agreement and shall not otherwise be refunded to Lessee.

**Attorney Fees and Expenses:**

Lessee agrees to pay all expenses incurred by Lessor in connection with the enforcement of any remedies under this Lease, including but not limited to, expenses of repossessing, storing, shipping, repairing and selling the Equipment and attorneys' fees.

**Joint and Several Liabilities:**

If there is more than one Lessee, (or if the Lessee is a Corporation) all lessees hereby agree to be jointly and severally liable for any breach of the terms of this agreement. The Lessee understands that they are obligated both personally and through their company for the faithful performance of all covenants of this agreement.

**Bankruptcy:**

Neither this Lease, nor any interest therein, is assignable or transferable by operation of law. If any proceeding under the Bankruptcy Act, as amended, is commenced by or against the Lessee, or if the Lessee is adjudged insolvent, or if Lessee makes any assignment for the benefit of his creditors, or if a writ of attachment or execution is levied on the Equipment and is not released or satisfied within ten ( 10 ) days thereafter, or if a receiver is appointed in any proceeding or action to which the Lessee is a party with authority to take possession or control of the Equipment, Lessor may exercise any one or more of the remedies mentioned previously. If Lessor elects to terminate the agreement, this Lease shall not be treated as an asset of Lessee.

Doc ID: 180fe6198ddda40fa443c2cd10d77c2f5dc19b72

**Ownership:**

During the Lease Term, the Lessor owns and retains title to the Equipment and Lessee has the right to use the Equipment for the full Lease term provided Lessee complies with all of the terms and conditions of this Lease. Lessee agrees not to permit a lien of any kind to be placed on the Equipment. In the event Lessee permits a lien to be placed on the Equipment, such will constitute a breach of the Lease and Lessee agrees that Lessor may, but is not required to, satisfy the lien in Lessor's own discretion and Lessee shall be responsible for compensating the Lessor for any payments so made.

**Assignment:**

Lessee agrees that Lessee shall not transfer, sell, sublease, assign, pledge or encumber either the Equipment or any rights under this Lease without the prior written consent of the Lessor. Lessee is to retain possession of the Leased Equipment at all times during this agreement except upon demand of surrender by Lessor or repossession by Lessor. Lessor shall have the unilateral right to assign its interest in this lease to a third-party.

**Acknowledgement And Subordination Language:**

Lessee acknowledges and agrees that all of its rights under the Lease Agreement with Lessor in and to the Property, including Lessee's right to possession of the property, are subordinate, junior and subject to the rights and claims of any assignee of Lessor ("Assignee") against the Property under any financing documents or security agreement, whether now existing or hereafter created,, including but not limited to the right of Assignee to take possession of the Property. Lessee consents and agrees to the assignment of (i) all monies due or to become due to Lessor under the Lease Agreement and (ii) all right and privileges of Lessor under the Lease Agreement. Lessee promises and agrees to settle all claims against Lessor directly with Lessor and hereby waives, relinquishes and disclaims as to Assignee all counterclaims, rights of set-off, and defenses Lessee may have against Lessor, including any right to withhold payments of or refrain from paying, any monies that are due to become due under the terms of the Lease Agreement; except that Lessee shall not be liable to Assignee for monies paid to Lessor prior to the time Assignee notifies lessee to pay Assignee directly.

**Hazmat And Telematics Language:**

Lessee further agrees that throughout the term of this Agreement (a) it will not permit the Property to be used for the transportation of passengers or for the digging, hauling, loading, storing or transporting of material designated as hazardous, radioactive, toxic, flammable, explosive or environmentally hazardous, unsafe or dangerous under any federal, state or local law or rule; and (b) it will not interfere with the operation of any telematics system in any Property; and that Assignee may monitor or access the Property's utilization, location and other information or reports contained in or generated by any such telematics system to ensure compliance with any Agreement related to the Property; or for any other lawful purpose; and may use any telematics system or information generated by the telematics system to locate the Property.

**Additional Documents:**

If Lessor shall so request, Lessee shall execute and deliver to Lessor such documents as Lessor shall deem necessary or desirable for purposes of recording or filing to protect the interest of Lessor in the Equipment including, but not limited to UCC financing statement.

Doc ID: 180fe6198ddda40fa443c2cd10d77c2f5dc19b72

**Notices:**

All notices, demands and communications required or desired to be given in connection with this Lease shall be in writing and shall be deemed to have been duly given on the date received if delivered personally, by courier service, or by electronic means or, if mailed, on the third day after mailing upon the party shown below.

**Integration:**

This Agreement sets forth the entire agreement between the Parties with regard to the subject matter hereof. All prior agreements, and covenants, express or implied, oral or written, with respect to the subject matter hereof, are hereby superseded by this agreement. This is an integrated agreement.

**Severability:**

In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provision of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

**Modification:**

Except as otherwise provided in this document, this Agreement may be modified, superseded, or voided *only* upon the written and signed Agreement of the Parties. Further, the physical destruction or loss of this document shall not be constructed as modification or termination of the agreement contained herein.

**Non-Disparagement**

The Lessee acknowledges and agrees that the Lessee will not defame or criticize the services, business, integrity, veracity, or personal or professional reputation of the Lessor or any of its directors, officers, employees, affiliates, or agents of any of the foregoing in either a professional or personal manner either during the term of this agreement or thereafter.

**Acknowledgments:**

Each party acknowledges that he or she had an adequate opportunity to read and study this Agreement, to consider it, and to consult with an attorney if he/she does so desire. Each party understands and acknowledges that this is a legally binding agreement and that they are entering into the same with full knowledge of all of the terms, conditions and covenants contained herein.

**Exclusive Jurisdiction for Suit:**

The parties entering into this agreement submit to personal jurisdiction in Du Page or Cook County, Illinois for adjudication or any disputes and/or claims between the parties under this agreement. Furthermore, the parties hereby agree that the courts of Du Page County or Cook County, Illinois (at Lessor's choice) shall have exclusive jurisdiction over any disputes between parties relative to this agreement, whether said dispute sounds in contract, tort, or other areas in the law.

Doc ID: 180fe6198ddda40fa443c2cd10d77c2f5dc19b72

**State Law:**

This Agreement shall be constructed under the laws of the State of Illinois.

**IN WITHESS WHEROF**, and acknowledging acceptance and agreement to the foregoing. **LESSOR** and **LESSEE** affix their signature hereto as of the date written on page 1 hereof:

**MANAGER**                                                  **LESSEE**

..............................                              ..............................

Authorized representative                                   **Owner/Operator**

**REX TRUCKING INC**

Address: 2950 e north st apt 600L

City/State: Greenville SC

Phone#: 912 915 1256

SS# or FEIN#: 88-2250418

In the State of Illinois:
County of Du Page:

The above parties, personally present before me, did set their hands and seals to the foregoing document this _____ day of _____ 20____ at Bensenville, Illinois.

_____    (SEAL)
Notary Public, State of Illinois
My Commission Expires: ___/___/_____

10 / 23 / 2024

Doc ID: 180fe6198ddda40fa443c2cd10d77c2f5dc19b72

Audit trail

**✖ Dropbox** Sign

| | |
|---|---|
| Title | Lease to purchase for truck without DDF - Kyle Jordan Smith... |
| File name | Lease to purchase...t DDF NEW NEW.pdf |
| Document ID | 180fe6198ddda40fa443c2cd10d77c2f5dc19b72 |
| Audit trail date format | MM / DD / YYYY |
| Status | ⠂ Signed |

Document History

| | | |
|---|---|---|
| ⟳ SENT | **10 / 23 / 2024** 13:29:15 UTC | Sent for signature to Kyle Jordan Smith ( MARY LOIS CHARITIES ) (smithkyle914@gmail.com) from bos@floydlogistics.com IP: 79.101.96.106 |
| ◉ VIEWED | **10 / 23 / 2024** 13:30:44 UTC | Viewed by Kyle Jordan Smith ( MARY LOIS CHARITIES ) (smithkyle914@gmail.com) IP: 172.56.200.43 |
| ✒ SIGNED | **10 / 23 / 2024** 13:37:20 UTC | Signed by Kyle Jordan Smith ( MARY LOIS CHARITIES ) (smithkyle914@gmail.com) IP: 172.56.200.43 |
| ⊘ COMPLETED | **10 / 23 / 2024** 13:37:20 UTC | The document has been completed. |

Powered by ✖ Dropbox Sign

# DRIVER INDEPENDENT CONTRACTOR APPLICATION

Date of Application  6/25/2025

Applicant Name  Kyle Jordan Smith

FEIN  882250418

SSN  108828608

*All companies listed as past Employers American trucks, Rocket Exp, & Crena all super EGO*

## Crena Transportation Services LLC
## 21 E State St, Suite 200, Columbus OH 43215

In compliance with Federal and State equal employment opportunities laws, qualified applicants are considered for all independent contractor positions without regard to race, color, religion, sex, national origin, age, marital status, veteran status, non-job-related disability, or any other protected group status.

## TO BE READ AND SIGNED BY APPLICANT

I authorize you to make such investigations and inquires of my personal, employment, financial or medial history and other related matters as may be necessary in arriving at an engagement decision. (Generally, inquiries regarding medical history will be made only if and after a conditional offer of engagement has been proposed.) I hereby release employers, schools, health care providers and other personal from all liability in responding to inquiries and releasing information in connection with my application.

In the event of engagement, I understand that false or misleading information given in my application or interview(s) may result in termination of my independent contractor agreement. I understand, also, that I am required to abide by all rules and regulations of the Company and DOT.

I understand that information I provide regarding current and/or previous employers may be used, and those employer(s) will be contacted, for the purpose of investigating my safety performance history as required by 49 CFR 391.23(d) and (e). I understand that I have the right to:

- Review information provided by previous employers,
- Have errors in the information corrected by previous employers and for those previous employers to re-send the corrected information to the Company and,
- Have a rebuttal statement attached to the alleged erroneous information, if the previous employer(s) and I cannot agree on the accuracy of the information.

Date  06 / 26 / 2025

Signature

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cd

# APPLICANT TO COMPLETE
(Answer all questions – please print)

Position(s) Applied for  Independent contractor

Last Name Smith          First Name Kyle          Middle Jordan          SSN 108828608

List your addresses for the past 3 years:

**Current Address**

Address 2950 E North ST APT 600L     City State Greenville, SC     Zip 29615     Phone 9129151256

**Previous Addresses**

Address_____ City State_____ Zip_____ How Long?_____

Address_____ City State_____ Zip_____ How Long?_____

Address_____ City State_____ Zip_____ How Long?_____

Address_____ City State_____ Zip_____ How Long?_____

Address_____ City State_____

Do you have the legal right to work in the United States?  ⦿ Yes  ○ No          Can you provide proof of age? ⦿ Yes  ○ No

Date of birth 12/22/1993          (Required for Commercial Drivers)          Where?_____

Have you worked for this company before?  ○ Yes  ⦿ No

Dates: From_____ To_____ Position_____

Reason for leaving _____          If not, how long since leaving last employment? 2020

Are you now employed?  ○ Yes  ⦿ No

Who referred you? No one          Name of bonding company _____

Have you ever been bonded? ○ Yes  ⦿ No
(Answer only if a job requirement)

Have you ever been convicted of a felony? ○ Yes  ⦿ No

If yes, please explain fully on a separate sheet of paper. Conviction of a crime is not an automatic bar to engagement-all circumstances will be considered.

Is there any reason you might be unable to perform the functions of the job for which you have applied (as described in the attached job description)? ○ Yes  ⦿ No

If yes, explain if you wish

Emergency Contacts :

Name : Eugene dyson          , Phone : 9147588298          , Relationship : Father

Name : Frances dyson          , Phone : 9149433310          , Relationship : Mother

Crena Transportation Services LLC

21 E State St, Suite 200, Columbus OH 43215

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cd

# EMPLOYMENT HISTORY

All driver applicants to drive in interstate commerce must provide the following information on all employers during the preceding 3 years. List complete mailing address, street number, city, state and zip code.

Applicants to drive a commercial motor vehicle* in intrastate or interstate commerce shall also provide an additional 7 years information on those employers for whom the applicant operated such vehicle. (NOTE: List employers in reverse order starting with the most recent. Add another sheet as necessary.)

**EMPLOYER**

**DATE**
From: 12/1/2019     To: 12/31/2020

Name AA Express inc
Address 1015 9th Ave                          Zip 57005
City Brandon          State SD
Contact Person Recruiting     Phone Number 8006583549
Position Held Independent contractor
Reason For Leaving Medical injury
Where you subject to FMCRs^ while employed? ⊙ Yes ○ No
Was your job designated as a safety-sensitive function in any DOT-regulated mode subject to the drug and alcohol testing requirements of 49 CFR Part 40? ⊙ Yes ○ No

**EMPLOYER**

**DATE**
From: 9/2/2018     To: 11/30/2019

Name JB hunt
Address 1200 new jersey avenue                Zip 20590
City Washington       State DC
Contact Person Recruiting     Phone Number 8777919458
Position Held Independent contractor
Reason For Leaving Mutual
Where you subject to FMCRs^ while employed? ⊙ Yes ○ No
Was your job designated as a safety-sensitive function in any DOT-regulated mode subject to the drug and alcohol testing requirements of 49 CFR Part 40? ⊙ Yes ○ No

**EMPLOYER**

**DATE**
From: 1/2/2017     To: 9/1/2018

Name BENORE LOGISTIC SYSTEMS INC
Address 2500 E ERIE Rd 0853                   Zip 48133
City ERIE             State MI
Contact Person Recruiting     Phone Number 7348482046
Position Held Local
Reason For Leaving Mutual
Where you subject to FMCRs^ while employed? ○ Yes ⊙ No
Was your job designated as a safety-sensitive function in any DOT-regulated mode subject to the drug and alcohol testing requirements of 49 CFR Part 40? ○ Yes ⊙ No

**EMPLOYER**

**DATE**
From: 1/1/2021     To: 5/31/2024

Name Tesla Inc
Address 1 electric ave                        Zip 89431
City Sparks           State NV
Contact Person Human resources   Phone Number 8885183752
Position Held Material handler
Reason For Leaving Mutual
Where you subject to FMCRs^ while employed? ○ Yes ⊙ No
Was your job designated as a safety-sensitive function in any DOT-regulated mode subject to the drug and alcohol testing requirements of 49 CFR Part 40? ○ Yes ⊙ No

*Includes vehicles having HVWR of 26,001 lbs. or more, vehicles designed to transport 16 or more passengers (including the driver), or any size vehicle used to transport hazardous materials in the quantity requiring placarding.

^The Federal Motor Carrier Safety Regulations (FMCSRs) apply to anyone operating a motor vehicle on a highway in interstate commerce to transport passengers of property when the vehicle: (1) weighs or has a GVWR of 10,001 pounds or more, (2) is designed or used to transport more than 8 passengers (including the driver), OR (3) is of any size and is used to transport hazardous materials in a quantity requiring placarding.

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279c

# EMPLOYMENT HISTORY (continued)

**EMPLOYER**

**DATE**
From: 7/3/2024
To: 10/22/2024

Name ENLIGHTENED TRUCKERS OF AMERICA LLC
Address 1900 POLARIS Pkwy SUITE 450
City COLUMBUS     State OH     Zip 43240
Contact Person HR     Phone Number 3802571135
Position Held OWNER OPERATOR
Reason For Leaving BETTER OPPORTUN

Where you subject to FMCRs^ while employed? ○ Yes ◉ No
Was your job designated as a safety-sensitive function in any DOT-regulated mode subject to the drug and alcohol testing requirements of 49 CFR Part 40? ○ Yes ◉ No

---

**EMPLOYER**

**DATE**
From: 10/31/2024
To: 6/25/2025

Name ROCKET EXPD LLC
Address 470 W BROAD St # 1189
City COLUMBUS     State OH     Zip 43215
Contact Person Goran Eri     Phone Number 6306614191
Position Held OTR
Reason For Leaving BETTER OPORTUNIT

Where you subject to FMCRs^ while employed? ○ Yes ◉ No
Was your job designated as a safety-sensitive function in any DOT-regulated mode subject to the drug and alcohol testing requirements of 49 CFR Part 40? ○ Yes ◉ No

---

**EMPLOYER**

**DATE**
From:
To:

Name
Address
City     State     Zip
Contact Person     Phone Number
Position Held
Reason For Leaving

Where you subject to FMCRs^ while employed? ○ Yes ◉ No
Was your job designated as a safety-sensitive function in any DOT-regulated mode subject to the drug and alcohol testing requirements of 49 CFR Part 40? ○ Yes ◉ No

---

**EMPLOYER**

**DATE**
From:
To:

Name
Address
City     State     Zip
Contact Person     Phone Number
Position Held
Reason For Leaving

Where you subject to FMCRs^ while employed? ○ Yes ◉ No
Was your job designated as a safety-sensitive function in any DOT-regulated mode subject to the drug and alcohol testing requirements of 49 CFR Part 40? ○ Yes ◉ No

---

*Includes vehicles having HVWR of 26,001 lbs. or more, vehicles designed to transport 16 or more passengers (including the driver), or any size vehicle used to transport hazardous materials in the quantity requiring placarding.

^The Federal Motor Carrier Safety Regulations (FMCSRs) apply to anyone operating a motor vehicle on a highway in interstate commerce to transport passengers of property when the vehicle: (1) weighs or has a GVWR of 10,001 pounds or more, (2) is designed or used to transport more than 8 passengers (including the driver), OR (3) is of any size and is used to transport hazardous materials in a quantity requiring placarding.

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279c

# EMPLOYMENT HISTORY (continued)

**EMPLOYER**

DATE

From: _____ To: _____

Name _____

Address _____ State _____ Zip _____

City _____ Phone Number _____

Contact Person _____

Position Held _____

Reason For Leaving _____

Where you subject to FMCRs^ while employed? ○ Yes ⊙ No

Was your job designated as a safety-sensitive function in any DOT-regulated mode subject to the drug and alcohol testing requirements of 49 CFR Part 40? ○ Yes ⊙ No

**EMPLOYER**

DATE

From: _____ To: _____

Name _____

Address _____ State _____ Zip _____

City _____ Phone Number _____

Contact Person _____

Position Held _____

Reason For Leaving _____

Where you subject to FMCRs^ while employed? ○ Yes ⊙ No

Was your job designated as a safety-sensitive function in any DOT-regulated mode subject to the drug and alcohol testing requirements of 49 CFR Part 40? ○ Yes ⊙ No

**EMPLOYER**

DATE

From: _____ To: _____

Name _____

Address _____ State _____ Zip _____

City _____ Phone Number _____

Contact Person _____

Position Held _____

Reason For Leaving _____

Where you subject to FMCRs^ while employed? ○ Yes ⊙ No

Was your job designated as a safety-sensitive function in any DOT-regulated mode subject to the drug and alcohol testing requirements of 49 CFR Part 40? ○ Yes ⊙ No

**EMPLOYER**

DATE

From: _____ To: _____

Name _____

Address _____ State _____ Zip _____

City _____ Phone Number _____

Contact Person _____

Position Held _____

Reason For Leaving _____

Where you subject to FMCRs^ while employed? ○ Yes ⊙ No

Was your job designated as a safety-sensitive function in any DOT-regulated mode subject to the drug and alcohol testing requirements of 49 CFR Part 40? ○ Yes ⊙ No

*Includes vehicles having HVWR of 26,001 lbs. or more, vehicles designed to transport 16 or more passengers (including the driver), or any size vehicle used to transport hazardous materials in the quantity requiring placarding.

^The Federal Motor Carrier Safety Regulations (FMCSRs) apply to anyone operating a motor vehicle on a highway in interstate commerce to transport passengers of property when the vehicle: (1) weighs or has a GVWR of 10,001 pounds or more, (2) is designed or used to transport more than 8 passengers (including the driver), OR (3) is of any size and is used to transport hazardous materials in a quantity requiring placarding.

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279c

# DECLARATION OF EMPLOYMENT STATUS
## THIS REFERS TO ANY GAPS IN EMPLOYMENT HISTORY

I understand that I must provide my complete employment history for the past 3 years, and all CDL required employment for the 7 years preceding that. Any gaps in employment longer than 1 month are explained as follows:

From: 6/1/2024 _____ To: 6/29/2024 _____

During this time, I was engaged in the following activity:

_____

_____

_____

In addition:

___ I was not employed by any company or individual

___ I was not convicted of any criminal act involving the use of a commercial motor vehicle or while driving a commercial motor vehicle

From: _____ To: _____

During this time, I was engaged in the following activity:

_____

_____

_____

In addition:

___ I was not employed by any company or individual

___ I was not convicted of any criminal act involving the use of a commercial motor vehicle or while driving a commercial motor vehicle

From: _____ To: _____

During this time, I was engaged in the following activity:

_____

_____

_____

In addition:

___ I was not employed by any company or individual

___ I was not convicted of any criminal act involving the use of a commercial motor vehicle or while driving a commercial motor vehicle

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

From: _____    To: _____

During this time, I was engaged in the following activity: _____

_____

_____

In addition:

___  I was not employed by any company or individual

___  I was not convicted of any criminal act involving the use of a commercial motor vehicle or while driving a commercial motor vehicle

From: _____    To: _____

During this time, I was engaged in the following activity: _____

_____

_____

In addition:

___  I was not employed by any company or individual

___  I was not convicted of any criminal act involving the use of a commercial motor vehicle or while driving a commercial motor vehicle

From: _____    To: _____

During this time, I was engaged in the following activity: _____

_____

_____

In addition:

___  I was not employed by any company or individual

___  I was not convicted of any criminal act involving the use of a commercial motor vehicle or while driving a commercial motor vehicle

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

From: _____     To: _____

During this time, I was engaged in the following activity: _____

_____

_____

In addition:

___ I was not employed by any company or individual

___ I was not convicted of any criminal act involving the use of a commercial motor vehicle or while driving a commercial motor vehicle

From: _____     To: _____

During this time, I was engaged in the following activity: _____

_____

_____

In addition:

___ I was not employed by any company or individual

___ I was not convicted of any criminal act involving the use of a commercial motor vehicle or while driving a commercial motor vehicle

From: _____     To: _____

During this time, I was engaged in the following activity: _____

_____

_____

In addition:

___ I was not employed by any company or individual

___ I was not convicted of any criminal act involving the use of a commercial motor vehicle or while driving a commercial motor vehicle

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

**ACCIDENT RECORD** for past 3 years or more (attach sheet if more space is required). If none, write **none.**

| | Dates | Nature of Accident (Head-on, Rear-End, Upset, etc.) | Fatalities | Injuries | Hazard Material S |
|---|---|---|---|---|---|
| Last Accident | | | | | |
| Next Previous | | | | | |
| Next Previous | | | | | |

**TRAFIC CONVICTIONS** and forfeitures for the past 3 years (other than parking violations). If none, write **none.**

| Location | Date | Charge | Penalty |
|---|---|---|---|
| | | | |
| | | | |

(Attach sheet if more space is required)

# EXPERIENCE AND QUALIFICATIONS – DRIVER

List all driver licenses or permits held in the past 3 years

| State | License Number | Type | Expiration Date |
|---|---|---|---|
| | | | |
| | | | |

**DRIVER LICENSES**

A. Have you ever been denied a license, permit or privilege to operate a motor vehicle?  ○ Yes  ⊙ No    If yes give details below

B. Has any license, permit or privilege ever be suspended or revoked?  ○ Yes  ⊙ No    If yes give details below

**DRIVING EXPERIENCE** check if yes

| Class of Equipment | | Equipment type |
|---|---|---|
| Straight Truck | ✔ | Refer |
| Tractor and Semi-Trailer | ✔ | Van |
| Tractor – Two Trailers | | |
| Motorcoach – School Bus | | More than 8 passengers |
| Motorcoach – School Bus | | More than 15 passengers |
| Other | | |

List states operated in for last five years: _____

Which safe driving awards do you hold and from whom? _____

## EXPERIENCE AND QUALIFICATIONS – OTHER

Show any trucking, transportation or other experience that may help in your work for this company

Independent contractor

List courses and training other than shown elsewhere in the application

None

List special equipment or technical materials you can work with (other than already shown)

None

## EDUCATION

Highest Grade Completed ___ College - 4

Last School Attended & Location (city & state) Monroe community college  Rochester new york

## TO BE READ AND SIGNED BY APPLICANT

This certifies that this application was completed by me, and that all entries on it and information in it are true and complete to the best of my knowledge.

Date: 06 / 26 / 2025

Signature: _____

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb2

# CERTIFICATION OF COMPLIANCE WITH DRIVER LICENSE REQUIREMENTS

Vehicle weighing 26,001 pounds or more, can transport more than 15 people, or transports hazardous materials that require place carding.

The requirements in Part 391 apply to every driver who operates in interstate commerce and operates a vehicle weighing 10,001 pounds or more, can transport more than 15 people, or transports hazardous materials that require place carding.

DRIVER REQUIREMENTS: Parts 383 and 391 of the Federal Motor Carrier Safety Regulations contain some requirements that you as a driver must comply with. These requirements are in effect as of July 1, 1987. They are as follows:

1.  **POSSESS ONLY ONE LICENSE:**
    You, as a commercial vehicle driver, may not possess more than one motor vehicle operator's license. If you have more than one license, keep the license from your state of residence and return the additional license to the states that issued them. DESTROYING a license does not close the record in the state that issued it, you must notify the state.
    If a multiple license has been lost, stolen, or destroyed, close your record by notifying the state of issuance that you no longer want to be licensed by the state.

2.  **NOTIFICATION OF LICENSE SUSPENSION, REVOCATION OR CANCELLATION:**
    Sections 392.42 and 383.33 of the Federal Motor Carrier Safety Regulations require that you notify your employer the NEXT BUSINESS DAY of any revocation or suspension of your driver's license.
    In addition, Section 383.31 requires that any time you violate a state or local traffic law (other than parking), you must report it within 30 days to: 1) your employing carrier, and 2) the state that issued your license (if the violation occurs in a state other than the one which issued your license). The notification to both the employer and state must be in writing.

The following license is the only one I will possess:

Driver's License No. <u>104896994</u>     State <u>SC</u>     Expiration Date <u>5/28/2029</u>

DRIVER'S CERTIFICATION: I certify that I have read and understand the above requirements.

Driver's Name (Printed): <u>Kyle Jordan Smith</u>

Driver's Signature: _____     Date <u>06 / 26 / 2025</u>

Reviewed by:     <u>Ivan Milutinovic</u>
                 Carrier Official (printed)
                 <u>President</u>     Date <u>06 / 26 / 2025</u>
                 (Carrier Signature Title)
                 <u>Crena Transportation Services LLC</u>
                 (Carrier)

Comments:

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# DRIVER'S ROAD TEST EXAMINATION

DRIVER NAME    Kyle Jordan Smith

Address    2950 E North ST APT 600L

City    Greenville

State    SC    Zip 29615

The road test shall be given by the motor carrier or a person designated by it. However, a driver who is a motor carrier must be given the test by another person. The test shall be given by a person who is competent to evaluate and determine whether the person who takes the test has demonstrated that he or she is capable of operating the vehicle and associated equipment that the motor carrier intends to assign.

The pre-trip inspection (as required 49 CFR 392.7).

Coupling and uncoupling of combination units, if the equipment he or she may drive includes combination units.

Placing the equipment in operation.

Use of vehicle's controls and emergency equipment.

Operating the vehicles in traffic and while passing other vehicles.

Turning the vehicle.

Braking and slowing the vehicle by means other than braking.

Backing and parking the vehicle.

Other, explain:_____

Type of equipment used in giving the test:_____

Examiner's signature: _____ _Andy Miller_____    Date: 06 / 26 / 2025

Remarks:

If the road test is successfully completed, the person who gave it shall complete a certificate of driver's road test.

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# CERTIFICATE OF DRIVER'S ROAD TEST

INSTRUCTIONS: If the road test is successfully completed, the person who gave it shall complete a certify motor carrier's driver qualification file of the person examined and a copy given to the person who had driver's road test. The original or copy of the certificate shall be retained by the motor carrier who conducted the road test. (49 CFR 391.31(e)(f)(g))

## CERTIFICATION OF ROAD TEST

DRIVER NAME     Kyle Jordan Smith

SSN     108828608

License Number     104896994

State     SC

Type of Power Unit     Semi-truck

Type of Trailer(s)     Dry van

If passenger carrier, type of bus _____

This is to certify that the above-named driver was given a road test under my supervision on _____, consisting of approximately _____ miles of driving. It is considered option that this driver possesses sufficient driving skill to operate safely the type of commercial motor vehicle listed above.

_Andy Miller_
(Signature of Examiner)

Safety officer
(Title)

(Organization and Address of Examiner)

# ANNUAL MOTOR VEHICLE DRIVER'S CERTIFICATION OF VIOLATIONS

In accordance with 49 CFR 391.27, I Kyle Jordan Smith _____ certify that the following is a true and complete list of traffic violations (other than parking violations) for which I have been convicted or forfeited bond or collateral during the past 12 months.

| Date | Offence | Location (City/State) | Type of Vehicle Operated |
|------|---------|----------------------|--------------------------|
|      |         |                      |                          |
|      |         |                      |                          |
|      |         |                      |                          |
|      |         |                      |                          |
|      |         |                      |                          |

If no violations are listed above, I certify that I have not been convicted or forfeited bond or collateral on account of any violation required to be listed during the past 12 months.

06 / 26 / 2025
_____
(Date of signature)

_____
(Driver's signature)

# ANNUAL REVIEW OF DRIVING RECORD

In accordance with 49 CFR 391.25, I certify that I have carefully reviewed the driving record of (Driver's name) Kyle Jordan Smith _____ to determine whether or not he/she meets the minimum requirements for safe driving specified in 49 CFR 391.11 or is disqualified to drive a motor vehicle pursuant to 49 CFR 391.15.

In reviewing this driver's record, I certify that I have considered any evidence that the driver has violated any applicable Federal Motor Carrier Safety Regulations or Hazardous Materials Regulations; and considered the driver's accident record and any evidence that the driver has violated laws governing the operations of motor vehicles, and I have given great weight to violations, such as speeding, reckless driving, and operating while under the influence Or alcohol or drugs, that indicate that the driver has exhibited a disregard of the safety of the public.

A copy of the response from each State agency to the inquiry required by 49 CFR 391.25(b) is attached.

This form shall be maintained in the driver's qualification file, as required by 49 CFR 391.51.

Crena Transportation Services LLC
_____
(Motor Carrier's Name)

06 / 26 / 2025
_____
(Review Date)

21 E State St, Suite 200,Columbus OH 43215
_____
(Motor Carrier's Address)

_Ivan Milutinovic_     President
_____
(Reviewed by: Signature)          (Title)

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# APPENDIX A-3

# APPENDIX B

## DRIVER'S NOTIFICATION LETTER

I Kyle Jordan Smith _____ certify that received a copy of, and have read the above Crena Transportation Services LLC , policy on Alcohol and Drug Testing Procedures., I understand that as a condition of engagement as a driver, I must comply with these guidelines, and do agree that I will remain medically qualified by following this procedure.

    If I develop a problem with alcohol/ drug abuse during my engagement with  Crena Transportation Services LLC        I will seek assistance through the current alcohol and drug testing program administrator.

108828608
_____
(Social Security Number)

_____
(Driver's Signature)

06 / 26 / 2025
_____
(Date)

# RECEIPT

Kyle Jordan Smith
(Driver's Name)

This is to certify that I have been provided educational materials that explain the requirements of section 382-601 and the Company's policies and procedures with respect to meeting the requirements. The materials include detailed discussion of the following checked items:

✔ The designated person to answer questions about the materials.

✔ The categories of drivers subject to Part 382

✔ Sufficient information about the safety – sensitive functions and periods of the workday that compliance is required.

✔ Specific information concerning prohibited driver conduct.

✔ Circumstances under which a driver will be tested.

✔ Test procedures, driver protection and integrity of the testing processes, and Safeguarding validity of the test.

✔ The requirement that tests are administered in accordance with Part 382

✔ An explanation of what will be considered a refusal to submit to a test and the consequences.

✔ The consequences for Part 382 Subpart B violations including removal from safety – sensitive function and 332,605 procedures.

✔ The consequences for drivers found to have an alcohol concentration of 0,02 or greater but less than 0,04.

✔ Information on the affects of alcohol and controlled substances use on:

- As individual's health
- Signs and symptoms of a problem
- Work
- Available methods of intervening when a problem I suspected
- Personal life

(Driver's Signature)

06 / 26 / 2025
(Date)

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# NOTICE TO DRIVERS

## CERTIFICATE OF COMPLIANCE

### (NOTE: ORIGINAL TO BE RETAINED BY CARRIER, COPY FOR DRIVER)

The Commercial Motor Vehicle Safety Act of 1986 provided for stronger controls over drivers of commercial vehicles. The Law applies to all drivers operating vehicles and combinations with Gross Vehicle Weight Rating over 26,000 pounds, and to any vehicle, regardless of wights, transporting hazardous materials in a quantity requiring placarding.

The following provisions of this legislation become effective July 1, 1987:

1. No driver may possess more than one license, and no motor carrier may use a driver having more than one license.

2. A driver convicted of a traffic violation (other than parking) in any vehicle must notify the motor carrier and the state which issued the license to that driver of the conviction within 30 days.

3. Any person applying for a job as a commercial vehicle driver must inform the prospective employer of all previous employment as the driver of a commercial vehicle for the past 3 years, in addition to any other required information about the applicant's employment history.

4. The Federal Motor Carrier Safety Regulations require that a driver who loses any privilege to operate a commercial vehicle, or who is disqualified from operating a commercial vehicle, must advise the motor carrier the next business day after receiving notification.

**PENALTIES**- Any violation of the above are punishable by a fine not to exceed $2,500. Willful violation of (1) or (3), above, failure to notify the motor carrier within 3 days of the loss of any privilege to operate a commercial vehicle can result in penalties.

## CERTIFICATION BY DRIVER

I hereby certify that I have read above and understand the driver provisions of the
Commercial Motor Vehicle Safety Act of 1986

Kyle Jordan Smith
(Driver's name)

108828608
(Social Security Number)

104896994
(Driver's License No.)

SC
(State)

5/28/2029
(Expiration Date)

2950 E North ST APT 600L
(Driver's Address)

Greenville
(City)

SC
(State)

29615
(Zip)

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# DRIVER SAFETY TRAINING

This is to confirm that the driver Kyle Jordan Smith _____ has received, and has had training in the areas of company and DOT rules and regulations. As required by our company and DOT regulation, I agree to read and familiarize myself with the following handbooks which are required to be in each vehicle, and are available through the company.

**HANDBOOKS:**

1. "Federal Motor Carrier Regulations Handbooks"
2. "North American Emergency Response Books"
3. "Company Rules and Regulation Guidebook:

**VIDEO** included in training were:

1. Vehicle Inspection.
2. Driver Guide to the Daily Logs.
3. Safety Training Techniques.
4. Emergency Maneuvers.
5. Speed and Space Management.
6. Air Brake Training.
7. Accident and Breakdowns.

VIDEOS WERE MADE BY J.J. KELLER AND ASSOCIATES, INC.

Following these training videos was a question-and-answer period which included additional company illustrations, photos, forms, further explanations and oral tests on these and other topics.

I understand that if I have any questions, or which to have any area of the training clarified, I may come to the company and get further explanation or information.

On this date 6/25/2025 _____ I have completed training of Log preparation and other public safety issues. I am now versed in proper DOT Regulations (395) I understand that by not following these DOT Regulations I will be subject to company disciplinary actions. I am also aware and have been informed of all company fines which will be enforced following failure to comply with company rules which are explained on the company handbooks.

_____
(Driver's Signature)

_____
(Instructor's Signature)

108828608
_____
(Social Security Number)

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# DRIVER RESPONSIBILITIES

**DRIVER IS FULLY RESPONSIBLE FOR THE SHIPMENT.**

1. Load should be inspected at all the time by the driver, and delivered in good condition.
2. If there are two drivers, both of theme should check on the condition of the load, and on the condition of the truck (wheels)

**DRIVER IS FULLY RESPONSIBLE FOR THE CONDITION OF THE TRUCK AND TRAILER.**

1. In case of accident immediately contact with the dispatch or safety department
2. Driver fully bear the expenses for destroying the load by his/her fault or inattention.
3. Driver is responsible to check on level of water in radiator, level of oil in engine, and air pressure in the wheels (100 psi)
4. Driver is responsible to inform dispatch about any defect in the truck or trailer.

**DRIVER IS RESPONSIBLE FOR ANY RECEIPTS AND SHIPMENT DOCUMETNS.**

1. After the trip return all bills.
2. Fuel
3. Tolls, road receipts.
4. Weight receipts
5. Repair
6. Unloading
7. Earnest

Kyle Jordan Smith
(Driver's Name)

108828608
(Social Security Number)

(Driver's Signature)

06 / 26 / 2025
(Date)

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# HOURS OF SERVICE POLICY

Starting December 16, 2019, all carriers and drivers subject to the ELD rule must use ELDs. HOURS of Services Requirement are detailed in CFR 49 Part 395.5.

These regulations were written to reduce accident's injuries to driver fatigue. The rules are as follows:

- 11 Hours Rule You may drive 11 hours after 10 hours off-duty
- 14 Hours Rule You may not drive beyond the14th hours after coming on duty, following 10hours off-duty
- 60/70 Hours Rule - You may not drive after 60/70 hours on-duty in 7/8 consecutive days.

**A DRIVER MAY RESTART A 7/8 CONSECUTIVE DAY PERIOD AFTER TAKING 34OR MORE CONSECUTIVE HOUR'S OFF-DUTY**

Dispatch may not dispatch a driver on a move that would cause a violation of these regulations. The Company and its drivers will operate in compliance with these regulations.

<div style="border:1px solid">

**DISCIPLINARY PROGRAM FOR LOG VIOLATIONS**
1st.Violation-Verbal Warning & Re Training & charge $300
2st. Violation-Written Warning & Retraining & charge $600
3rd. Violation-1 day off at the dispatcher's convenience & charge $900

**DISCIPLINARY PROGRAM FOR LOG OOS**
1st.Violation-Verbal Warning & Re Training & charge $500
2st. Violation-Written Warning & Retraining & charge $1000
3rd. Violation-1 day off at the dispatcher's convenience & charge $1500

</div>

**ALL VIOLATIONS ARE SUBJECT TO THE FOLLOWING DEDUCTIONS: VIOLATION DISCOVERED MINIMUM OF $500 OUT OF SERVICE MINIMUM $500**

108828608
(Social Security Number)

Kyle Jordan Smith
(Driver's Name)

06 / 26 / 2025
(Date)

(Driver's Signature)

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

In a proactive effort to prevent Crena Transportation Services LLC    FMCSA safety measurement system performance profile from having a negative impact that will prevent our brokering and shipping partners from doing business with us as a team, we have the following deductions in place. By actually conducting Pre-trip & Post-Trip Inspections and reporting the need to have vehicle repairs, and working with Dispatchers to ensure you have the adequate time to work, we can all collectively reduce the chances of having many Roadside Inspection violations:

## Disciplinary Actions for Hours of Service | Log Book Violations
1st Offense for an Out-Of-Service Violation deduction up to $500.
1st Offense for a Non-Out-of-Service Violation deduction up to $300.
2nd Offense for an Out-of-Service Violation deduction up to $1000.
2nd Offense for a Non-Out-of-Service Violation deduction up to $600.
3rd Offense for an Out-of-Service Violation deduction up to $1500 or termination.
3rd Offense for a Non-Out-of-Service Violation deduction up to $900.
Failing or Disregard to be in contact with Broker as required, deduction of $25.
Cancelling a Dispatched Assignment while en-route to a delivery will result in a deduction of $150.
Failing to provide a Dispatcher correct location or truck status or driving hours will result in a deduction of $50. Missing pick-up or delivery appointment and not notifying the broker will result in a deduction of $300.

## Disciplinary Actions for Unsafe Driving | Moving & Non-Violations
1st Offense for a Moving Violation, Medical Card, CDL, and Unsafe Parking will result in a deduction of $1000.
2nd Offense for a Moving Violation, Medical Card, CDL, and Unsafe Parking will result in a deduction of $2500.
3rd Offense for a Moving Violation, Medical Card, CDL, and Unsafe Parking may result in Termination and/or a deduction of $3000.
Failure to report Driver/vehicle inspection report may result in a deduction of $300.
Failure to submit Driver/vehicle examination report within 10 days may result in a deduction of $300
Becoming negligent and improper parking location failing to prevent cargo and vehicle theft or vandalism, may result in a deduction of $5000 or costs for the insurance deductible.
Being involved in an accident and not notifying dispatch or company officials may result in a deduction of $2500.
If a driver leases a semi-trailer and due to negligence, it becomes stolen, the applicable deductible amount shall be deducted.

## Disciplinary Actions for Vehicle Maintenance | Equipment Violations
1st Offense for an Out-Of-Service Violation may be deduction up to $500.
1st Offense for a Non-Out-of-Service Violation will be deducted $300.
2nd Offense for an Out-Of-Service Violation may be deducted up to $1000.
2nd Offense for a Non-Out-Of-Service Violation will be deducted up to $600.
3rd Offense for an Out-Of-Service Violation may be deducted up to $2000 or termination. 3rd Offense for a Non-Out of Service Violation may be deducted up to $900.

## Rewards Incentives & Compliance Program
USDOT Level 1 Inspection with no violations will be paid $500.
USDOT Level 2 Inspection with no violations will be paid $300.
USDOT Level 3 Inspection with no violations will be paid $200.

_____
(Driver's Signature)

*THE BELOW DISCLOSURE AND AUTHORIZATION LANGUAGE IS FOR MANDATORY USE BY ALL ACCOUNT HOLDERS*

## IMPORTANT DISCLOSURE

## REGARDING BACKGROUND REPORTS FROM THE *PSP Online Service*

In connection with your application for employment with Crena Transportation Services LLC ("Prospective Employer"), Prospective Employer, its employees, agents or contractors may obtain one or more reports regarding your driving, and safety inspection history from the Federal Motor Carrier Safety Administration (FMCSA).

When the application for employment is submitted in person, if the Prospective Employer uses any information it obtains from FMCSA in a decision to not hire you or to make any other adverse employment decision regarding you, the Prospective Employer will provide you with a copy of the report upon which its decision was based and a written summary of your rights under the Fair Credit Reporting Act before taking any final adverse action. If any final adverse action is taken against you based upon your driving history or safety report, the Prospective Employer will notify you that the action has been taken and that the action was based in part or in whole on this report.

When the application for employment is submitted by mail, telephone, computer, or other similar means, if the Prospective Employer uses any information it obtains from FMCSA in a decision to not hire you or to make any other adverse employment decision regarding you, the Prospective Employer must provide you within three business days of taking adverse action oral, written or electronic notification: that adverse action has been taken based in whole or in part on information obtained from FMCSA; the name, address, and the toll free telephone number of FMCSA; that the FMCSA did not make the decision to take the adverse action and is unable to provide you the specific reasons why the adverse action was taken; and that you may, upon providing proper identification, request a free copy of the report and may dispute with the FMCSA the accuracy or completeness of any information or report. If you request a copy of a driver record from the Prospective Employer who procured the report, then, within 3 business days of receiving your request, together with proper identification, the Prospective Employer must send or provide to you a copy of your report and a summary of your rights under the Fair Credit Reporting Act.

Neither the Prospective Employer nor the FMCSA contractor supplying the crash and safety information has the capability to correct any safety data that appears to be incorrect. You may challenge the accuracy of the data by submitting a request to https://dataqs.fmcsa.dot.gov. If you challenge crash or inspection information reported by a State, FMCSA cannot change or correct this data. Your request will be forwarded by the DataQs system to the appropriate State for adjudication.

Any crash or inspection in which you were involved will display on your PSP report. Since the PSP report does not report, or assign, or imply fault, it will include all Commercial Motor Vehicle (CMV) crashes where you were a driver or co-driver and where those crashes were reported to FMCSA, regardless of fault. Similarly, all inspections, with or without violations, appear on the PSP report. State citations associated with Federal Motor Carrier Safety Regulations (FMCSR) violations that have been adjudicated by a court of law will also appear, and remain, on a PSP report.

The Prospective Employer cannot obtain background reports from FMCSA without your authorization.

## AUTHORIZATION

If you agree that the Prospective Employer may obtain such background reports, please read the following and sign below:

I authorize Crena Transportation Services L ("Prospective Employer") to access the FMCSA Pre-Employment Screening Program (PSP) system to seek information regarding my commercial driving safety record and information regarding my safety inspection history. I understand that I am authorizing the release of safety performance information including crash data from the previous five (5) years and inspection history from the previous three (3) years. I understand and acknowledge that this release of information may assist the Prospective Employer to make a determination regarding my suitability as an employee.

I further understand that neither the Prospective Employer nor the FMCSA contractor supplying the crash and safety information has the capability to correct any safety data that appears to be incorrect. I understand I may challenge the accuracy of the data by submitting a request to https://dataqs.fmcsa.dot.gov. If I challenge crash or inspection information reported by a State, FMCSA cannot change or correct this data. I understand my request will be forwarded by the DataQs system to the appropriate State for adjudication.

I understand that any crash or inspection in which I was involved will display on my PSP report. Since the PSP report does not report, or assign, or imply fault, I acknowledge it will include all CMV crashes where I was a driver or co-driver and where those crashes were reported to FMCSA, regardless of fault. Similarly, I understand all inspections, with or without violations, will appear on my PSP report, and State citations associated with FMCSR violations that have been adjudicated by a court of law will also appear, and remain, on my PSP report.

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

I have read the above Disclosure Regarding Background Reports provided to me by Prospective Employer and I understand that if I sign this Disclosure and Authorization, Prospective Employer may obtain a report of my crash and inspection history. I hereby authorize Prospective Employer and its employees, authorized agents, and/or affiliates to obtain the information authorized above.

Date: _____06 / 26 / 2025_____

_____
Signature

Kyle Jordan Smith
_____
Name (Please Print)

NOTICE: This form is made available to monthly account holders by NIC on behalf of the U.S. Department of Transportation, Federal Motor Carrier Safety Administration (FMCSA). Account holders are required by federal law to obtain an Applicant's written or electronic consent prior to accessing the Applicant's PSP report. Further, account holders are required by FMCSA to use the language contained in this Disclosure and Authorization form to obtain an Applicant's consent. The language must be used in whole, exactly as provided. Further, the language on this form must exist as one stand-alone document. The language may NOT be included with other consent forms or any other language.

NOTICE: The prospective employment concept referenced in this form contemplates the definition of "employee" contained at 49 C.F.R. 383.5.

*LAST UPDATED 2/11/2016*

# DRIVER INDEPENDENT CONTRACTOR OPERATING AGREEMENT

The undersigned motor carrier, including its divisions, subsidiaries, affiliates and assigns, ("Carrier") and the undersigned contractor ("Contractor"), pursuant to 49 C.F.R. Part 300 et seq., enter into this Independent Contractor Operating Agreement, including any appendices and addendums ("Agreement").

## 1. EQUIPMENT AND SERVICES

1.1. Contractor agrees to provide Carrier the use of the equipment described in Appendix A ("Equipment") and all labor, including driver(s), necessary to operate the Equipment and to perform all of the services contemplated by this Agreement.

1.2. Contractor represents and warrants that Contractor is the Equipment's "owner" under 49 C.F.R. § 376.2(d).

1.3. Upon taking possession of the Equipment, Carrier will furnish to Contractor a receipt as required by 49 C.F.R. § 376.11(b).

1.4. Contractor is free to substitute a different vehicle for the one constituting the Equipment if each of the specifications applicable to Equipment is met with respect to such different vehicle and Carrier furnishes Contractor with a new receipt covering the vehicle.

1.5. Carrier does not guarantee any specific number of shipments or amount of revenue or profit to Contractor, or to use the Equipment at any particular time or location.

1.6. Contractor is free to accept or reject any shipment offered by Carrier.

1.7. Contractor is free to provide vehicles not identified as Equipment and professional truck driving services to other motor carriers during the term of this Agreement.

1.8. Contractor is also free to provide the Equipment to other motor carriers during the term of this Agreement in accordance with the requirements of federal law, as described in Section 18 of this Agreement.

1.9. Throughout this Agreement, "Contractor's workers" and "Contractor's drivers" include Contractor if Contractor elects to personally perform any aspect of this Agreement.

## 2. TERM AND TERMINATION

2.1 Term. The term of this Agreement shall commence as of the Effective Date and terminate on the Termination Date indicated above the signature block below. Either party may terminate this Agreement immediately for any of the reasons provided in Section 2.2 of this Agreement below. Further, either party may terminate this Agreement at any time and without cause upon sixty (60) days written notice to the other party. Termination shall be effective upon the earliest of the following: (i) the date provided in the written notice; (ii) as stated on the equipment receipt below; (iii) upon immediately upon termination of Carrier's possession of the Equipment under 49 C.F.R. 49 C.F.R. § 376.11(b)(2).

2.2 For Cause Termination. If Carrier or any of Contractor's workers commits any of the following, the other party may but is not required to terminate this Agreement: (i) materially breaches this Agreement; (ii) commits, attempts to commit, conspires, or threatens to commit a felony or intentional tort; (iii) violates any applicable federal, state, local, Native American tribal, or foreign law, regulation or ordinance ("Applicable Law").

2.3 Obligations Upon Termination. Upon the later of (i) termination of this Agreement; or (ii) completion of the services provided for herein, Contractor agrees to remove all Carrier identification from the Equipment and return it, or provide a letter certifying that is has been removed, to Carrier, together with all of Carrier's property (in good working condition), Trailing Equipment (defined in Section 13 below), permits, load-securement equipment, and freight all to Carrier's nearest terminal, and to pay Carrier all amounts Contractor currently owes Carrier under this Agreement. Should Contractor fail to meet any of the obligations of this Section 2.3 of the Agreement, Contractor agrees to pay Carrier for all expenses incurred by Carrier in returning those items to good working condition and in seeking the return of the items, including reasonable attorneys' fees and collection costs. Carrier may pursue all other remedies permitted by law or authorized in this Agreement against Contractor for failure to meet Section 2.3 of the Agreement.

2.4 Early Termination. Contractor understands that Carrier incurs substantial start-up costs in bringing on a new contractor. Therefore, should the Agreement be terminated before the Termination Date by either party, Contractor agrees that Carrier shall have the right to charge the Contractor pursuant to Section 5.1 for start-up costs incurred on behalf of the Contractor, in the amount set forth in the Deductions Table in Section 6 of Appendix A ("Deductions Table").

Initials: K  S

25

3. **GROSS COMPENSATION**

3.1. <u>Gross Compensation Generally</u>. Contractor's gross compensation is set forth in Appendix A below and constitutes the total compensation for the use of the Equipment and for everything furnished, done by, or required of Contractor's workers in connection with this Agreement, including, but not limited to, driving the Equipment and performing all nondriving activities, such as pre- and post-trip inspections, waiting to load or unload (detention), loading or unloading (if required), fueling, repairing and maintaining the Equipment, hooking and unhooking trailers (loaded or empty), preparing logbooks and other paperwork, and other services. **CONTRACTOR—AS AND INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE—AGREES THAT CONTRACTOR IS RESPONSIBLE FOR PAYING ALL OPERATING EXPENSES.** Contractor is entitled to gross compensation only upon the full performance of any trip offered by Carrier and accepted by Contractor.

3.2. <u>Adjusted Gross Revenue</u>. Adjusted Gross Revenue ("AGR") shall means the rate as agreed upon between the Contractor and Carrier and as reflected on the Carrier Rate Confirmation or Dispatch Sheet, for linehaul transportation, hourly work, accessorial services, detention, and all other services, fuel surcharges, and other charges and surcharges for a particular shipment less: (i) revenue billed by Carrier for all "Additional Compensation" items listed in Appendix A or elsewhere in this Agreement; (ii) incentives, discounts, fees, including those for loading or unloading services provided by Carrier's Customer either directly or through third parties, including but not limited to Carrier's Customer or an affiliate of Carrier (together, "Third Parties"), or commissions that Carrier gives Carrier's Customer with respect to a shipment; (iii) other amounts Carrier paid to Third Parties in relation to movement of the shipment if not covered by a charge separately stated on Carrier's invoice to Carrier's Customer, including but not limited to fees or commissions (including commission recoveries) paid to brokers, freight forwarders, inter-line or augmenting carriers, warehouse or other storage providers, terminals, agents, or any other Third Party, freight payment processing fees consisting of the actual cost incurred by Carrier for the shipment if Carrier's Customer or an third-party payer makes deductions from Carrier's freight charges related to electronically transmitted billing and payment account use, expenses attributable to an accessorial service, escorts, overweight, overdimensional, or other permits, loading and/or unloading services, amounts paid or accrued for cartage, certain specialized trailers and excessive trailer spotting, tarping, or special security measures paid to a Third Party or to Contractor, and amounts paid to other contractors as a pro rata payment for their participation in the movement of a shipment; and (iv) charges separately stated on Carrier's invoice to Carrier's Customer as fuel surcharges (or fuel or other cost adjustments or special fuel charges), insurance surcharges, charges for Third-Party contract services, freight payment processing fees, detention charges, charges for escorts, charges for overweight, overdimensional, or other permits, charges for special loading and/or unloading services, excess-value charges or high-value freight charges, "truck ordered but not used" charges, or surcharges for special security measures furnished or paid for by Carrier.

3.3. <u>Compensation Adjustments</u>. Carrier will provide Contractor with a proposed addendum containing any change to Contractor's gross compensation at least ten (10) business days in advance. If Contractor wishes to continue operating on Carrier's behalf, Contractor may consent to the change by signing the addendum. If Contractor does not consent to the change before the date indicated on the addendum, this Agreement may be terminated on the date set forth on the addendum, and Contractor will not be subject to the change proposed in the addendum.

3.4. <u>Billing Errors</u>. If Carrier discovers and corrects an error in the amount of any item billed on a shipment that Contractor hauled and for which Contractor was compensated on a percentage of AGR, Carrier will credit to, or deduct from, Contractor's gross compensation at a subsequent settlement a share, corresponding to the applicable percentage of AGR normally payable to Contractor for that service, of the amount Carrier actually collects or refunds in remedying the error. Before or at settlement, Carrier will provide Contractor with a copy of the amended rated freight bill or a computer-generated document that contains the same information (or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill), and will otherwise meet the requirements of Section 4 of this Agreement with respect to the shipment.

4. **SETTLEMENT STATEMENT AND PERIOD**

4.1 <u>Settlement</u>.Carrier will settle with and pay gross compensation to Contractor within thirty (30) days after Contractor's submission to Carrier of driver logs required by the Federal Motor Carrier Safety Administration ("FMCSA") and those documents necessary for Carrier to secure payment from Carrier's Customer, including the signed freight bill, delivery receipt, or bill of lading (settlement will not be conditioned on Contractor's submission of a clean bill of lading (i.e., a bill of lading to which no exceptions have been taken)), concerning a trip in the service of Carrier under this Agreement. Carrier currently settles more quickly, on each Friday, within 11 days of submission of the foregoing documents, for shipments for which such documents are submitted by noon Central Time the preceding Monday. At each settlement, Carrier will furnish to Contractor a statement detailing all debit and credit entries since the preceding statement ("Settlement Statement"). The

26

parties agree that all debit and credit entries detailed in each Settlement Statement are conclusively presumed to be correct and proper if not disputed by Contractor within 180 days of Carrier's issuance of the Settlement Statement.

4.2 Withholding of Compensation. Upon termination of this Agreement, Carrier may withhold any and all compensation owed to Contractor until Contractor removes and returns to Carrier all Carrier identification devices or provides a letter certifying of such removal.

## 5. GROSS COMPENSATION DEDUCTIONS

5.1. Settlement Compensation. Contractor authorizes Carrier to charge back to or deduct from Contractor's gross compensation, maintenance fund, or any money owed to Contractor, all amounts Contractor owes to Carrier, as listed or referenced in the Deductions Table in Section 6 of Appendix A ("Deduction Summary") or elsewhere in this Agreement, resulting in a net amount, if any, to be remitted to Contractor ("Settlement Compensation"). If Contractor owes Carrier a net amount following any settlement, Contractor agrees to immediately pay Carrier that amount. Carrier has the right to recover, through all legal means, any such amounts Contractor owes Carrier. Contractor agrees not to charge any amounts to Carrier's account, or to execute or endorse any instrument for or on behalf of Carrier, without Carrier's advance written permission. Contractor and Carrier will not incur or authorize any other debts in the name of the other.

5.2. Documentation. With respect to all charge-back items and deductions, Contractor, upon request, will be afforded copies of those documents which are necessary to determine the validity of the charge.

5.3. Appendix A. Carrier will notify Contractor in writing of a change to any item listed or referenced in Appendix A, or in Carrier's coverages described in Section 8. Contractor will not be subject to that change until fifteen (15) days after the notice, unless (i) Contractor signs an addendum consenting to the change, in which case the change described in the addendum will go into effect immediately upon signing, or (ii) the third-party vendor at issue provides a shorter period of notice, in which case the change will go into effect on the date dictated by the third-party vendor. Otherwise, Contractor's failure to object to the change constitutes Contractor's consent to the change effective as of the date specified in the notice. If Contractor notifies Carrier of Contractor's objection within that period and Contractor and Carrier are unable to resolve the matter to their mutual satisfaction, either party will have the right to terminate this Agreement immediately upon the change becoming effective.

## 6. CARRIERS INSURANCE OBLIGATIONS

6.1. Under FMCSA regulations (49 C.F.R. Part 387) issued pursuant to 49 U.S.C. § 13906, Carrier will maintain (through the purchase of insurance policies or an FMCSA approved self-insurance program) "public liability" insurance (as defined in 49 C.F.R. § 387.5) at all times the Equipment is being operated on behalf of Carrier. Carrier may also maintain cargo loss-and-damage insurance at all times the Equipment is being operated on behalf of Carrier. These coverages will be maintained at Contractor's expense pursuant to the Deduction Table. Carrier's possession of public liability and/or cargo loss-and-damage insurance will in no way affect Contractor's indemnity obligations to Carrier as provided for in this Agreement. Carrier's public liability insurance and cargo insurance (if any) will have coverage not less than, and deductibles of not greater than, those stated in Appendix A. Carrier's public liability insurance and cargo insurance do not list Contractor, either by class or individually, as an additional insured. If Contractor wishes to insure Contractor against bodily injury, property damage, environmental restoration, and cargo claims asserted directly against Contractor by an injured third party, Contractor must purchase and maintain Contractor's own insurance policies covering such claims.

## 7. INSURANCE OBLIGATIONS OF CONTRACTOR.

7.1. Coverage for Workplace Injuries. During the term of this Agreement, Contractor must maintain, at Contractor's own expense, an insurance policy providing coverage for work related injuries, including, but not limited to, coverage for medical expenses and lost compensation, sustained by any of Contractor's workers that meets the requirements of all Applicable Law.

(a) Worker's Compensation Insurance. Contractor must maintain workers' compensation insurance that complies with Applicable Law for any of Contractor's workers who are domiciled or principally localized1 in North Carolina. The workers' compensation insurance policy: (i) must provide principal coverage in the state in which Carrier is headquartered, in the state in which Contractor is domiciled, and in any other state(s) in which, in Carrier's judgment, Contractor will have substantial operations on behalf of Carrier on or after the Effective Date; (ii) must not, if Contractor is a corporation, exclude officers from coverage; (iii) must provide "other states coverage" that excludes only the "Monopolistic States" (currently, North Dakota, Ohio, Washington, and Wyoming); and (iv) must provide, if available, an extended protection endorsement or provision to cover or reimburse Contractor (if not domiciled in a Monopolistic State) and Carrier for any benefits and expenses incurred as a result of a claim made by any of Contractor's workers in any Monopolistic State. If Contractor is domiciled in any of the Monopolistic States,

27

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

Contractor must have state-fund coverage. Before operating the Equipment under this Agreement, Contractor must provide Carrier with a copy of a declarations page or, for state-fund coverage, a document showing Contractor's active enrollment, including, where applicable, certificates of current premium payment.

(b) <u>Occupational Accident Insurance</u>. If workers' compensation insurance is not required under Section 7.1.1 of this Agreement and Contractor elects not to obtain workers' compensation insurance, Contractor agrees to maintain occupational accident insurance, subject to the following conditions: (i) Contractor agrees to comply with all Applicable Law regarding occupational accident insurance, including but not limited to the special conditions imposed by the following jurisdictions: Arkansas, Kansas, Mississippi, Texas, and/or Utah, (Carrier's agreement to facilitate occupational accident insurance for any of Contractor's workers in such jurisdictions does not warrant that Contractor has complied with such conditions but instead is made in direct reliance on Contractor's representation that it has and will continue to do so); and (ii) before operating the Equipment under this Agreement, Contractor must provide Carrier with proof of all occupational accident insurance not facilitated by Carrier. The occupational accident insurance must meet the specifications listed in Appendix A and be no less comprehensive than the coverage Carrier may facilitate on Contractor's behalf if Contractor so chooses.

7.2. <u>Additional Insurance Obligations</u>. Contractor agrees to maintain at Contractor's own expense the following insurance policies, each with limits and maximum deductibles as set forth in Appendix A below:

(a) <u>Commercial General Liability and Truckers Insurance</u> covering bodily injury, property damage, and environmental restoration liability, including an endorsement to assure compliance by Carrier and Contractor with all applicable rules and regulations of the DOT, which shall cover Carrier's as well as Contractor's liability for operations under this Agreement as well as any other operation of the Equipment and any Trailing Equipment (as described in Section 13 of this Agreement).

(b) <u>Auto Liability</u> Insurance on the Equipment.

(c) <u>All Risk Broad Form Motor Truck Cargo Legal Liability Insurance</u> which does not exclude coverage for loss from an unlocked, unattended vehicle, or from a vehicle lacking a GPS locator or other theft prevention device.

7.3. <u>Other Insurance</u>. Contractor is responsible for maintaining, at Contractor's expense, any fire, theft, uninsured and/or underinsured motorist, physical damage (collision) to the Equipment, physical damage (collision) to Trailing Equipment, or other insurance coverage that Contractor may desire for the Equipment or for Contractor's health care or other needs. Contractor acknowledges that Carrier may, and Contractor authorizes Carrier to, waive, reject, or reduce no-fault, uninsured, and underinsured motorist coverage from Carrier's insurance policies to the extent allowed under Applicable Law, and Contractor agrees to cooperate in the completion of all necessary documentation for the waiver, election, rejection, or reduction.

7.4. <u>Contractor's Insurance Policies</u>. Contractor's insurance policies must be issued by insurance carriers that are A.M. Best "A"-rated or of equivalent financial strength in the commercially reasonable judgment of Carrier. Contractor agrees to furnish to Carrier documentation, such as certificates of insurance, showing that all coverages required by this Agreement have been procured, that the coverages are being properly maintained, and that the premiums are paid. Each certificate furnished to Carrier must identify the insurance carrier, policy number, and expiration date, and show that Carrier has been named as an additional insured with primary and non-contributory coverage. Contractor's workers' compensation policy (if required by Section 7.1.1 of this Agreement) must contain an alternate employer endorsement in favor of Carrier. Contractor must provide, or cause its insurance carrier to provide, written notice to Carrier of cancellation or modification of the policy at least 30 days in advance.

7.5. <u>Contractor's Liability If Insurance Coverages Are Not Maintained</u>. Subject to the indemnity limits in Section 15.2 of this Agreement, Contractor agrees to defend, indemnify, and hold harmless Carrier from any loss, damage, fine, expense (including reasonable attorneys' fees), action, and claim for injury to persons (including death) or damage to property that Carrier may incur arising out of or relating to Contractor's failure to maintain the insurance coverages required by this Agreement. In addition, Contractor, on behalf of Contractor's insurer, expressly waives all subrogation rights against Carrier, and if a subrogation action is brought by Contractor's insurer, Contractor agrees to defend, indemnify, and hold Carrier harmless from that action.

7.6. <u>Carrier Facilitated Insurance</u>. Contractor may authorize Carrier to facilitate, on Contractor's behalf, the insurance coverages listed in Appendix A. For each coverage elected by Contractor, Carrier will deduct or otherwise recover the amounts stated in Appendix A. If Contractor fails to provide proper evidence of the purchase or maintenance of the insurance required by Section 7 of this Agreement, Carrier is authorized but not required to obtain the insurance at Contractor's expense and deduct or otherwise recover the amounts stated in Appendix A. Contractor recognizes that Carrier is not in the business of selling insurance, and any insurance coverage requested by Contractor from Carrier is subject to all of the terms, conditions, and exclusions of the actual policy. Carrier will ensure that Contractor is provided with a certificate of insurance meeting the

28

requirements of 49 C.F.R. § 376.12(j)(2) for each facilitated policy, and Carrier will provide Contractor with a copy of each such policy upon request.

7.7. <u>Insurance Coverage Costs and Changes</u>. If Contractor has elected an insurance coverage facilitated by Carrier and the cost or other details change, Carrier will notify Contractor in writing. Contractor will not be subject to the change until fifteen (15) days after the notice, unless (i) Contractor signs an addendum consenting to the change, in which case the change described in the addendum will go into effect immediately upon signing, or (ii) the third-party vendor at issue provides a shorter period of notice, in which case the change will go into effect on the date dictated by the third-party vendor. Otherwise, Contractor's failure to object to the change constitutes Contractor's consent to the change effective as of the date specified in the notice. Carrier will provide Contractor with an updated Certificate of Insurance reflecting the change and, upon request, a copy of the insurance policy. If Contractor notifies Carrier of Contractor's objection within that period set forth in the notice and Contractor and Carrier are unable to resolve the matter to their mutual satisfaction, either party will have the right to terminate this Agreement immediately upon the change becoming effective.

7.8. <u>Deductibles</u> and <u>Excess Loss or Damages</u>. Contractor will be responsible for all deductible amounts and for any loss or damage in excess of the applicable insurance policy limits.

## 8. MAINTENANCE FUND

Contractor authorizes Carrier to establish and administer an maintenance fund as follows ("Maintenance Fund"):

8.1. <u>Principal</u>. Contractor must maintain in the Maintenance Fund the Principal Amount stated in the Deductions Table, to be funded by deductions from Contractor's gross compensation at the rate set forth in the Deductions Table beginning the first week Contractor provides services under this Agreement and continuing until the Principal Amount is reached. If the amount in the Maintenance Fund falls below the Principal Amount, Contractor authorizes Carrier to deduct from Contractor's gross compensation at double the indicated rate until the Principal Amount is reached.

8.2. <u>Items to Which Maintenance Funds May Be Applied</u>. The Maintenance Fund will be held by Carrier for the purpose of ensuring Contractor's compliance with this Agreement. The items to which the Maintenance Fund will apply are all charge-back items and deductions set forth in the Deductions Table ("Maintenance Items").

8.3. <u>Accountings</u>. While the Maintenance Fund is under Carrier's control, Carrier will either: (i) clearly indicate in Settlement Statements the amount and description of any deduction or addition made to the Maintenance Fund; or (ii) provide a separate accounting to Contractor of any transactions involving the Maintenance Fund on a monthly basis. On Contractor's request, Carrier will provide an accounting of any transactions involving the Maintenance Fund.

8.4. <u>Return of Maintenance Fund</u>. In no event will the balance in the Maintenance Fund (less any final deductions) be returned to Contractor later than one hundred and twenty (120) days from the date of termination of this Agreement for which the balance shall be returned to Contractor no later than forty five (45) days from the date of termination of this Agreement. At the time of the return of any balance in the Maintenance Fund, Carrier may deduct monies for all Maintenance Items. Carrier will not make deductions from the Maintenance Fund for items for which, by the end of one hundred and twenty (120) days or forty five (45) days (depending on the type of the maintenance fund) after termination of this Agreement, neither Contractor nor Carrier has yet made expenditure or incurred a quantified, legally binding obligation to pay. Carrier will provide a final accounting to Contractor of all final deductions made from the Maintenance Fund within one hundred and twenty (120) days or forty five (45) days (depending on the type of the maintenance fund) from the date of termination of this Agreement.

## 9. LEGAL REQUIREMENTS AND CUSTOMER SPECIFICATIONS.

Contractor's workers who perform services under this Agreement will not engage in—or attempt, conspire, or threaten to engage in—any act or omission that would constitute a felony or intentional tort, whether or not arising out of or relating to operations under this Agreement. In addition, Contractor recognizes that Carrier's separate and distinct business of providing motor carrier freight transportation service to the public is subject to Customer Specifications and to regulation by various federal, state, local, Native American tribal, and foreign authorities. Contractor acknowledges that Contractor has a full and complete understanding and knowledge of the requirements of all these authorities and of all applicable Customer Specifications. Contractor agrees to adhere to and perform the following to aid Carrier in discharging Carrier's legal and customer-service responsibilities.

9.1. <u>Drivers</u>. Contractor is not obligated to personally perform any of the services contemplated by this Agreement. Contractor agrees to provide professional drivers who are at least twenty-three (23) years old, have a minimum of two years' experience and clean driving records, and meet Carrier's other driver qualification standards ("Driver Qualification Standards") and Applicable Law, including all standards found in the Federal Motor Carrier Safety Regulations. Contractor's drivers must authorize Carrier to access driver files, FMCSA's Safety Measurement System data, and FMCSA's Pre-Employment Screening Program reports, both during the driver qualification process and at any time thereafter. Contractor appoints all drivers it furnishes to Carrier as Authorized Representatives of Contractor. Carrier will disqualify, for at least the period

29

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

specified in 49 C.F.R. § 383.51, any driver who has been convicted of or alleged to have committed a disqualifying violation set forth in that regulation, and Carrier will have the right to disqualify temporarily or permanently any driver (including Contractor) found to be: (i) in violation of Sections 9.5, 9.6, or 11.2 of this Agreement; (ii) unsafe, unqualified, unfit, or uninsurable under Applicable Law; (iii) in violation of applicable Driver Qualification Standards; or (iv) in violation of any Customer Specifications. Upon a driver's disqualification by Carrier, Contractor agrees to provide another qualified driver, as necessary, to complete the performance of any services affected by the disqualification. Contractor is free, at any time during this Agreement, to hire substitute or additional drivers who meet the Driver Qualification Standards and Applicable Law.

9.2. Transportation Worker Identification Credential. Contractor agrees to ensure that each of Contractor's workers obtains a Transportation Worker Identification Credential ("TWIC") if a TWIC is necessary to access any locations. If any of Contractor's workers lack a TWIC and need a suitably credentialed escort, Contractor agrees to pay the fee charged by the escort.

9.3. Documentation. Contractor must timely submit to Carrier all properly completed driver logs and supporting documents (including originals or copies of toll receipts), physical-examination certificates, accident reports, and any other required data, documents, or reports. Contractor agrees that all bills of lading or other papers identifying the property carried on the Equipment will show that the property is under the responsibility of Carrier or of a Sublease Carrier (as defined in the Addendum for Alternative Uses of Equipment).

9.4. Medical Examinations. Contractor agrees to ensure that all of Contractor's drivers complete medical examinations prior to driving and follow-up examinations as required by 49 C.F.R. §§ 391.41 et seq. Contractor will bear the expense of medical examinations for all of Contractor's drivers. Contractor also agrees to ensure that each driver notifies Carrier immediately if a physical condition develops or worsens, or, the driver begins taking (or increases the dosage of) a medication that might adversely affect the driver's ability to safely operate a commercial motor vehicle. Carrier may, any time after learning of a driver's adverse physical condition or new medication or dosage, suspend the driver's qualification to operate the Equipment under Carrier's authority pending Carrier's receipt of further information from Contractor. Carrier will then decide whether to restore the qualification of the driver, and will notify the driver and Contractor of the decision.

9.5. Drug and Alcohol Testing. Contractor agrees to ensure that all of Contractor's drivers will comply with: (i) all drug-and-alcohol use-and-testing requirements under Applicable Law; and (ii) Carrier's Drug-and-Alcohol Policy ("Drug-and-Alcohol Policy"), including participation in Carrier's random drug-and-alcohol testing program (if any). Violation by a driver of Carrier's Drug-and-Alcohol Policy or any drug-and-alcohol use-andtesting requirement imposed by any Applicable Law will immediately disqualify that driver. Carrier will bear the expense of any initial drug tests; Contractor will bear the expense of all subsequent drug-and-alcohol testing for all of Contractor's drivers.

9.6. Contractor's Operations. Contractor agrees to ensure that all of Contractor's workers: (i) drive or otherwise perform in a safe and prudent manner at all times so as to avoid endangering the public, the worker, and/or the property being transported; (ii) comply with Applicable Law (including without limitation prohibitions on texting and use of handheld mobile telephones), Carrier's operating authorities, and all Customer Specifications and Carrier Policies and Procedures (to the extent compliance would not pose an undue safety risk); and (iii) not be involved, during this Agreement, in an "accident" that, in Carrier's reasonable judgment, was "preventable," as those terms are defined in 49 C.F.R. § 390.5 and 49 C.F.R. Part 385, App. B, respectively.

9.7. Compliance, Safety, and Accountability. Contractor's drivers must at all times meet FMCSA's safety standards sufficient to enable Carrier to: (i) achieve and maintain a "satisfactory" or similar rating that enables Carrier to operate without FMCSA intervention or restriction pertaining to any of the safety evaluation areas ("BASICs") measured by FMCSA's Compliance, Safety, Accountability program ("CSA"); (ii) obtain insurance coverage without increased costs associated with driver ratings or other driver measurements under CSA; and (iii) be and remain competitive with similarly situated carriers with regard to quality of driver safety as measured under CSA. Carrier and Con tractor each recognize and agree that (i) Carrier's Safety Measurement System ("SMS") evaluation maintained by the FMCSA has economic value, (ii) roadside safety inspection reports of Contractor or any if its drivers, and/or the Equipment, which are submitted to the FMCSA pursuant to the SMS ("Roadside Inspections") which report no violation improve that evaluation, (iii) Roadside Inspections which report violations worsen that evaluation and generate added direct and indirect costs to Carrier which are impossible to quantify in advance, and (iv) this Agreement requires Contractor to comply in all respects with Applicable Law such that violations noted in a Roadside Inspection constitute a breach of this Agreement. The parties further agree that the actual damage that Carrier will suffer due to Contractor violations will be difficult to measure, and that the specific damages amounts determined in advance in this Agreement which are to be charged to Contractor as set forth in Section 8 and 9 of Appendix A and Section 5 of Appendix B constitute reasonable estimate(s) of Carrier damage resulting from Contractor violations and are not a penalty to Contractor. The parties further agree that those liquidated damages are not intended to create Carrier control over Contractor's operations but instead are intended only to identify reasonable damages that Carrier

30

will suffer. In addition, Contractor shall be paid additional compensation as set forth in Section 8.4 of Appendix A for Roadside Inspections which report no violations.

9.8. <u>Customer Specifications</u>. Contractor agrees to comply with all specifications dictated by Carrier's Customers communicated to Contractor with which Contractor may safely comply without violating Applicable Law or Carrier's Policies and Procedures, and without endangering the public, Contractor's workers, and the property being transported ("Customer Specifications"). If Carrier's Customer conditions access to its facilities or freight upon compliance with any Customer Specification that Contractor does not assent to, Contractor may categorically opt out of receiving Carrier's offer of shipments from such customer.

9.9. <u>Cash on Delivery Shipments</u>. Contractor, as trustee, will collect and account for all monies due Carrier for transportation charges and cost of goods in shipments designated as Cash on Delivery ("C.O.D."), in accordance with bill of lading, shipping contract, or other instructions covering the shipment, and promptly remit all collected monies to Carrier. Contractor is not authorized to make any adjustments to the amount to be collected and agrees that no shipment will be delivered until all C.O.D. charges have been collected as required. Any losses relating to the return and transmittal of monies so collected or not collected will be solely Contractor's responsibility, and Contractor authorizes Carrier to deduct or otherwise recover all such amounts.

9.10. <u>Carrier Policies and Procedures</u>. To aid Carrier in discharging Carrier's obligations under Applicable Law and meeting Customer Specifications, Carrier has adopted Policies and Procedures comprised of applicable Driver Qualification Standards, a Drug-and-Alcohol Policy, and a Manual for Contractors and Their Drivers. Carrier may amend its Policies and Procedures at any time and will furnish any amendments to Contractor before the amendment goes into effect. Contractor agrees to require each of Contractor's workers to read and sign Carrier's Policies and Procedures and provide a signed copy to Carrier.

## 10. CONTRACTOR'S OPERATING EXPENSES

10.1. <u>Generally</u>. Contractor, at Contractor's expense, agrees to provide the Equipment ready to operate and fully roadworthy, including the necessary licenses, permits, cab cards, and state base plates, and will furnish all lubricants, fuel, tires (including changing or repairing tires), and other parts, supplies, equipment, and repairs necessary or required for the safe and efficient operation and maintenance of the Equipment. Unless otherwise provided in this Agreement, Contractor agrees to pay all expenses incident to the operation of the Equipment, including but not limited to empty mileage, lumper services, highway use taxes, weight taxes, state property, ad valorem, or indefinite situs taxes, fuel taxes, registration fees, base plates and licenses (and any unused portions thereof), Native American tribal fees and other permits of all types, ferry, bridge, tunnel, and road tolls, detention and accessorial charges not collected by Carrier because of Contractor's failure to provide required documentation, and the costs of Contractor's workers as set forth in Section 19.3 of this Agreement.

10.2. <u>Maintenance and Inspection</u>. Contractor will maintain the Equipment in safe condition and in compliance with Applicable Law (including but not limited to all regulations administered by the California Air Resources Board) at Contractor's expense. To ensure compliance with Applicable Law, Contractor must either: (i) provide Carrier a copy of an inspection report showing the Equipment passed a full annual inspection under 49 C.F.R. § 396.17 within the sixty (60) day period prior to the Effective Date of this Agreement; or (ii) make the Equipment available for an inspection at an appropriate maintenance facility, and have any necessary maintenance or repairs done at Contractor's expense, before the Effective Date. During this Agreement, Contractor agrees to have a full inspection performed at an appropriate maintenance facility at Contractor's expense at least once every ninety (90) days or more frequently to the extent required by other Applicable Law (e.g., at least once every ninety (90) days as required by California law). Contractor also agrees to have a full inspection performed at an appropriate maintenance facility within fifteen (15) days following any roadside inspection of the Equipment that results in a violation with negative implications for Carrier's Vehicle Maintenance BASIC, at Contractor's expense. Contractor also agrees to make the Equipment available for inspection at any time upon reasonable request by Carrier at an appropriate maintenance facility, at Contractor's expense. Contractor agrees to provide Carrier with a copy of any inspection reports (roadside or otherwise) immediately upon completion of the inspection and agrees to share with Carrier maintenance and repair records for the Equipment on a monthly basis. Contractor also agrees that a failure to timely report maintenance and repair records to Carrier generates added direct and indirect costs to Carrier which are impossible to quantify in advance, and therefore agrees to report each maintenance and repair record to Carrier by the end of each month in which maintenance or repairs were performed and to pay Carrier $300 as liquidated damages and not as a penalty for each month in which maintenance and repair records are not reported.

10.3. <u>Fines and Penalties</u>. Except as otherwise provided in Section 10.4 and not subject to the indemnity limits of Section 15.2 of this Agreement, Contractor agrees to promptly notify Carrier of and pay all fines and penalties arising out of or relating to the use of the Equipment under this Agreement—whether naming any of Contractor's workers who perform services under this Agreement, Carrier, or both, and including but not limited to parking, traffic, or logbook-violation fines and penalties—

31

imposed for the violation of Applicable Law where the violation results, at least partially, from the acts or omissions of any of Contractor's workers. Contractor authorizes Carrier to deduct or otherwise recover all such amounts.

10.4. Overweight and Oversized Shipments. Contractor agrees to ensure that all shipments are in compliance with the size-and-weight laws of the States, provinces, and localities through which the Equipment will travel, and to notify Carrier if the vehicle is overweight, oversized, or in need of permits before commencing the haul. Except when the violation results from the acts or omissions of Contractor, Carrier will assume the risks and costs of fines for overweight and oversize trailers when the trailers are preloaded and sealed or the load is containerized, or for improperly permitted loads, or the trailer or lading is otherwise outside of Contractor's (including Contractor's drivers') control. Contractor agrees to pay or reimburse Carrier for any costs or penalties due to Contractor's failure to weigh each shipment or to notify Carrier that the vehicle is overweight, oversized or in need of permits. Contractor authorizes Carrier to deduct or otherwise recover all such amounts.

10.5. Base Plates. Contractor agrees to obtain and display on the Equipment the base plates necessary to operate the Equipment lawfully on Carrier's behalf. If Contractor chooses to have Carrier obtain the base plates and deduct the expense from Contractor's gross compensation, by so indicating in Appendix A, Carrier will obtain the plate(s) and deduct or otherwise recover the amount(s) stated in the Deductions Table. If this Agreement is terminated prior to Contractor's reimbursement of Carrier's expense in full, Contractor authorizes Carrier to deduct any remaining amount from Contractor's final settlement and/or Maintenance Fund. Carrier will not refund to Contractor any portion of the amount received by Carrier due to ongoing liability associated with the plate. If Contractor asks Carrier to make any changes to a base plate (for example, to increase or decrease the vehicle-weight bracket), Carrier will use its best efforts to make the change and deduct or otherwise recover the related amount.

10.6. Permits. Contractor agrees to obtain and pay for all permits and licenses necessary under Applicable Law for Contractor to operate the Equipment lawfully on Carrier's behalf. In jurisdictions where Contractor is responsible for obtaining permits to operate lawfully in their territories, if Contractor chooses to have Carrier obtain such permits and deduct the expense from Contractor's gross compensation, by indicating such in Appendix A, Carrier will obtain the permits and deduct or otherwise recover the amount(s) stated in the Deductions Summary. In jurisdictions where only Carrier (not Contractor) is eligible to apply for certain permits—such as the Oregon Weight-Mile Tax, permits to haul hazardous materials in or through the States of California, Colorado, Idaho, Nevada, or West Virginia, or to haul intrastate on Carrier's behalf in those States that impose initial per-vehicle filing fees for intrastate permits—Carrier will obtain the permits and deduct or otherwise recover the amount(s) stated in the Deductions Table. If Contractor asks Carrier to obtain a special permit required by Applicable Law for Contractor to haul any particular shipment (e.g., an overdimensional permit or a temporary permit), Carrier will obtain the permit(s) and deduct or otherwise recover the amount(s) stated in the Deductions Table. Contractor agrees to return all permits issued in Carrier's name to Carrier upon termination of this Agreement. No refund will be made to Contractor by Carrier of the permit expenses, even if returned permits are reused by Carrier. Contractor will be liable to Carrier for all expenses incurred by Carrier due to Contractor's failure to return any permits. If Contractor asks Carrier to make any changes to a permit (e.g., to increase or decrease the vehicle-weight bracket), Carrier will use its best efforts to make the change and deduct or otherwise recover the related amount. Contractor may, upon request, obtain an itemization of the amounts Carrier has advanced for Contractor for permits, the portion of that amount already paid by Contractor, and the portion remaining. This itemization will separately identify each amount paid to the issuing jurisdiction, plus a Carrier Markup (if any), and any fees to a third-party service.

10.7. Fuel and Mileage Taxes and Reporting. Contractor is responsible for obtaining an International Fuel Tax Agreement ("IFTA") permit and performing fuel and mileage tax reporting for the operation of the Equipment. Contractor agrees to be solely responsible for calculating, reporting, and paying all fuel taxes owed for the operation of the Equipment; and agrees to indemnify, defend, and hold harmless Carrier from all claims arising out of or relating to the fuel tax reporting and payment (not subject to the indemnity limits in Section 15.2 of this Agreement). Carrier will furnish each of Contractor's drivers with a card ("Fuel Card") that Contractor's drivers may use only for fuel, additives, lubricants, and, subject to Carrier approval, maintenance for the Equipment. Contractor's workers are free not to use the Fuel Card except as set forth below. If Contractor instead chooses, by so indicating in Appendix A, to have Carrier perform fuel and mileage tax reporting on Contractor's behalf and deduct the expense from Contractor's gross compensation:

(a) Reporting; Use of Fuel Card. Carrier will be deemed the reporting entity with respect to the Equipment and the fuel consumed by it. Carrier will settle with Contractor monthly and submit quarterly, in Carrier's name, all applicable reports and payments of fuel taxes. Contractor's drivers will use the Fuel Card for all fuel purchases.

(b) Fuel Tax Deductions or Credits. In addition to the flat amount(s) stated in the Deductions Table, Carrier will quarterly, with respect to Contractor's operations in all taxing jurisdictions combined, either: (i) deduct or otherwise recover any net fuel use tax owed; or (ii) credit Contractor for any net fuel use tax credit or refund due Contractor. Carrier will ensure that Contractor receives, at least quarterly, summaries of credits and debits for fuel taxes on a state-by-state basis either on Settlement Statements or through separate accountings, at Carrier's option.

32

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

(c) <u>Computation of Taxes</u>. Carrier will compute Contractor's fuel use and mileage taxes on a fleetwide-average basis. If Contractor fails to provide Carrier complete and accurate fuel-tax-related records in time for Carrier's computation of Carrier's fuel tax reports and payments for the preceding month, Carrier will compute Contractor's fuel use taxes based on total miles dispatched by Carrier at the miles-pergallon rate stated in the Deductions Summary.

(d) <u>Fuel Discounts</u>. Carrier shall retain all fuel discounts that may be applied as a result of Contractor's use of the Fuel Card.

## 11. COMMUNICATIONS

11.1. <u>Electronic Logging Devices</u>. To serve Customers' shipment-tracking demands and help fulfill government requirements, including compliance with the hours-of-service regulations, Contractor must maintain and operate in the Equipment, and Contractor's driver will use, an Electronic Logging Device ("ELD"). Carrier will, at Contractor's expense, furnish, install, and maintain in an operable condition an ELD in the Equipment. Contractor will immediately return the ELD to Carrier upon Carrier's request or the termination of this Agreement. If the ELD is lost, damaged as a result of Contractor's negligence, or not returned upon request or upon termination of this Agreement, Contractor authorizes Carrier to deduct or otherwise recover the entire expense incurred by Carrier in recovering, repairing, or replacing the ELD. Carrier will not be responsible for any loss or damage to the Equipment arising or resulting from the installation, use, or removal of the ELD. If Contractor replaces the unit(s) of Equipment, Contractor will bear the expense of removal and re-installation of the ELD in the replacement Equipment, and Contractor authorizes Carrier to deduct or otherwise recover all such expense.

11.2. <u>Safe Use of Communication Devices</u>. Applicable Law prohibits the handheld use of mobile phones by drivers operating commercial motor vehicles except in an emergency when such use is necessary to communicate with law enforcement officials or other emergency services. Violations of this prohibition may impact driving safety and result in civil penalties against Carrier. As a result, Contractor agrees to ensure that Contractor's drivers comply with Applicable Law and Customer Specifications regarding use of mobile phones and ELDs while operating the Equipment. Failure to comply with such prohibitions or limitations may result in disqualification of the driver involved and/or termination of this Agreement.

11.3. <u>ELD Privacy Disclosure and Consent Form</u>. Appendix B describes the categories of data collected by the ELD, the uses to be made of such data by Carrier, and the right of Contractor's driver(s) to review certain data upon request.

11.4. <u>Consent to Telephone Communications</u>. Pursuant to the Telephone Consumer Protection Act, Contractor authorizes Carrier or any agent of Carrier to contact Contractor at Contractor's telephone number(s) appearing in the signature block after the main text of this Agreement, or otherwise provided to Carrier by Contractor before, on, or after the Effective Date, including any telephone number associated with a cellular phone, via any method, including but not limited to live, person-to-person communications and by automatic telephone dialing system.

## 12. CARGO CLAIMS

Contractor agrees to immediately report all cargo claims to Carrier, including all claimed shortages, overages, damages, or other exceptions to the cargo. If possible, Contractor agrees to notify Carrier of all cargo claims before leaving the Customer's or consignee's location. Contractor's indemnity obligation to Carrier under Sections 15.1 and 15.2 of this Agreement will apply to each cargo claim, including but not limited to delay, shortages, misdelivery, and any direct damage claim relating to lost, damaged, or contaminated loads arising out of or relating to Contractor's services. Contractor authorizes Carrier to deduct or otherwise recover any such amounts.

## 13. USE OF TRAILING EQUIPMENT

For every trailer, chassis, or other unit of trailing equipment provided to Contractor by Carrier or Carrier's Customer ("Trailing Equipment"), including those covered by a Trailer Rental Addendum to this Agreement:

13.1. <u>Regular Maintenance</u>. Contractor will, at Contractor's expense, be responsible for all regular maintenance of axles, brakes, and other electrical and mechanical systems; repairs of damage to Trailing Equipment; including purchases of replacement tires needed as a result of reasonable wear and tear for all of Trailing Equipment.

13.2. <u>Contractor's Responsibilities</u>. Contractor agrees to be responsible for daily pre-trip and post-trip inspections, proper inflation of tires, prompt informing of Carrier upon experiencing defective or mal-performing tires, brakes, or other electrical or mechanical features of Trailing Equipment, and proper lubrication. Contractor agrees and warrants that all Trailing Equipment if used by Contractor's drivers will be used to transport only shipments tendered to Contractor by Carrier, except pursuant to an Addendum for Trailer Sublease. *Subject to the indemnity limits in Section 15.2 of this Agreement*, Contractor will be liable for the entire amount of all repairs of all damage to the Trailing Equipment, as well as all expenses and indirect, special, and consequential damages resulting therefrom,

33

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

including, but not limited to, storage costs while awaiting repair, towing or moving expenses, and replacement costs in the event of a total loss, arising out of or relating to Contractor's use of Trailing Equipment, other Carrier equipment, or equipment of any other carrier. All such repairs and maintenance will be performed at facilities designated or approved by Carrier. Contractor authorizes Carrier to deduct or otherwise recover all these amounts. Upon request by Contractor, Carrier will provide Contractor with a written explanation and itemization of the deduction.

13.3. Return of Trailing Equipment. Contractor agrees to return any Trailing Equipment in the same good condition as received by Contractor, along with any and all other equipment and property belonging to Carrier immediately upon Carrier's request or upon termination of this Agreement. If Trailing Equipment is not in as good a condition as when it was delivered by Carrier, Contractor authorizes Carrier to restore Trailing Equipment to proper condition and to charge back to Contractor the costs of these repairs or reconditioning. If Contractor for any reason fails to return Trailing Equipment, Contractor agrees to reimburse Carrier for all reasonable expense, including attorneys' fees, incurred by Carrier in recovery of Trailing Equipment. Contractor agrees that if it is necessary for Carrier to enter upon Contractor's private property or move Contractor's private property in order to recover Trailing Equipment, Contractor grants Carrier permission to do so. *Contractor agrees to defend, indemnify, and hold harmless Carrier (and Carrier's agents) from any form of liability whatsoever in connection with the repossession; such indemnity obligation will not be subject to the limits in Section 15.2 of this Agreement.*

## 14. CRASHES, ACCIDENTS, INCIDENTS, AND CLAIMS

Contractor must immediately report to Carrier any crash, collision of the Equipment with any vehicle, object or person, accident (whether or not defined as an "accident" or "preventable" under this Agreement), incident, potential or actual claim, bodily injuries, losses or damages (including to cargo and to any Trailing Equipment), shortages, overweight, or overages involving Contractor's operations under this Agreement. If any such occurrence is not reported immediately to Carrier, Contractor: (i) will risk disqualification of Contractor's worker who failed to make the report and/or termination of this Agreement; and (ii) must, not subject to the indemnity limits in Section 15.2 of this Agreement, reimburse Carrier for all expense incurred as a result of the failure. Contractor's workers must cooperate fully with Carrier and Carrier's representatives and insurers (at Contractor's expense) with respect to any legal action, hearing, or other proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder, including provision of written reports or affidavits, attendance at hearings, and trials and assistance in securing evidence or obtaining the attendance of witnesses.

## 15. INDEMNIFICATION BY CONTRACTOR

**15.1. Generally. Contractor agrees to defend, indemnify, and hold harmless Carrier (and its affiliates, subsidiaries, officers, agents, and employees) from any direct, indirect, or consequential loss, damage, delay, fine, civil penalty, action, claim for injury or death to persons (including to Carrier's employees or agents), damage to property, environmental response or restoration expense, cargo loss or damage (including contaminated loads and deemed losses due to failure or lack of documentation of temperature or breakage of seals), loss of or damage to Trailing Equipment or Carrier's other real or personal property, injunctive obligations, or other expense that Carrier pays or otherwise incurs, including reasonable attorneys' fees and costs of litigation, arising out of or relating to any of Contractor's workers' negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions ("Carrier Damages"). Contractor authorizes Carrier to deduct or otherwise recover any amounts due to Carrier under this section. If any of Contractor's drivers operates the Equipment for any purpose other than the carriage of Carrier's lading, Contractor agrees to defend, indemnify, and hold harmless Carrier (and its affiliates, subsidiaries, officers, agents, and employees) from any Carrier Damages arising from that operation. This section will remain in full force and effect both during this Agreement and after its termination.**

**15.2. Indemnity Limits. Contractor's indemnity obligation for Carrier Damages is limited—except as expressly provided elsewhere in this Agreement—to paying Carrier up to the amounts of Carrier Damages stated in the Deductions Table for the indicated categories of claims. None of those dollar limits will apply to any liquidated damages owed to Carrier or to any Carrier Damages resulting from the operation of the Equipment not on behalf of Carrier. In addition, the indemnity limits stated in the Deductions Table will apply only to Contractor's indemnity obligation for Carrier Damages and will not limit in any way the losses, damages, attorneys' fees, or other expenses that Contractor may sustain as a result of an injured third party's assertion of a claim directly against Contractor. The indemnity limits provided for in this Section and stated in the Deductions Table shall not apply to the extent Carrier Damages arise out of or relate to any of Contractor's workers' gross negligence or willful misconduct (including but not limited to intentional torts).**

Initials: K S

34

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

15.3. <u>Carrier's Coverages</u>. Carrier has secured insurance coverages that may cover risks and liabilities for which Contractor has agreed to indemnify Carrier under this Agreement (for example, public liability insurance). Such policies are expressly for the benefit of Carrier and only incidentally may benefit Contractor. Terms of the policies may change (for example, higher or lower deductibles, length of coverage, UM/UIM waivers or limitations, or insurance underwriters). Contractor has neither any obligations under the policies nor any rights under their terms.

15.4. <u>Claims by Contractor or Other Contractors</u>. Notwithstanding Section 15.1 of this Agreement, and not subject to the limits of Section 15.2 of this Agreement, Contractor agrees to defend, indemnify, and hold harmless Carrier from: (i) any claim by Contractor for loss of or damage to the Equipment or Contractor's other property (and any related fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation) due to the negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions of any of Contractor's workers; and (ii) any claim by any other contractor of Carrier for loss of or damage to the other contractor's truck, tractor, trailer, or other property (and any related fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation) due to the negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions of any of Contractor's workers.

15.5. <u>Reclassification</u>. THE TERMS OF THIS AGREEMENT REFLECT THAT CONTRACTOR IS AN INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE. THEREFORE: Notwithstanding Section 15.1 and not subject to the indemnity limits in Section 15.2 of this Agreement, Contractor agrees to defend, indemnify, and hold harmless Carrier from all reasonable attorneys' fees and litigation expenses Carrier incurs in defending against any claims, suits, actions, or administrative proceedings brought by Contractor or any of Contractor's workers alleging that Contractor or any of Contractor's workers is an employee of Carrier, but which ultimately, upon completion of all appeals or the running of all applicable appeal periods, fail to result in any final judicial or administrative decision holding the allegation to be true.

## 16. INDEMNIFICATION BY CARRIER

16.1. <u>Generally</u>. Carrier agrees to defend, indemnify, and hold harmless Contractor (and Contractor's affiliates, subsidiaries, officers, agents, and employees) from any claim (including any for which Contractor is covered by Carrier's insurance) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation ("Contractor Damages") that Contractor pays or otherwise incurs arising out of or relating to Carrier's (including Carrier's agents' or employees') negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions. This indemnity obligation will not apply to any claim of loss or damage to the Equipment or to Contractor's other property, or to any claim arising out of or relating to Contractor's workers' operation of the Equipment for any purpose other than the performance of Contractor's obligations under this Agreement. Carrier's indemnity obligations do not apply when the Equipment is being operated pursuant to an Addendum for Alternative Uses of Equipment. Contractor agrees to furnish Carrier with a written explanation and itemization of any claim for cargo or property damage. This section will remain in full force and effect both during and after the termination of this Agreement. Carrier will credit to Contractor's next Settlement Compensation any amounts due Contractor under this section.

16.2. <u>Indemnity Limits</u>. Carrier's indemnity obligation under Section 16.1 of this Agreement will be limited to a maximum of $5,000 of the total amount in Contractor Damages that Contractor paid or otherwise incurred per occurrence, and in no event will Carrier's indemnity obligation under Section 16.1 of this Agreement exceed $10,000 where multiple claims arise in combination out of any one occurrence. The indemnity limits provided for in this Section shall not apply to the extent Contractor Damages arise out of or relate to Carrier's (including Carrier's agents' or employees') gross negligence or willful misconduct (including but not limited to intentional torts).

## 17. POSSESSION AND IDENTIFICATION OF EQUIPMENT

17.1. <u>Exclusive Possession and Responsibility</u>. Carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement. The foregoing declarations are made solely to conform to FMCSA regulations and may not be used for any other purposes, including any attempt to classify Contractor as an employee of Carrier. Nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether any of Contractor's workers is an independent contractor or an employee of Carrier. Solely because of the limitations of 49 C.F.R. §§ 376.12(c)(1) and (2), Contractor may operate the Equipment for another motor carrier or entity during this Agreement only with the prior written consent of Carrier.

17.2. <u>Identification of Equipment</u>. Except as otherwise provided herein, during the term of this Agreement Contractor agrees to apply to and maintain on the Equipment such identification as Carrier may designate under Applicable Law. Contractor must remove any items that, in Carrier's reasonable judgment, would interfere with this identification or be offensive.

35

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

Contractor agrees to remove or cover up this identification at the termination of this Agreement, or while operating the Equipment for any purpose other than conducting Carrier's business. Contractor agrees to keep the Equipment in clean appearance and identified as described herein, at Contractor's expense. Contractor agrees to display its business name and address on the Equipment in a manner that is consistent with Applicable Law.

## 18. ALTERNATIVE USE OF EQUIPMENT

Except as restricted by Applicable Law, nothing in this Agreement prohibits Contractor from providing transportation services for other motor carriers, brokers, directly for shippers, or any other person or entity, provided that Contractor complies with the requirements of 49 C.F.R. Part 376. For this purpose, Carrier has prepared an Addendum for Alternative Uses of Equipment, which is available upon request. If Contractor engages in an Alternative Use of Equipment (as defined in the Addendum for Alternative Uses of Equipment) without obtaining the required authorization from Carrier in advance, Contractor will have materially breached this Agreement. In that event, and in light of the administrative, claims-investigation, litigation related, and other expenses Carrier may incur in the event of a highway accident occurring due such an unauthorized trip, Contractor agrees to pay Carrier liquidated damages in the amount stated in the Addendum for Alternative Uses of Equipment, in addition to the indemnity obligation Contractor agrees to owe Carrier under this Agreement. In addition, Carrier may, at its option, immediately terminate this Agreement on account of such breach.

## 19. CONTRACTOR NOT EMPLOYEE OF CARRIER

19.1. Generally. This Agreement is between two independent businesses that are separately owned and operated. It is expressly understood and agreed that Contractor is an independent contractor for the Equipment and driver services provided under this Agreement. Contractor agrees to provide necessary documentation and apply for certification of Contractor's independent contractor status where mandated by Applicable Law.

19.2. Equipment, Maintenance, and Routes. Subject only to Applicable Law, it will be the sole responsibility of Contractor to: (i) select, purchase or lease, and finance the Equipment; (ii) to decide when, where, and how maintenance and repairs are to be performed; and (iii) to select all routes and decide all meal, rest, and refueling stops, provided that to meet Carrier's Customers' demands, Contractor agrees to make timely and safe deliveries of all loads, and to notify Carrier when delivery has been made or will be delayed for any reason.

19.3. Contractor's Workers. Subject only to Applicable Law and safety considerations, Contractor assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, meal and rest breaks, wages, and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, coverage of worker injuries, adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of or relating to Contractor's use or employment of drivers, drivers' helpers, and other workers to perform any aspect of this Agreement. In addition, Contractor agrees to be solely responsible for complying with Applicable Law governing the terms and conditions of employment of Contractor's employees or applicants for employment, including, without limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of payment of income; unemployment; Medicare and other state and federal payroll taxes; and other required withholdings for Contractor's employees. If Contractor obtains any of the Equipment from a third party that is not exempt from 49 C.F.R. Part 376, Contractor will ensure that such third party receives all of the rights and benefits due under 49 C.F.R. Part 376 pursuant to 49 C.F.R. § 376.12(m), and Contractor will provide Carrier with a copy of any agreement Contractor enters into for the purpose of satisfying this obligation.

19.4. Taxes. Contractor is free to choose the form in which to operate Contractor's business. Contractor agrees to file all tax forms and returns that Contractor may be required by law to file, on account of Contractor's workers used in the performance of this Agreement, and to pay when due all taxes and contributions reported in the forms and returns. In that regard, Contractor knows: (i) of Contractor's responsibilities to pay estimated social security taxes and state and federal income taxes with respect to remuneration received from Carrier; (ii) that the social security tax Contractor must pay is higher than the social security tax the individual would pay if he or she were an employee; and (iii) that the service provided by Contractor to Carrier under this Agreement is not work covered by the unemployment compensation laws of any State, including Georgia; provided, however, that should Contractor employ or use drivers, helpers, or other workers to fulfill Contractor's obligations under this Agreement, and the drivers, helpers, or other workers are covered by the unemployment laws of any State, including Georgia, Contractor is solely responsible for providing unemployment insurance for the drivers, helpers, or other workers. Contractor agrees to furnish Carrier such evidence of compliance with the foregoing as Carrier may reasonably require, including but not limited to proof of income and payroll taxes currently paid by Contractor or withheld by Contractor from the wages of Contractor's workers. Carrier will file a Form 1099 with the Internal Revenue Service with respect to Contractor as required by Applicable Law.

36

**20. THE PARTIES' OBLIGATIONS UPON RECLASSIFICATION.**

If any of Contractor's workers is determined to be an employee of Carrier by any governmental authority, whether directly or as a joint employer ("Reclassification Decision"), either party may, at its election, rescind this Agreement back to the time of its formation, and both parties would then be returned to their respective positions before it was signed. If either party makes that election, the following terms apply when the Reclassification Decision becomes final:

    20.1. <u>Contractor's Obligations</u>. Contractor will: (i) owe Carrier, for the period of time this Agreement was in effect, all gross compensation (as defined in Section 3 of this Agreement) previously paid to Contractor by Carrier, less any deductions under Section 5 of this Agreement; (ii) relinquish all rights in any balances in maintenance funds then under Carrier administration that are traceable to compensation previously paid to Contractor by Carrier; and (iii) owe Carrier any cash advances provided by Carrier to Contractor that Contractor used for personal, household, or other expenses not in performance of Contractor's obligations under this Agreement or that Contractor retained unspent. Contractor will be entitled to deduct from these amounts any expenses Contractor incurred in performance of Contractor's obligations under this Agreement that were not covered by charge-backs or paid by Carrier.

    20.2. <u>Carrier's Obligations</u>. Carrier will owe Contractor, for all work activities during the period of time this Agreement was in effect (including any activities for which Carrier has not yet paid Contractor), only the then applicable "hourly mean wage" for Occupation Code 53-3032 for the Chicago-Naperville-Arlington Heights, IL Metropolitan Division, as published by the Bureau of Labor Statistics of the U.S. Department of Labor (or, if higher, the federal minimum hourly wage or a state's then-applicable minimum hourly wage but only to the extent Contractor's wage earning activities occurred in that state), multiplied by Contractor's total hours spent actually performing on-duty work for Carrier, consisting of both driving and non-driving time, under any applicable hours-of-service regulations. The total hours worked will be computed based on any relevant, reliable evidence, which may include Settlement Statements, driver logs, shipment-tracking data, bills of lading, fuel receipts, and toll receipts.

    20.3. <u>Option to Terminate</u>. Because reclassification of Contractor or any of its workers as an employee of Carrier would fundamentally change the parties' assumptions and expectations, either party may, upon issuance of a Reclassification Decision, terminate this Agreement upon one (1) days' notice to the other.

    20.4. <u>Survival</u>. The provisions of this section will survive both the rescission and termination of this Agreement.

**21. COMPLETION OF PERFORMANCE**

If Contractor's acts or omissions related to a shipment, including, but not limited to the failure to complete delivery or abandonment of freight or Trailing Equipment, subject Carrier to liability, Carrier may take possession of the shipment and complete performance. In that event, Contractor waives any recourse against Carrier for the action. Contractor authorizes Carrier to deduct or otherwise recover from gross compensation all direct or indirect costs, expenses, or damages, including attorneys' fees, incurred by Carrier as a result of Carrier's taking possession of the shipment and completing performance.

**22. CONTRACTOR NOT REQUIRED TO PURCHASE OR RENT PRODUCTS, EQUIPMENT, OR SERVICES**

Other than the ELD, Contractor is not required to purchase or rent any products, equipment, or services from Carrier as a condition of entering into this Agreement. The terms of any contract under which Contractor elects any transaction that gives Carrier the right to make deductions from Contractor's settlement will be specified in an Appendix or Addendum to this Agreement.

**23. PASSENGER AUTHORIZATION**

As required by 49 C.F.R. § 392.60, Contractor agrees not to allow any passengers to ride in the Equipment without authorization in writing by Carrier, which will be given only if: (i) all of Contractor's workers and the passenger submit to Carrier a fully executed Passenger Authorization and Release of Liability form; and (ii) Contractor furnishes Carrier a Certificate of Insurance for passenger liability coverage meeting all the requirements of Section 7 of this Agreement, as well as Appendix A, or elects to have Carrier facilitate the coverage. Carrier will deduct or otherwise recover from Contractor the costs associated with obtaining Passenger Authorization. Contractor agrees not to permit any passenger to operate or be in charge of the Equipment at any time for any purpose whatsoever, or to be outside the cab during loading or unloading.

**24. LOADING AND UNLOADING**

If the shipper or consignee does not assume loading and unloading responsibilities, Contractor agrees to be responsible for the loading or unloading of property transported on behalf of Carrier at Contractor's expense and with no additional compensation for those services, unless otherwise indicated in Appendix A.

37

## 25. CONFIDENTIALITY AND TRADE SECRETS

25.1. <u>Protection of Confidential Information</u>. Contractor acknowledges that any list of Carrier's Customers is a valuable, special, and unique asset of the business of Carrier. Contractor agrees that during and after the term of this Agreement Contractor's workers: (i) will not disclose the list of Carrier's Customers or any part thereof to any third party for any reason without Carrier's prior written consent; (ii) will preserve as "Confidential Information" all trade secrets, know-how and information relating to Carrier's business, forms, processes, developments, sales and promotional systems, prices and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, or other contractors, and other sources of any kind resulting from this Agreement; and (iii) will regard the Confidential Information as the sole property of Carrier, and will not publish, disclose or disseminate the same to others without the written consent of Carrier.

25.2. <u>Non-Solicitation</u>. Contractor acknowledges that Carrier's Customers are material to Carrier's business. Contractor shall not in any way induce other contractors or employees of Carrier, or any Contractor's worker, for the purpose of entering into a relationship to solicit or do business with Customers of Carrier with whom Contractor had business or learned the existence of as a result of such business while performing this Agreement, said restriction to be in effect during the term of this Agreement and for a period of one (1) year thereafter. Contractor agrees and acknowledges that the obligations of this paragraph are not inequitable, and that it will not be deprived of a gainful occupation by enforcement of this paragraph.

25.3. <u>Remedies</u>. Contractor recognizes that in the event Contractor were to disclose Confidential Information or solicit Carrier's Customers in violation of Sections 25.1 or 25.2, Carrier would suffer substantial damages which would cause irreparable harm to Carrier which Carrier has no adequate remedy at law. Contractor therefore agrees that in the event of any material breach or threatened material breach by any of Contractor's workers of Sections 25.1 or 25.2, Carrier will be entitled to an injunction, restraining Contractor's workers from disclosing, in whole or in part, the list of Carrier's Customers, and all other Confidential Information, or, as applicable, from doing business with Carrier's Customers. Carrier will be irreparably damaged in the event of any material breach of this provision by Contractor. Accordingly, in addition to any other legal or equitable remedies that may be available to Carrier, Contractor agrees that Carrier will be able to seek and obtain immediate injunctive relief in the form of a temporary restraining order without notice, preliminary injunction, or permanent injunction against Contractor's workers to enforce these confidentiality and nonsolicitation provisions and that Carrier will not be required to post any bond or other security and will not be required to demonstrate any actual injury or damage to obtain injunctive relief from the courts. Nothing in this section should be construed as prohibiting Carrier from pursuing any remedies available to Carrier at law or in equity for the material breach, including the recovery of monetary damages from Contractor.

25.4. <u>Notice Required by 18 U.S.C. § 1833(b)(3)</u>. To the extent the Confidential Information constitute "trade secrets" under 18 U.S.C. § 1839(3), Carrier provides the following notice to Contractor pursuant to 18 U.S.C. § 1833(b)(3): An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

## 26. BENEFIT AND ASSIGNMENT

This Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective successors. Contractor may not assign or subcontract any obligations to another party without the prior written consent of Carrier, though Contractor remains free to engage workers to perform services under this Agreement. Carrier may assign or subcontract this Agreement or any rights or obligations hereunder without the prior written consent of Contractor.

## 27. NOTICES

All notices must be in writing (unless permitted elsewhere in this Agreement to be oral) and will be deemed to have been fully given: (i) upon delivery if delivered in person, by facsimile transmission, or electronic means; (ii) on the next day after being deposited with an overnight delivery company with the express charges prepaid; or (iii) on the date indicated on the return receipt, or if there is no receipt, on the third day after being deposited in the United States Mail with first-class postage prepaid. The parties agree to be under a continuing duty to provide written notice to each other regarding changes to any of the contact information.

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

**28. GOVERNING LAW, DISPUTE RESOLUTION AND RELATED WAIVERS**

28.1. Governing Law and Dispute Resolution. THIS AGREEMENT WILL BE GOVERNED BY THE LAWS OF THE UNITED STATES AND OF ILLINOIS, WITHOUT REGARD TO THE CHOICE-OF-LAW RULES OF THAT OR ANY OTHER

28.2. JURISDICTION. THE ILLINOIS UNIFORM ARBITRATION ACT SHALL GOVERN THE INTERPRETATION, ENFORCEMENT, AND PROCEEDINGS PURSUANT TO

28.3. THE ARBITRATION CLAUSE IN THIS AGREEMENT. THE PARTIES AGREE THAT ANY CLAIM OR DISPUTE ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT, OR WITH RESPECT TO ANY ASPECT OF THE RELATIONSHIP BETWEEN THE PARTIES, WHETHER UNDER FEDERAL, STATE, LOCAL, OR FOREIGN LAW (INCLUDING BUT NOT LIMITED TO 49 C.F.R. PART 376), MUST BE BROUGHT EXCLUSIVELY IN THE STATE COURTS OF DUPAGE COUNTY, ILLINOIS. THE PARTIES CONSENT TO THE JURISDICTION OF THESE COURTS.

28.4. Arbitration. ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH THEREOF, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION IN ACCORDANCE WITH ITS COMMERCIAL ARBITRATION RULES, AND JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. WITHIN 14 DAYS AFTER THE COMMENCEMENT OF ARBITRATION, EACH PARTY SHALL SELECT ON PERSON TO ACT AS ARBITRATOR AND THE TWO SELECTED SHALL SELECT A THIRD ARBITRATOR WITHIN 10 DAYS OF THEIR APPOINTMENT. IF THE ARBITRATORS SELECTED BY THE PARTIES ARE UNABLE OR FAIL TO AGREE UPON THE THIRD ARBITRATOR, THE THIRD ARBITRATOR SHALL BE SELECTED BY THE AMERICAN ARBITRATION ASSOCIATION. EACH PARTY SHALL BEAR ITS OWN COSTS AND EXPENSES AND AN EQUAL SHARE OF THE ARBITRATORS' AND ADMINISTRATIVE FEES OF ARBITRATION. CONTRACTOR MAY OPT OUT OF ARBITRATION BY SUBMITTING A REQUEST TO OPT OUT TO CONTRACTORS SAFETY OR FLEET MANAGER WITHIN 30 DAYS FROM THE EFFECTIVE DATE OF THIS AGREEMENT

28.5. Waiver. CONTRACTOR AND CONTRACTOR'S WORKERS WAIVE ANY RIGHT TO INITIATE, JOIN (I.E., OPT IN TO), REMAIN IN (I.E., NOT OPT OUT OF), OR OTHERWISE PARTICIPATE IN ANY CLASS ACTION, COLLECTIVE ACTION, CONSOLIDATED ACTION, OR REPRESENTATIVE ACTION BROUGHT AGAINST CARRIER, INCLUDING BUT NOT LIMITED TO SUCH ACTIONS BROUGHT UNDER STATE OR FEDERAL LAW AND THOSE ARISING UNDER THE FAIR LABOR STANDARDS ACT.

**29. MISCELLANEOUS PROVISIONS**

29.1. General. The subject headings of this Agreement are included for convenience only and must not affect the construction or interpretation of any of its provisions. All dollar amounts are based on U.S. Dollars. Unless otherwise specified, all references to "days" mean calendar days. This Agreement may be executed in counterparts.

29.2. Severability. If any provision (including any sentence or part of a sentence) of this Agreement is deemed invalid for any reason, this Agreement will be void only as to that provision, sentence or part of a sentence, and this Agreement will remain otherwise binding between the parties. Any provision, sentence or part of a sentence, deemed voided will be replaced with provisions that will be as close to the parties' intent as permissible.

29.3. Waiver. A waiver of any provision of this Agreement will not constitute a waiver of any other provision, nor will any waiver constitute a continuing waiver. No waiver will be deemed effective or binding unless executed in writing by the party making the waiver. The failure or refusal of a party to insist upon the strict performance of any provision of this Agreement, or to exercise any right under this Agreement, will not be construed as a waiver of the provision or right, nor will the failure or refusal be deemed a customary practice contrary to the provision or right. The rights and remedies of Carrier under this Agreement or under Applicable Law are cumulative, and the exercise of any of them will not be exclusive of any other right or remedy provided by this Agreement or allowed under Applicable Law.

29.4. No Third-Party Beneficiaries. Nothing in this Agreement creates any rights in any party not a signatory to or expressly designated as a third-party beneficiary herein.

29.5. Completeness and Amendments. This Agreement constitutes the entire agreement between Carrier and Contractor pertaining to the subject matter contained herein and fully replaces and supersedes all prior and contemporaneous agreements, representations, and understandings, except as provided in Section 29.6 of this Agreement. No modification or amendment to this Agreement is binding unless in writing and signed by both Carrier and Contractor, except as otherwise provided in this Agreement.

29.6. Credits and Debits under Previous Agreements. Balances in escrow funds or maintenance funds created under any previous written agreement between the parties will be credited to the Maintenance Fund created under this Agreement (if any). All compensation and other amounts due Contractor from Carrier, and all advances and other amounts due Carrier from

39

Contractor, under the previous agreement, will remain due and payable. The amounts of compensation for trips started, and the amounts of advances and other amounts due Carrier, before the Effective Date of this Agreement will be determined by the previous agreement, the payment procedures will be determined by this Agreement, and the payment timing will be determined by the predecessor agreement or this Agreement, whichever requires payment earlier.

29.7. <u>Copies and Statement of Lease</u>. Carrier will keep the original of this Agreement, and Contractor agrees to keep a copy as well. Contractor also agrees that this Agreement or a Statement of Lease in the form appended hereto will be carried on the Equipment during the term of this Agreement.

29.8. <u>Survival</u>. If, up to and including the date of termination of this Agreement, one or more events occur that give rise, before or after that date, to a liability or entitlement of Contractor or Carrier under this Agreement, the liability or entitlement will continue until it is satisfied in full, notwithstanding the termination of this Agreement. Contractor's obligations include, but are not limited to, completing performance in the event of termination.

29.9. <u>Consent to Do Business Via Electronic Methods</u>. Carrier and Contractor consent to do business using any electronic method permitted by FMCSA. This consent includes, but is not limited to, the use of electronic methods to effect and transmit the signature of any document, including this Agreement and any supplement, modification, addendum, amendment, notice, consent and/or waiver required by this Agreement, or any other document required by FMCSA regulations to be generated and maintained (or exchanged by private parties). The parties agree that when either party uses any electronic method to accomplish electronic signatures, the chosen method: (i) identifies and authenticates the sender as the source of the electronic communication; (ii) indicates the sender's approval of the information contained in the electronic communication; and (iii) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature. Either party may elect to use a handwritten signature with respect to any document, provided that the election will not preclude the other party from using an electronic signature to the same document.

**NOTICE: THIS IS A BINDING LEGAL DOCUMENT. The parties acknowledge that each has the right and opportunity to fully review the Agreement prior to signing and, if each so elects, seek the assistance of legal counsel of its own choosing. By signing this Agreement, Contractor (i) represents it has read this Agreement; (ii) has sought and received the advice of an attorney or, if not, has chosen not to do so; (iii) if Contractor's primary language is not English, has had the opportunity to have this Agreement translated; and (iv) is entering into this Agreement freely, voluntarily, and without duress, undue influence, coercion, or promise of any benefit not specifically described in this Agreement.**

**(Signature Page Follows)**

40

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

By signing below, Contractor acknowledges that, as reflected in this Agreement:

- Contractor is NOT an employee of Carrier, and all aspects of the relationship between Contractor and Carrier are based on Contractor's status as an independent contractor.
- Contractor has agreed to be responsible for the operating expenses incurred in connection with Contractor's business operations.
- Contractor's agreement to take responsibility for Contractor's expenses is an indispensable term of this Agreement but for which Carrier would not have agreed to pay the gross compensation stated herein, or have entered into this Agreement.
- The gross compensation Carrier agrees to pay is not intended to ensure that Contractor can pay for Contractor's operating expenses. Instead, it is intended to provide the amount of revenue to Carrier sufficient to convince, in the market, a contractor both to provide, maintain, fuel, legally credential, and otherwise operate suitable and dependable Equipment and to provide and pay a qualified professional driver (or drivers) to operate the Equipment.
- The gross compensation paid to Contractor is MORE than Carrier would pay an employee to perform driving services, which reflects the reality of the marketplace, in that Carrier cannot attract contractors willing to take the entrepreneurial risk of running their own businesses by paying merely the personal-services wage they could earn as employees.

Contractor : Kyle Jordan Smith

_Kyle Smith_
Signature

2950 E North ST APT 600L
Street Address

Greenville, SC, 29615
City, State, Zip Code

9129151256
Phone Number

smithkyle914@gmail.com
Email Address

06 / 26 / 2025
Date

Crena Transportation Services

_Ivan Milutinovic_
Ivan Milutinovic

06 / 26 / 2025
Date

41

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# APPENDIX A

1. **EQUIPMENT LIST**

| Make | Model | Year | Unit Number | VIN Number |
|---|---|---|---|---|
| VOLVO | VNL 760 | 2025 | 5385 | 4V4NC9EJ4SN695385 |
| | | | | |

2. **GROSS COMPENSATION**

   2.1. Pursuant to Section 3 of this Agreement, Carrier will pay Contractor gross compensation, comprising Base Compensation and Additional Compensation, as described in this section.

   2.2. Base Compensation. Carrier will pay Contractor 75 % of the Agreed Carrier Rate Confirmation or Dispatch Sheet (as defined in Section 3.2 of this Agreement).

   2.3. Additional Compensation.

   (a)  (Accessorial Compensation. Carrier will tender to Contractor compensation or cost reimbursement Carrier receives from Carrier's Customer for loading or unloading of a shipment in an amount as agreed upon between Carrier's dispatcher and Contractor if and when such accessorial compensation is negotiated by and between Carrier and its customer. Otherwise, if no accessorial compensation is received from Carrier's customer, Contractor will be responsible for the loading or unloading of shipments at its expense. In addition, the compensation or cost reimbursement of other accessorial charges, including but not limited to detention, and tarping, will be paid to Contractor as agreed upon between Carrier's dispatcher and Contractor if and when such accessorial compensation is negotiated by and between Carrier and its customer. Otherwise, if no other accessorial compensation, such as for detention, and tarping, is received from Carrier's customer, Contractor will be responsible for tarping or detention at its expense. Contractor agrees that it is not entitled to the full accessorial compensation that Carrier receives from its customer(s) due to time, effort and labor expense Carrier spends on negotiating such accessorial compensation.

   (b)  Fuel-Related Compensation. Carrier will retain any and all fuel-related compensation Carrier receives from Carrier's Customer.

   (c)  Compensation for Roadside Stop. Compensation for Roadside Stops which result in no violations is set forth in Section 8.4 of this Appendix.

3. **BASE PLATE**

Contractor **MUST** select one of the following:

☐ Contractor will obtain plates for the Equipment.

☒ Carrier will obtain apportioned plate(s) under the International Registration Plan for the Equipment (whichever is applicable) and deduct or otherwise recover the amount stated in the Deductions Summary, below. In no event shall the cost of the plate be refundable. Upon termination of this agreement for whatever reason, Carrier may sell or otherwise transfer or dispose of the plates without compensation or refund to the Contractor.

4. **CONTRACTOR-ELIGIBLE PERMITS**

Contractor MUST select one of the following:

☐ Contractor will obtain Contractor-eligible permits.

☒ Carrier will obtain Contractor-eligible permits, and Carrier will deduct or otherwise recover the amount stated in the Deductions Summary.

5. **FUEL AND MILEAGE TAX REPORTING**

Contractor **MUST** select one of the following:

42

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

☐ Contractor will obtain and pay any required fee for IFTA permits and will perform all fuel and mileage tax reporting with respect to the Equipment at Contractor's expense.

☒ Carrier will obtain and pay any required fee for IFTA permit and will perform all fuel and mileage tax reporting services with respect to the Equipment.

## 6. DEDUCTIONS SUMMARY

Pursuant to Section 5 of this Agreement, Contractor authorizes Carrier to deduct or recover the items in the Deductions Summary Bellow.

If no dollar figure is listed, the deductions will vary in amount and will be computed as indicated. As used in this Agreement, "Carrier Markup" means any amount that exceeds the actual cost incurred by Carrier, whether such excess amount is retained by Carrier to offset administrative costs, as profit, or for any other purpose.

| DEDUCTIONS SUMMARY | |
|---|---|
| Charge-Back or Other Deduction Item | Amount of Method of Computation of Deduction |
| Adjustments to compensation | According to Section 3.5 of this Agreement. |
| Advance check | If Contractor elects, with Carrier's prior written consent, to use an advance check to pay any of Contractor's expenses under this Agreement, Carrier will charge back the amount advanced, plus a pertransaction fee of $10.00 (comprising both the fee charged by issuer of the advance checks and/or a Carrier Markup). Amount advanced and any fees will be first deducted from Contractor's maintenance fund. Additional Carrier Markup fee of 20% will apply for any balance owed not covered by the maintenance fund. |
| Advances of Contractor's compensation charged to Carrier's Fuel Card for Contractor's use to purchase only fuel, additives, and lubricants. | Amount Carrier advanced to Contractor (charged to the Fuel Card) on Contractor's request, plus a per-transaction fee in an amount equal to the fee charged from the Fuel Card provider to the Carrier (comprising both a fee charged by issuer of the Fuel Card and/or a Carrier Markup). If Carrier receives any discounts, rebates, or credits on Contractor's use of the Fuel Card, Carrier will retain such discounts and rebates as a Carrier Markup. |
| Base Plate(s) | If Contractor elects Carrier to obtain an apportioned plate under the International Registration Plan for the Equipment (whichever is applicable), Carrier will deduct an annual $2,500.00 flat fee. If Contractor exchanges the Equipment for a replacement vehicle, then a prorated amount of the $2,500 shall be deducted plus a Heavy Highway Vehicle Use fee of $550.00. |
| C.O.D. Charges under Section 9.9 of this Agreement | Amount of charges owed by Carrier's Customer and not collected by Contractor's worker, or collected but not remitted to Carrier, when collection and remittance is required for a shipment. |
| Detention, accessorial and other Customer-charge revenue not collected by Carrier from Carrier's customer because of Contractor's failure to transmit to Carrier the necessary documentation supplied by the Customer. | Amount Carrier was unable to collect from Carrier's Customer as a result of Contractor's failure to transmit to Carrier the necessary documentation supplied by Carrier's Customer, provided that no charge back will be made if Contractor contacted Carrier's dispatch regarding issue prior to departure from Carrier's Customer (consignor or consignee) location. |
| Claims for Carrier Damages and other indemnity obligations owed by Contractor to Carrier under this Agreement. | The amount of Carrier Damages that Carrier paid or otherwise incurred, except (but subject to Section 15.2) when Contractor has elected, in the "Certificate of Insurance" in Section 8.2 of Appendix A below, to participate in Carrier's coverage for Commercial Liability and Cargo Insurance and physical damage insurance on Carrier's Trailing Equipment: Actual up to $10,000.00 for Carrier Liability Damages related to bodily injury, property damage, or environmental restoration. Actual up to $10,000.00 for Carrier Damages related to cargo loss or physical damages. |

43

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

| | Actual up to $10,000.00 for Carrier Damages related to loss of or damage to Trailing Equipment or Carrier's other property. For other indemnity obligation owed by Contractor to Carrier under this Agreement, the amount stated in the applicable provision of this Agreement. |
|---|---|
| Drug and Alcohol Testing | Carrier will deduct a $99.00 flat fee. |
| EFS Fees. | Carrier will deduct a weekly fee $10.00 weekly fee with an additional fee of $10.00 for every $1,000 paid for repairs on Contractor's behalf in the following manner: |
| ELDs; in addition to Section 11.1 | Carrier will deduct the amount paid to third-party vendor or otherwise incurred by Carrier to repair or replace. Carrier will deduct the cost to replace the ELD in the amount of $200.00. Carrier will deduct $150.00 per month plus a $99.99 set-up fee. |
| Equipment inspection charges when performed at a qualified repair shop or at Carrier's shop | Amount Carrier paid to third-party vendor. |
| Equipment lease charges | If applicable, See Equipment Lease Agreement. Amount Carrier paid to escort. |
| Escort fee pursuant to Section 9.2 of this Agreement | Principal Amount: $2,500.00 to be deducted, under Section 8.1 of this |
| Maintenance Fund | Agreement, up to $750.00 per week. If for any reason less than $750.00 is deducted in a given week, the difference will be an additional deduction in subsequent weeks, until the Principal Amount is reached. If the amount in the Maintenance Fund falls below the Principal Amount, deductions will be made at double the indicated rate until the Principal Amount is reached. Amount Carrier paid to U.S. Postal Service or other third-party vendor. |
| Express mail, U.S. First Class Mail, or other package delivery services if Contractor charges them to Carrier's account with the delivery service vendor | Amount Carrier paid or otherwise incurred. |
| Fines and penalties, including traffic tickets and related court costs, attorneys' fees, and other legal expenses, pursuant to Sections 10.3 and 10.4 of this Agreement. | For fuel and oil purchases that Contractor elects to make using Contractor's |
| Fuel and oil purchases that Contractor elects to make using Contractor's source of payment. | source of payment, Carrier will deduct or otherwise recover an amount computed by multiplying the number of gallons or other units purchased by a price no greater than the price per unit posted at the fuel vendor's facility; and, a Carrier Markup fee per transaction, or if paid via Carrier provided EFS, an EFS fee as stated above per transaction. |
| Fuel and Mileage Tax Reporting | Carrier will deduct or otherwise recover a flat charge of $100 per quarter or prorated on a more frequent basis, comprising the permit fees and a tax-reporting Carrier Markup. Any additional fuel tax that Contractor may owe will be separately deducted or otherwise recovered by Carrier. If Contractor fails to provide Carrier complete and accurate fuel-tax records in time for Carrier's computation, on the seventh day of each month, of Carrier's fuel and mileage tax reports and payments for the preceding month, Carrier will compute Contractor's fuel use taxes based on total miles dispatched by Carrier at a rate of 6 miles-per-gallon. |
| Garnishment Orders | Amount Carrier paid in compliance with any lawfully issued order or lien, a copy of which Carrier will supply to Contractor at or before the first deduction relating to it, plus a Carrier Markup in the amount authorized by Applicable Law. After termination of, but not during, this Agreement, Carrier will deduct from Contractor's Maintenance Fund (after all deductions authorized by this Deductions Table) the portion of any garnishment or lien amount due that exceeds the balance in Contractor's Settlement Compensation. See Section 7.2 Certificate of Insurance in this Appendix. |
| Insurance Coverages | See Section 8 of this Appendix. |
| Liquidated Damages related to violations noted in Roadside Stops as set forth in Section 8 of this Appendix. | Carrier will charge back the amount advanced, plus a per transaction fee of |
| Loan payments if Contractor elects, and upon Carrier's written consent, to borrow an amount | $10.00 (comprising both the fee charged by issuer of the advance checks and/or |

44

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

| from Carrier to cover cost of maintenance, repairs, or other expenses. | a Carrier Markup). Additional Carrier Markup fee of 20% will apply for any balance owed not covered by the maintenance fund. |
|---|---|
| Medical examinations to the extent Section 9.4 of this Agreement requires Contractor to pay for them | If Carrier agrees in writing to pay, carrier will charge back the amount advanced, plus a per transaction fee of $10.00 (comprising both the fee charged by issuer of the advance checks and/or a Carrier Markup). Additional Carrier Markup fee of 20% will apply for any balance owed not covered by the maintenance fund. |
| Motel Charges | If Carrier agrees in writing to pay, carrier will charge back the amount advanced, plus a per transaction fee of $10.00 (comprising both the fee charged by issuer of the advance checks and/or a Carrier Markup). Additional Carrier Markup fee of 20% will apply for any balance owed not covered by the maintenance fund. |
| Operating Expenses not otherwise listed in this Deductions Summary which are the responsibility of Contractor under this Agreement and which Contractor requests that Carrier pay initially on Contractor's behalf. | If Carrier agrees in writing to pay, carrier will charge back the amount advanced, plus a per transaction fee of $10.00 (comprising both the fee charged by issuer of the advance checks and/or a Carrier Markup). Additional Carrier Markup fee of 20% will apply for any balance owed not covered by the maintenance fund. |
| Parking Charges | If Carrier agrees in writing to pay, carrier will charge back the amount advanced, plus a per transaction fee of $10.00 (comprising both the fee charged by issuer of the advance checks and/or a Carrier Markup). Additional Carrier Markup fee of 20% will apply for any balance owed not covered by the maintenance fund. |
| Performance completion charges under Section 21 of this Agreement for Carrier's cost of completing a shipment or other assignment Contractor undertakes but does not complete for any reason (including Contractor's dropping a load at a facility Carrier operates or utilizes rather than at the consignee's location) | Amount carrier paid or otherwise incurred under Section 21 of this Agreement. If non-completion is excusable in Carrier's sole reasonable judgment, compensation will be paid to Contractor for the portion of the trip Contractor successfully completed. |
| Permits pursuant to Section 10.6 of this Agreement. | For New York, New Mexico and Kentucky permits, Carrier shall deduct a fee of $30. For all other permits, the amount Carrier paid issuing jurisdiction or otherwise incurred for the permit. For permit change fees, the amount Carrier paid issuing jurisdiction or otherwise incurred in relation to the change. |
| Short-Term Tractor Lease if Contractor elects to rent, through Carrier, a substitute tractor | See applicable Short-Term Equipment Lease. |
| Termination related expenses pursuant to Section 2.3 of this Agreement | Amount Carrier paid or otherwise incurred if repairs or other services are performed by a third-party vendor. If repairs or other services are performed by Carrier, the amount Carrier incurred for parts and labor plus a Carrier Mark-up, resulting in prices which will be provided to Contractor immediately after Carrier completes the work competitive with other vendors in the relevant market(s). In addition, Contractor will pay fifty dollars ($50) per day as liquidated damages for Contractor's failure to remove and/or return Carrier identification pursuant to Section 2.3. |
| Termination-related reimbursement of Carrier start-up costs pursuant to Section 2.4 of this Agreement | $10,000.00 to partially cover vehicle signage expenses; stickers, permits and licenses obtained on behalf of Contractor; cargo and liability insurance expenses for insurance obtained on behalf of Contractor; and medical expenses for any DOT examinations (drug, alcohol, etc.) |
| Tolls for highways, bridges, tunnels, ferries, and other facilities | Amount carrier paid to toll authority plus $50.00 for each toll violation. |
| Trailing Equipment Lease and other amounts if Contractor has rented a trailer pursuant to an Equipment Lease Agreement. | If applicable, amounts set forth in such Trailing Equipment Lease Agreement. |
| Trailing Equipment repair, return, reconditioning, indemnity, and related expenses pursuant to sections 13.2 and 13.3 of this Agreement | Carrier shall deduct a $250 monthly fee for Trailing Equipment maintenance upon return of such Trailing Equipment. Should Contractor fail to return Trailing Equipment an additional $1,500 fee shall be deducted by Carrier. If Contractor elects to obtain such products and services from Carrier's affiliated maintenance and parts vendor, the amount Carrier incurred for parts and labor, |

45

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

| | plus markups resulting in prices which will be provided to Contractor at the time Contractor places an order. |
|---|---|
| Transponder replacement if lost, stolen or damaged by Contractor | Carrier shall deduct a $250 monthly fee for Trailing Equipment maintenance upon return of such Trailing Equipment. Should Contractor fail to return Trailing Equipment an additional $1,500 fee shall be deducted by Carrier. If Contractor elects to obtain such products and services from Carrier's affiliated maintenance and parts vendor, the amount Carrier incurred for parts and labor, plus markups resulting in prices which will be provided to Contractor at the time Contractor places an order. |
| Transponder replacement if lost, stolen or damaged by Contractor | Amount Carrier paid to transponder-issuing organization plus Carrier's administrative costs, including $25 for IPass or EZ Pass transponder; $25 for Okla. Pike Pass transponder; $25 for PrePass transponder. |
| Travel cost (bus, air, taxi, or other passenger fares) if Contractor needs to travel due to an accident or on other Carrierapproved trips. | If Carrier agrees in writing to pay, carrier will charge back the amount advanced, plus a per transaction fee of $10.00 (comprising both the fee charged by issuer of the advance checks and/or a Carrier Markup). Additional Carrier Markup fee of 20% will apply for any balance owed not covered by the maintenance fund. |
| Trip Pak expense if Contractor elects to use this service to expedite delivery of Contractor's trip documents to Carrier. | Carrier shall deduct a monthly fee of $50.00 from Contractors first weekly settlement. |
| Truck washes if Contractor uses Carrier's account | If Carrier agrees in writing to pay, carrier will charge back the amount advanced, plus a per transaction fee of $10.00 (comprising both the fee charged by issuer of the advance checks and/or a Carrier Markup). Additional Carrier Markup fee of 20% will apply for any balance owed not covered by the maintenance fund. |
| Weigh station bypass charges if Contractor elects to use Prepass or other weigh station bypass services. | $5.00 per unit of Equipment per week (including a Carrier Markup). If lost, stolen or damaged, Carrier will deduct the cost to replace the transponder in the amount of $25.00. |
| Liquidated Damages related to violations of hours of service or use of a false ELD as forth in Appendix B and Carrier Hours of Service Policy. | See Section 5 of Appendix B. |
| Recovery of the Equipment. | Should Contractor fail to return the Equipment upon termination, Carrier will deduct all expenses to recover the Equipment plus a Carrier Markup. |

## 7. INSURANCE

7.1. Insurance Limits, Deductibles, and Other Specifications. Carrier will maintain either: (i) commercial public liability insurance that has a combined single limit of not less than the dollar amounts required by 49 U.S.C. § 13906 and FMCSA regulations promulgated there under, with a deductible or self-insured retention of $5,000.00; or (ii) a public liability self-insurance program approved by FMCSA.

    (a)    Carrier's Cargo Insurance. Carrier will maintain either: (i) commercial cargo insurance that has a limit of not less than $100,000.00 per occurrence, with a deductible or self-insured retention of a maximum $10,000.00 or (ii) a cargo selfinsurance program.

    (b)    Carrier's Physical Damage Insurance on Trailing Equipment. If Carrier elects to maintain commercial Physical Damage (Collision) Insurance on Trailing Equipment, Carrier represents that such insurance has a deductible or self-insured retention of $5,000.00.

    (c)    Contractor's Insurance.

        (i)    Contractor's insurance policies required under Section 7.2 shall have the following limits and maximum deductibles:

            (A)    Commercial General Liability and Truckers Insurance will have a minimum combined single limit of $1,000,000 and a maximum deductible of $5,000.00.

            (B)    Physical damage insurance on Trailing Equipment will have a minimum limit of the current market value of the Trailing Equipment as of the Effective Date and a maximum deductible of $5,000.00.

            (C)    Cargo liability insurance will have a minimum limit of $100,000.00 and a maximum deductible of $5,000.00.

        (ii)    In addition: If Contractor elects Carrier's to participate in Commercial Liability and Cargo Insurance and physical damage insurance on Carrier's Trailing Equipment (thus meeting the requirements of Section 7.2),

46

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

Contractor agrees to maintain, at Contractor's expense, non-trucking liability insurance providing public-liability coverage to Contractor whenever the Equipment, including any Trailing Equipment (as described in Section 13 of this Agreement), is not being operated on behalf of or in the business of Carrier. The coverage must meet the specifications listed in Appendix A and be no less comprehensive than the non-trucking liability insurance Carrier may facilitate on Contractor's behalf if Contractor so chooses.

(iii)  Contractor will be responsible for any loss or damage in excess of the policy limit.

(iv)  Contractor's non-trucking liability insurance will have a minimum combined single limit of not less than $1,000,000.00 for injury or death to any person or for damages to property in any one occurrence with no deductible.

(v)  Contractor's Work-Injury Insurance. If workers' compensation insurance is required by Section 7.1.1 of this Agreement, such insurance will provide principal coverage in Illinois. If occupational accident insurance is permitted under Section 7.1.2 of this Agreement, such coverage must have a minimum combined single limit of not less than $1,000,000.00 and no deductible.

(d)  Contractor's other Insurance. The state in which Carrier's insurance policies are delivered and under whose law Contractor, pursuant to Section 7.3 of this Agreement, authorizes Carrier to waive, reject, or reduce no-fault, uninsured, and underinsured motorist coverage from those policies is Illinois.

7.2.  Certificate of Insurance. Contractor requests that Carrier facilitate on Contractor's behalf the insurance coverages Contractor has selected by placing Contractor's initials under each election section after electing "Yes" or "No" in the right-hand column titled "Election" below.

| **Commercial Auto Liability and Cargo Insurance** (meeting the requirements of Section 7.2) | **Elections** |
|---|---|
| Cost to Contractor: $295 per driver per week including a Carrier admin fee. | YES ☒<br>NO ☐ |
| **Commercial Auto Liability** | |
| Effective Date(s): From the Effective Date of this Agreement through the next succeeding February 1, and each subsequent annual renewal period. | Initials: K  S |
| Amount of Coverage: $1,000,000.00 combined single limit per occurrence for auto liability; $100,000.00 for cargo damage, and the fair market value of Trailing Equipment at the Effective Date for Trailing Equipment coverage. For more details regarding coverage, see insurance policy. | |
| Deductible cost to Contractor: Actual up to $5,000.00 per occurrence for auto liability. | |
| **Cargo Insurance** | |
| Effective Date(s): From the Effective Date of this Agreement through the next succeeding February 1, and each subsequent annual renewal period. | |
| Amount of Coverage: $100,000.00 for cargo damage; and the fair market value of Trailing Equipment at the Effective Date for Trailing Equipment. | |
| Deductible cost to Contractor: Actual up to $10,000.00 per occurrence for cargo claim. | |
| **NOTE ELECTION OF THIS COVERAGE REQUIRES CONTRACTOR TO MAINTAIN THE NON-TRUCKING LIABILITY INSURANCE COVERAGE DESCRIBED IN SECTION.** | |

47

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

| | Elections |
|---|---|
| **Physical Damage Insurance on Tractor**<br><br>Effective Date(s): From the Effective Date of this Agreement through the next succeeding February 1, and each subsequent annual renewal period.<br><br>Amount of Coverage: Contractor-specified value of truck below. In the event of a "loss" as defined in the policy, the policy will, unless its terms provide otherwise, pay the lesser of: (i) actual cash value (defined as the cost to replace with new vehicle of like kind and quality less depreciation for age, mileage, and physical condition) of truck at time of loss; or (ii) the cost to repair truck. For more details regarding coverage, see insurance policy.<br><br>Cost to Contractor: up to 8% annually, billed monthly, of Contractor-specified value of Equipment including Carrier admin fee.<br><br>Deductible: $ 5,000.00 per occurrence. | YES ☒<br>NO ☐<br><br>Initials: K  S |
| **Physical Damage Insurance on Trailing Equipment**<br><br>Effective Date(s): From the Effective Date of this Agreement through the next succeeding February 1, and each subsequent annual renewal period.<br><br>Amount of Coverage: Value of Trailer<br><br>Cost to Contractor: up to 8% annually, billed monthly, of Contractor-specified value of Equipment including Carrier admin fee.<br><br>Deductible: $ 5,000.00 per occurrence | Elections<br><br>YES ☒<br>NO ☐<br><br>Initials: K  S |
| **Bobtail Insurance**<br><br>Effective Date(s): From the Effective Date of this Agreement through the next succeeding February 1, and each subsequent annual renewal period.<br><br>Amount of Coverage: The fair market value of the Equipment at the Effective Date.<br><br>Cost to Contractor: a monthly deduction of $450 for a 2016 tractor; $470 for a 2017 tractor; $490 for a 2018 tractor; $520 for a 2019 tractor; $540 for a 2020 tractor; $560 for a 2021 tractor; $570 for a 2022 tractor; $590 for a 2023-2025 tractor<br><br>Deductible cost to Contractor: Actual up to $10,000.00 per occurrence. | **Elections**<br><br>YES ☒<br>NO ☐<br><br>Initials: K  S |

48

**8.  DAMAGES AND ADDITIONAL COMPENSATION FOR ROADSIDE STOPS**

8.1.  In light of the considerations set forth in Section 9.8 of this Agreement, Carrier and Contractor agree that Contractor shall pay to Carrier liquidated damages for violations noted in Roadside Stops in accordance with the following:

    (a)  1st Offense for an Out-of-Service Violation - $500

    (b)  1st Offense for a Non-Out-of-Service Violation - $300

    (c)  2nd Offense for an Out-of-Service Violation - $1,000

    (d)  2nd Offense for a Non-Out-of-Service Violation - $600

    (e)  3rd Offense for an Out-of-Service Violation - $1,500 and/or Termination

    (f)  3rd Offense for an Out-of-Service Violation - $900

8.2.  In addition, if Contractor has a "Preventable Accident," as that term is defined at 49 C.F.R. §385.3 ("an accident (1) that involved a commercial motor vehicle, and (2) that could have been averted but for an act, or failure to act, by the motor carrier or the driver as defined by regulations"), then Contractor shall pay Carrier, as liquidated damages and not as a penalty, in addition to Contractor's other obligations under the Agreement, the sum of $500.

8.3.  Contractor also agrees that a failure to timely report Roadside Inspections to Carrier generates added direct and indirect costs to Carrier which are impossible to quantify in advance, and therefore agrees to report each Roadside Inspection to Carrier by the end of the business day next following the day on which it was performed and to pay Carrier $300 as liquidated damages and not as a penalty for each Roadside Inspection which is not reported within such time.

8.4.  For each Roadside Inspection which does not result in any violations, Contractor shall receive additional compensation as follows:

    (a)  USDOT Level I Inspection - $500

    (b)  USDOT Level II Inspection - $300

    (c)  USDOT Level III Inspection - $200

**9.  NONCOMPLIANCE WITH UNSAFE DRIVING POLICY DAMAGES**

9.1.  In light of the considerations set forth in Section 9.8 of this Agreement, Carrier and Contractor agree that Contractor shall pay to Carrier liquidated damages for noncompliance with Carrier's Unsafe Driving Policy in accordance with the following:

    (a)  Use of hand-held mobile device while driving - $1,000

    (b)  For each moving violation - $1,000

    (c)  Failure to report Contractor's traffic violations - $300 and possible disqualification of the driver involved and/or termination of this Agreement

    (d)  For each seat belt violation - $1,000

    (e)  For each failure to report an accident to the safety department - $2,500 and/or termination of this Agreement

**10.  METHOD OF DELIVERY OF SETTLEMENT STATEMENTS**

Carrier will email Settlement Statements to Contractor at the email address listed in the signature block after the main text of this Agreement.

**11.  METHOD OF PAYMENT OF SETTLEMENT COMPENSATION**

Carrier will make an electronic deposit into a Contractor-designated bank account.

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

**This Appendix A is agreed to by the undersigned parties on the latest date set forth below.**

Contractor : Kyle Jordan Smith

Crena Transportation Services

_(signature)_
_____
Signature

*Ivan Milutinovic*
_____
Ivan Milutinovic

2950 E North ST APT 600L
_____
Street Address

06 / 26 / 2025
_____
Date

Greenville, SC, 29615
_____
City, State, Zip Code

9129151256
_____
Phone Number

smithkyle914@gmail.com
_____
Email Address

06 / 26 / 2025
_____
Date

50

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# APPENDIX B

### 1. ELD REQUIREMENTS AND ITS PURPOSES

Contractor agrees to maintain in each unit of Equipment (as defined in Section 1 of this Agreement) a compliant and functioning ELD. The principal purpose of this requirement is to assist Contractor's drivers and Carrier in complying with any applicable hours-of-service regulations and other Applicable Law and in avoiding adverse safety scores and FMCSA interventions under CSA. The ELD may also assist in providing load dispatching and tracking services to meet the specifications of Carrier's Customers.

### 2. CATEGORIES OF ELECTRONIC INFORMATION COLLECTED

The ELD is capable of collecting various categories of data regarding the Equipment and its operation (collectively "Electronic Information"), including but not limited to the: name of the driver and any co-driver(s), and corresponding driver identification information; duty status (that is, "Off Duty," "Sleeper Berth," "Driving," and "On-Duty Not Driving"); date and time the Equipment is in operation; location of the Equipment; distance traveled (including when the Equipment crosses state lines); name and DOT number of Carrier; 24-hour period starting time; multiday basis used by Carrier to compute cumulative duty hours and driving time; hours in each duty status for the 24-hour period, and total hours; Equipment number; load information, such as shipping document number(s), or name of shipper and commodity(ies); fuel use, including when the Equipment is refueled; speed of the Equipment; hard-braking events; and power-on self-tests and diagnostic error codes. The Electronic Information is transmitted from the Equipment to the third-party vendor of the ELD (as identified below) and then from the third-party vendor to Carrier. Carrier may access certain categories of the Electronic Information in furtherance of its efforts to comply with Applicable Law, including hours-of-service regulations, or to meet Customer Specifications.

### 3. CARRIER USES OF ELECTRONIC INFORMATION

The third-party vendor— KAMI ELD —is responsible for the collection and storage of the Electronic Information. Carrier does not collect or store the Electronic Information, but has access to the Electronic Information and reserves the right to request that the third party vendor collect and store the Electronic Information for as long as the Equipment with the installed ELD operates under lease to Carrier, and for a reasonable time thereafter. Contractors or their drivers who have questions about the safeguards KAMI ELD has put in place to protect against the loss, unauthorized access, use, destruction, or improper disclosure of the Electronic Information may contact the third-party vendor at https://kamield.com/. Carrier has reasonable safeguards in place to secure the Electronic Information it receives from the third-party vendor, and limits access to the Electronic Information to authorized individuals who need to know the information in order to ensure compliance with Applicable Law, including the hours-of-service regulations, and to meet Customer Specifications.

### 5. RIGHT TO REVIEW ELECTRONIC INFORMATION

Contractor's workers will have the right, on written request to Carrier, to review the collected Electronic Information that Carrier itself continues to have access to, but only Electronic Information relating to the person making the request. A written request for such a review should be addressed to Carrier and sent by email or U.S. Mail to the address listed in the signature block after the main text of this Agreement.

### 6. VIOLATION OF HOURS OF SERVICE OR A FALSE ELD

A violation of the hours of service regulations, or a false ELD is discovered, the following disciplinary actions may be taken:

- (a)  1st Offense - Verbal warning and $300 deduction
- (b)  2nd Offense - Written warning and $600 deduction
- (c)  3rd Offense - 2-day suspension and $900 deduction
- (d)  4th Offense - Termination

If you are placed out-of-service as a result of an hours of service violation during a DOT roadside inspection, the following disciplinary actions may be taken:

- (a)  1st Offense - Verbal warning and $500 deduction
- (b)  2nd Offense - Written warning and $1,000 deduction
- (c)  3rd Offense - Termination and $1,500 deduction

51

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

**This Appendix B is agreed to by the undersigned parties on the latest date set forth below:**

Contractor : Kyle Jordan Smith

Crena Transportation Services

_Ivan Milutinovic_

Ivan Milutinovic

Signature

2950 E North ST APT 600L

Street Address

06 / 26 / 2025

Date

Greenville, SC, 29615

City, State, Zip Code

9129151256

Phone Number

smithkyle914@gmail.com

Email Address

06 / 26 / 2025

Date

52

# RECEIPT FOR POSSESSION OF EQUIPMENT

Carrier has received from Contractor and taken possession of the following Equipment described in this Agreement:

| Make | Model | Year | Unit Number | VIN Number |
|---|---|---|---|---|
| VOLVO | VNL 760 | 2025 | 5385 | 4V4NC9EJ4SN695385 |
| | | | | |
| | | | | |
| | | | | |

This Equipment was received by Carrier at    06 / 26 / 2025

Crena Transportation Services

*Ivan Milutinovic*

Ivan Milutinovic

53

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# STATEMENT OF LEASE

Contractor  Kyle Jordan Smith          and the undersigned carrier ("Carrier") have entered into an Independent Contractor Operating Agreement ("Agreement") effective  6/26/2025        . The Equipment identified below is being operated by Carrier. Contractor is the Equipment's "owner" under 49 C.F.R. § 376.2(d). The Agreement will remain in effect until  6/26/2030 ("Termination Date"), unless sooner terminated by either party. The Agreement includes no restrictions relative to the commodities to be transported. The original of the Agreement is kept by Carrier at the address shown below.

**Contractor :**  Kyle Jordan Smith

_____
Signature

2950 E North ST APT 600L
_____
Street Address

Greenville, SC, 29615
_____
City, State, Zip Code

9129151256
_____
Phone Number

smithkyle914@gmail.com
_____
Email Address

06 / 26 / 2025
_____
Date

Crena Transportation Services

*Ivan Milutinovic*
_____
Ivan Milutinovic

06 / 26 / 2025
_____
Date

54

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# CARRIER DRUG &

# ALCOHOL POLICY

Revised

January 11, 2024

55

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

Carrier, as defined by the Driver Independent Contractor Operating Agreement executed between the parties, is dedicated to the health and safety of our drivers. Drug and/or alcohol use may pose a serious threat to driver health and safety. Therefore, it is our policy to prevent the use of drugs and abuse of alcohol from having an adverse effect on our drivers.

The serious impact of drug use and alcohol abuse has been recognized by the federal government. The Federal Motor Carrier Safety Administration (FMCSA) has issued regulations which require the company to implement an alcohol and controlled substances testing program.

The purpose of the FMCSA-issued regulations is to establish programs designed to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles.

Carrier will comply with these regulations and is committed to maintaining a drug-free workplace.

It is Carrier's policy of that the use, sale, purchase, transfer, possession, or presence in one's system of any controlled substance (except medically prescribed drugs) by any driver while on Carrier's premises, engaged in Carrier business, operating Carrier's equipment, or while under the authority of Carrier is strictly prohibited. Disciplinary action will be taken as necessary.

Neither this policy nor any of its terms are intended to create a contract of employment or contain the terms of any contract of employment. The company retains the sole right to change, amend, or modify any term or provision of this policy without notice.

❖ **Responsibility**

In accordance with 49 CFR §382.601(a), Carrier shall provide educational materials that explain the requirements in Part 382 and the Carrier's policies and procedures with respect to meeting these requirements.

Each driver hired or transferring into a safety-sensitive function is responsible for reviewing the content of the information presented to drivers. Each driver is responsible for asking questions about the procedures if the content is unclear to him/her. Drivers may pose follow-up questions about the content of this policy and procedures to.

❖ **Regulatory Requirements**

All drivers who operate commercial motor vehicles that require a commercial driver's license under 49 CFR Part 383 are subject to the FMCSA's drug and alcohol regulations, 49 CFR Part 382.

❖ **Who is Responsible**

It is Carrier's responsibility to provide testing for the driver that is in compliance with all federal and state laws and regulations, and within the provisions of this policy.

The driver is responsible for complying with the requirements set forth in this policy. The driver will not use, have possession of, abuse, or have the presence of alcohol or any controlled substance in excess of regulation-established threshold levels while on duty. The driver will not use alcohol within performing a "safety-sensitive" function, while performing a "safety sensitive" function, or immediately after performing a "safety-sensitive" function. The driver must submit to alcohol and controlled substances tests administered under Part 382.

All supervisors must make every effort to be aware of a driver's condition at all times the driver is in service of the company. The supervisor must be able to make reasonable suspicion observations to determine if the driver is impaired in some way, and be prepared to implement the requirements of this policy if necessary.

❖ **Definitions**

**Alcohol** means the intoxicating agent in beverage alcohol, ethyl alcohol, or other low molecular weight alcohols including methyl and isopropyl alcohol.

**Alcohol** use means the consumption of any beverage, liquid mixture, or preparation, including any medication, containing alcohol.

**Drug** means any substance (other than alcohol) that is a controlled substance as defined in this policy and 49 CFR Part 40.

**Negative result** means the result reported by an HHS-certified laboratory to an MRO when a specimen contains no drug or the concentration of the drug is less than the cutoff concentration for the drug or drug class and the specimen is a valid specimen.

**Positive result** means the result reported by an HHS-certified laboratory when a specimen contains a drug or drug metabolite equal to or greater than the cutoff concentrations.

56

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

**Dilute specimen** means a urine specimen with creatinine and specific gravity values that are lower than expected for human urine.

**Refuse to submit** (to an alcohol or controlled substances test) means that a driver:

1.  Fails to appear for any test (except pre-engagement) within a reasonable time, as determined by Carrier, consistent with applicable DOT regulations, after being directed to do so by Carrier. This includes the failure of a driver (including an owner-operator) to appear for a test when called by a C/TPA;
2.  Fails to remain at the testing site until the testing is complete (except pre-engagement if the driver leaves before the testing process begins);
3.  Fails to provide a urine specimen for any DOT required drug test (except pre-engagement if the driver leaves before the testing process begins);
4.  In the case of a directly observed or monitored collection in a drug test, fails to permit the observation or monitoring of the driver's provision of the specimen;
5.  Fails to provide a sufficient amount of urine when directed, and it has been determined, through a required medical evaluation, that there was no adequate medical explanation for the failure;
6.  Fails or declines to take a second test Carrier or the collector has directed the driver to take;
7.  Fails to undergo a medical examination or evaluation, as directed by the MRO as part of the verification process, or as directed by the DER (In the case of a pre-engagement drug test, the driver is deemed to have refused to test on this basis only if the pre-engagement test is conducted following a contingent offer of engagement);
8.  Fails to cooperate with any part of the testing process (e.g., refuse to empty pockets when directed by the collector, behave in a confrontational way that disrupts the collection process, fail to wash hands after being directed to do so by the collector).
9.  For an observed collection, fails to follow the observer's instructions to raise his/her clothing above the waist, lower clothing and underpants, and to turn around to permit the observer to determine if he/she has any type of prosthetic or other device that could be used to interfere with the collection process.
10. Possesses or wears a prosthetic or other device that could be used to interfere with the collection process.
11. Admits to the collector or MRO that he/she adulterated or substituted the specimen.
12. Is reported by the MRO as having a verified adulterated or substituted test result.

❖ **Conditions for Engagement**

A driver applicant who has refused a drug or alcohol test, failed a random, reasonable suspicion, post-accident, return-to-duty, follow-up alcohol test, or tested positive for controlled substances will not be considered for engagement with Carrier.

A driver applicant who has tested positive for drugs during a DOT pre-engagement test will not be considered for engagement.

❖ **Circumstances for Testing**

**Pre-engagement §382.301**

In accordance with §382.301, all driver applicants will be required to submit to and pass a urine drug test as a condition of engagement.

Each driver applicant will be asked whether he/she has tested positive, or refused to test, on any DOT pre-engagement drug test administered by any previous company to which the driver applicant applied for, but did not obtain, safety-sensitive transportation work during the past 3 years.

If the driver applicant admits that he/she has tested positive, or refused to test, on any DOT preemployment or pre-engagement test, the driver applicant will not be considered for engagement.

Job applicants, who are denied engagement because of a positive test under another motor carrier or under our company's DOT pre-employment pre-engagement testing, may not reapply for engagement with Carrier.

Driver applicant drug testing shall follow the collection, chain-of-custody, and reporting procedures set forth in 49 CFR Part 40.

If the driver transferring into a safety-sensitive function does not pass his/her DOT pre-engagement drug screen, he/she will not be considered for engagment.

Carrier must contact the previous employer's testing program prior to using the driver and obtain the following information:

✓   The name and address of the program (usually the driver's prior and/or current employer or carrier company);
✓   Verification that the driver participates or participated in the program;
✓   Verification that the program conforms with the required procedures set forth in 49 CFR Part 40;

57

The driver's supervisor will prepare and maintain a record stating the reasons why the test was not administered within the allotted time frame.

**Random Testing (Sec. 382.305)**

Carrier will conduct random testing for all drivers as follows.

Every driver shall submit to random testing as directed by Carrier pursuant to DOT regulations. All such tests will be unannounced and performed at reasonable intervals throughout the workday, workweek and year. Whenever a driver is randomly selected to be tested, he/she will be notified of their selection and instructed to immediately report to the collection site. A driver who tests positive or refuses to submit to a test is medically unqualified to drive and/or perform any other safety-sensitive function.

Each driver selected for random testing shall be tested during the selection period. If a driver selected for random testing is on vacation, temporary layoff, medical leave or otherwise not at work, the driver must be referred for a random test upon his/her return to work. Carrier will not skip or select an alternate in the event a selected driver is unavailable for testing on any particular day during the random selection period. If a driver selected for random testing does not return to work before the beginning of a new random selection period (i.e., the next random draw), the Company will ensure that a sufficient number of drivers are subsequently selected so the annual testing rate is 6 not less than the minimum annual percentage rates established by the FMCSA for random drug and alcohol testing.

The driver, once notified of his/her selection must proceed immediately to the collection site.

**Return-to-Duty Testing (Sec. 382.309)**

After failing an alcohol test, a driver must undergo a return-to-duty test prior to performing a safety-sensitive function. The test result must indicate a breath alcohol concentration of less than 0.02.

After testing positive for a controlled substance, a driver must undergo a return-to-duty test under direct observation prior to performing a safety-sensitive function. The test must indicate a verified negative result for drug use.

**Follow-Up Testing (Sec. 382.311)**

Following the driver's violation of Part 382, Subpart B, the driver will be subject to follow-up testing. Follow-up testing will be unannounced. The number and frequency of such follow-up testing will be directed by the SAP, and consist of at least six tests in the first 12 months. Followup testing may be done for up to 60 months. Follow-up drug tests must be conducted under direct observation.

**Refusal to Submit**

According to Sec. 382.211, a driver may not refuse to submit to a post-accident, random, reasonable suspicion, or follow-up alcohol or controlled substances test required by the regulations. A driver who refuses to submit to such tests may not perform or continue to perform safety-sensitive functions and must be evaluated by a substance abuse professional as if the driver tested positive for drugs or failed an alcohol test.

Refusal to submit includes failing to provide adequate breath or urine sample for alcohol or drug testing and any conduct that obstructs the testing process. This includes adulteration or substitution of a urine sample.

Any driver that in any way shape or form refuses a test will be documented and discharged from their duties.

❖ **Driver Assistance**

**Driver Education and Training (Sec. 382.601)**

All drivers will be given information regarding the requirements of Part 382 and this policy by their supervisor.

**Supervisor Training**

According to FMCSA regulation, all employees and/or independent contractors of Carrier designated to supervise drivers will receive training on this program. The training will include at least 60 minutes on alcohol misuse and 60 minutes on drug use. The training content will include the physical, behavioral, speech, and performance indicators of probable alcohol misuse and drug use. The training allows supervisors to determine reasonable suspicion that a driver is under the influence of alcohol or drugs

❖ **Discipline**

59

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

  ✓  Verification that the driver is qualified under this rule, including that the driver has not refused to submit to an alcohol or drug test;

  ✓  The date the driver was last tested for alcohol or drugs; and

  ✓  The results of any drug or alcohol test administered in the previous 6 months, and any violations of the alcohol misuse or drug use rules.

**Reasonable Suspicion Testing (Sec. 382.307)**

If the driver's supervisor or another company official designated to supervise drivers believes a driver is under the influence of alcohol or drugs, the driver will be required to undergo a drug and/or alcohol test.

The basis for this decision will be specific, contemporaneous, articulable observations concerning the appearance, behavior, speech, or body odors of the driver.

The driver's supervisor or another company official will immediately remove the driver from any and all safety-sensitive functions and take the driver or make arrangements for the driver to be taken to a testing facility.

The person who makes the determination that reasonable suspicion exists to conduct an alcohol test may not administer the alcohol test. Per FMCSA regulation, reasonable suspicion alcohol testing is only authorized if the observations are made during, just preceding, or after the driver is performing a safety-sensitive function.

Per FMCSA regulation, if the driver tests 0.02 or greater, but less than 0.04, for alcohol the driver will be removed from all safety-sensitive functions, including driving a commercial motor vehicle, until the start of the driver's next regularly scheduled duty period, but not less than 24 hours following administration of the test.

If an alcohol test is not administered within two hours following a reasonable suspicion determination, the program administrator will prepare and maintain a record stating the reasons why the test was not administered within 2 hours.

If the test was not administered within 8 hours after a reasonable suspicion determination, all attempts to administer the test shall cease. A record of why the test was not administered must be prepared and maintained.

A written record of the observations leading to an alcohol or controlled substance reasonable suspicion test, signed by the supervisor or Carrier official who made the observation, will be completed within 24 hours of the observed behavior or before the results of the alcohol or controlled substances test are released, whichever is first.

A driver awaiting the results of a reasonable suspicion drug test will be placed out-of-service.

**Post-Accident Testing (Sec. 382.303)**

Drivers are to notify their supervisor as soon as possible if they are involved in an accident.

According to FMCSA regulations (Sec. 382.303), if the accident involved the following, the driver will be tested for drugs and alcohol as soon as possible following the accident:

  ✓  A fatality,

  ✓  Bodily injury with immediate medical treatment away from the scene and the driver received a citation, or

  ✓  Disabling damage to any motor vehicle requiring tow away and the driver received a citation

The driver must remain readily available for testing. If the driver isn't readily available for alcohol and drug testing, he/she may be deemed as refusing to submit to testing. A driver involved in an accident must to do post-accident drug test maximum 8h from the time when accident is happened.

If the alcohol test is not administered within 8 hours following the accident, all attempts to administer the test will cease. A report and record of why the test was not administered will be prepared and maintained.

The drug test must be administered within 32 hours of the accident. If the test could not be administered within 32 hours, all attempts to test the driver will cease.

58

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

According to FMCSA regulation, no person who has failed an alcohol or drug test, or refused to test, will be allowed to perform safety-sensitive functions until the referral, evaluation, and treatment requirements have been complied with. The following company disciplinary measures apply to all reasonable suspicion, post-accident, and random tests.

❖ **Clearinghouse**

The Clearinghouse is a secure online database that gives carrier companies, the FMCSA, State Driver Licensing Agencies (SDLAs), and State law enforcement personnel real-time information about commercial driver's license (CDL) and commercial learner's permit (CLP) holders' drug and alcohol program violations. An act of Congress directed the Secretary of Transportation to establish the Clearinghouse.

The Clearinghouse enables companies to identify drivers who commit a drug and alcohol program violation while working for one company, but who fail to subsequently inform a subsequent company, as required.

The Clearinghouse provides FMCSA, SDLAs, and companies the necessary tools to identify drivers who are prohibited from operating a CMV based on U.S. Department of Transportation (DOT) drug and alcohol program violations, and ensure that such drivers receive the required evaluation and treatment before operating a commercial motor vehicle (CMV) on public roads.

The first Clearinghouse final rule requires FMCSA-regulated companies, medical review officers (MROs), substance abuse professionals (SAPs), and consortia/third-party administrators (C/TPAs) to report to the Clearinghouse information related to violations of the drug and alcohol regulations in 49 Code of Federal Regulations, Parts 40 and 382 by current and prospective employees and/or independent contractors.

**The first Clearinghouse rule also requires the following:**

- ✓ Companies are required to query the Clearinghouse for current and prospective drviers' drug and alcohol violations before permitting those employees to operate a CMV on public roads.
- ✓ Companies are required to annually query the Clearinghouse for each driver they currently engage.

The second Clearinghouse final rule (Clearinghouse-II) supports FMCSA's goal of ensuring that only qualified drivers are eligible to obtain and retain a CDL. Beginning November 18, 2024, SDLAs will be required to remove the commercial driving privileges of drivers in a "prohibited" status in the Clearinghouse, which would result in a downgrade of the CDL until the driver completes the return-to-duty (RTD) process.

**Clearinghouse-II also requires the following:**

- ✓ SDLAs must also query the Clearinghouse before issuing, renewing, upgrading, or transferring CDLs and issuing, renewing, and upgrading CLPs.
- ✓ SDLAs must review a driver's information when notified by FMCSA of a driver's Clearinghouse status change.

Driver will need to be registered to provide electronic consent in the Clearinghouse if a prospective or current Carrier company needs to conduct a full query of the driver's Clearinghouse record— this includes all pre-employment or pre-engagement queries. See 49 CFR 382.703(d). A driver must also be registered to electronically view the information in his or her own Clearinghouse record. See 49 CFR 382.709.

Registered drivers will have their Clearinghouse accounts and contact preferences set up, allowing them to quickly respond to query requests from companies. Registration is available at https://clearinghouse.fmcsa.dot.gov/register.

By signing below, I hereby acknowledge that I have completely read and fully understand the company Drug & Alcohol policy.

_____

Driver signature

Date: 06 / 26 / 2025
_____

60

# CARRIER UNSAFE DRIVING POLICY

Revised

January 11, 2024

61

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

The purpose of this policy is to ensure the safety of those individuals who drive Carrier's vehicles. Vehicle accidents are costly to Carrier, but more importantly, they may result in injury to you or others. It is the driver's responsibility to operate all vehicles in a safe and reasonable manner and to drive in such a way as to prevent injuries and property damage. As such, Carrier endorses all applicable state motor vehicle regulations relating to driver responsibility. Carrier expects each driver to drive in a safe and courteous manner pursuant to the following safety rules. The attitude you take when behind the wheel is the single most important factor in driving safely.

❖ **Driver Eligibility**

- Drivers must have a valid driver's license for the type of vehicle to be operated, and keep the license(s) with them at all times while driving. All CDL drivers must comply with all applicable D.O.T. regulations, including successful completion of medical, drug, and alcohol evaluations.
- Must be 23 years old with minimum of two years of experience.
- Carrier's vehicles are to be driven by authorized drivers ONLY, except in emergencies, or in the event of repair testing by a mechanic. Other drivers and family members are not authorized to drive Carrier's vehicle.
- Carrier's vehicles are to be driven for Carrier Business ONLY, unless otherwise agreed to by Carrier in writing. Personal use of Carrier's vehicles is prohibited. No unauthorized persons are allowed to ride in Carrier's vehicles.
- Any driver who has a revoked or suspended driver's license shall immediately notify the safety department and discontinue operation of Carrier's vehicle. Failure to do so may result in disciplinary action including, but not limited to, termination.
- All accidents involving Carrier's vehicles, regardless of severity, must be reported to the police and to the safety department. Failing to stop after an accident and/or failure to report an accident may result in disciplinary action, including, but not limited to, termination.
- The use of a Carrier vehicle while under the influence of drugs and/or alcohol is forbidden and is sufficient cause for discipline, including, but not limited to, termination.
- All drivers and passengers operating or riding in Carrier's vehicles must wear seat belts.
- Report any mechanical difficulties or repair needs to the fleet department.
- Drivers are responsible for the security of the Carrier vehicles being used by them. The vehicle engine must be shut off, ignition keys removed, and vehicle doors locked whenever the vehicle is left unattended. If the vehicle is left with a parking attendant, only the ignition key is to be left.

❖ **Driving Records**

Your personal driving records are a reflection of your overall driving habits, and directly affect our insurance costs. Your personal driving is your responsibility and our concern.

Motor Vehicle Records ("MVRs") will be ordered periodically to assess driving records. An unfavorable record may result in termination. A standard method of evaluation for all prospective and current drivers' MVRs will be used:

- One (1) or more type 'A' Violations in the past 3 years, as defined below Three (3) or more accidents, regardless of fault, in the last 3 years

**Type 'A' Violations:**
- ✓ Driving While Intoxicated
- ✓ Driving While Under the Influence of Drugs
- ✓ Negligent Homicide Arising out of the use of a Motor Vehicle (Gross Negligence)
- ✓ Operating During a period of Suspension or Revocation
- ✓ Using a Motor Vehicle for the commission of a Felony
- ✓ Aggravated Assault with a Motor Vehicle
- ✓ Operating a Motor Vehicle Without the Owners Authority (Grand Theft)

62

✓ Permitting an Unlicensed Person to Drive Reckless Driving Speed Contest (Racing) ∟ Hit and Run (Bodily Injury or Property Damage)

❖ **Cell phone Usage**

Under all circumstances, drivers shall obey all motor vehicle laws. Violations and/or fines incurred by drivers shall be the full responsibility of the driver, and may affect engagement with Carrier as outlined above.

✓ Use of the cell phone while driving if such use interferes with the vehicle's operation:
✓ One hand must be on the wheel at all times.
✓ Texting is forbidden.
✓ Dialing out should be done only from a safely parked position.
✓ Hands-free cellular phones are subject to the same policy as the hand-held cellular phones. (No dialing out, texting, or interfering with safe operation of the vehicle).

Fines and Penalties – Using a hand-held mobile phone while driving a CMV can result in suspension, termination of engagement, and deduction of $1,000. Violations negatively impact SMS results, and they carry the maximum severity weight.

✓ In order to prevent this violation please:
✓ Make sure the mobile telephone is within close enough proximity that it is operable while the driver is restrained by properly installed and adjusted seat belts.
✓ Use an earpiece or the speaker phone function.
✓ Use voice-activated dialing.
✓ Use the hands-free feature. To comply, a driver must have his or her mobile telephone located where driver is able to initiate, answer, or terminate a call by touching a single button. The driver must be in the seated driving position and properly restrained by a seat belt. Drivers are not in compliance if they unsafely reach for a mobile phone, even if they intend to use the hands-free function.

No Calls, No Texts, No Tickets!

❖ **Speeding Policy**

Drivers should understand the importance of staying within speed limits, and how to identify the limit on the roads they use. Drivers should never drive faster than road conditions safely allow, should obey speed limits at all times (including variable limits and temporary limits at roadworks) and that persistent failure to do so will be treated as a serious matter. Good progress on the road does not mean driving as quickly as possible.

- All drivers are obliged and committed to follow road rules.
- You should always drive at a speed appropriate to the conditions.
- You must also observe speed restrictions relevant to your vehicle configuration.
- Do not speed to meet timeslots or designated arrival times.
- When travelling on unfamiliar roads, you should adjust the speed of the vehicle such that you are able to stop suddenly in the case of deviations, culverts and other hazards.
- You should always follow posted signs that provide a guide to the condition and characteristics of the road.

63

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

- Always reduce your speed in wet conditions – drive slowly, even if this results in delays to delivery and pick up schedules.
- You should descend hills at sign posted truck speed and gear instructions, or in the gear you climbed the hill in.
- Always observe the road work speed limits.
- You should take corners at or below the speed indicated on the advisory sign.
- Plan your trip well ahead to give you more reaction time and plenty of time to arrive safely.
- Always observe the speed limit in depots, parking lots, rest areas, customer's premises and work sites.
- If you have been found to be travelling in excess of the applicable speed limit you may face disciplinary action from Carrier.
- All vehicles have been fitted with a speed limiter to ensure that the vehicle does not exceed the maximum permitted speed of 100 km/h. Anybody found tampering with a speed limiting device will have their engagement terminated immediately.

Deductions for violation of policy – Speeding ticket may result in termination of driver's engagement with Carrier and a deduction of $1,000. Violations negatively impact SMS results, and they carry the maximum severity weight.

❖ **Traffic Violations**

Payment of fines for parking or moving violations, towing storage or impoundment are the sole responsibility of driver. Carrier will not condone nor excuse ignorance of any motor vehicle violations that result in court summons being directed to itself as the owner of the vehicle.

For each such moving violation Carrier will deduct $1,000.

Each driver is required to report all moving violations to safety department within 24 hours. This requirement applies to violations involving the use of any vehicle (company, personal or other) while performing Carrier business. Failure to report violations will result in possible disciplinary action, including, but not limited to termination of engagement and a deduction of $300.

Please be aware that motor vehicle violations incurred during non-business hours for personal use may also affect your driving status as well and are subject to Carrier review.

❖ **Safety Belt Policy**

It is Carrier's policy that every driver and all occupants of any vehicle must wear safety belts while on company business. This applies to all personally-owned, company-owned, leased, and rented vehicles. Drivers must wear lap and shoulder belts when operating a motor vehicle. For sleeper berths, occupant restraint systems installed by the manufacturer must be used, whether the system is at the entry point of the berth or incorporated as a belt-type restraint within the berth itself.

Wearing a seat belt has a lot of benefits. Here are the reasons aside from worrying about receiving a citation why you should always wear your seat belt:

1.They Save Lives: Wearing a seat belt prevents your body from moving in the event of a crash or emergency stop. If you are in an accident your truck will stop moving but whatever in the truck and is not secured to the truck will continue moving forward. Unfortunately, without a seatbelt it's often the windshield or roadway that stops your forward motion. Wear your seat belt so that your windshield doesn't have to stop your forward motion.

64

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

2.They Keep You Behind the Wheel: If there is an accident you might lose control of your truck because you don't have a seat belt on to help hold you in place. Wearing your seat belt holds you in place so that you could steer your way out of danger.

3.Your Family: If you do have loved ones waiting for you at home then wear the seat belt for them. If you tell your children to wear their seat belts then you need to wear yours too! Lead by example!

Deductions – Seat Belt policy violations may result in a deduction of $1,000. Violations negatively impact SMS results.

❖ **Accident Policy**

Specifically, the Federal Department of Transportation (DOT), which oversees the FMCSA, requires motor carriers to follow certain procedures for keeping track of serious accidents involving commercial motor vehicles (CMVs).

The DOT sets criteria as to which accidents must be recorded otherwise known as a "DOTrecordable" accidents. Since most carriers operate across state lines or otherwise affect commerce in more than one state, the Commerce Clause of the U.S. Constitution gives the federal government jurisdiction over these matters.

Carriers must maintain certain records related to the accident for three years. The DOT uses this data to determine the number of such accidents per 1 million miles driven. Carriers are rated and, if they surpass certain thresholds, may face sanctions and extra scrutiny.

**Definition of a DOT-Recordable Accident**

The definition of a DOT-recordable accident and the rules for recording them are encoded in §390.15 of the FMCSR. If an accident involving a CMV results in any of the following, it must be recorded on the accident register:

1. Fatality;
2. Bodily injury in which that person receives immediate medical attention away from the scene of the accident; or
3. At least one of the vehicles involved in the accident had to be towed from the scene

The DOT does not consider fault or preventability with respect to DOT-recordable accidents.

Companies who have trucks on the road should make sure their drivers know the proper procedures for handling accidents. Basic rules include the following:

- Drivers should immediately stop their vehicle after an accident of any kind. They should never leave the scene of an accident.
- Drivers should immediately activate flashers. If it's possible to move the truck, it should be pulled off the road or as far to the side as possible to prevent further collisions.
- If the driver is injured, the driver should remain in the vehicle (unless exiting is necessary for the safety of the driver) and wait for emergency medical assistance to arrive. Moving could cause further injury.
- If the driver is uninjured, he or she should check the accident scene for others who might be injured.
- Drivers should notify authorities, calling 911 or the highway patrol.
- It's also important to take steps to prevent further collisions and injuries. Uninjured drivers should set out reflective triangles or flares to warn other traffic.
- Drivers should also try to assess any damage to the vehicle and/or the cargo.

Drivers should report the accident to Carrier at the earliest opportunity, answer any questions, and provide the following information:

- Location of the accident
- Description of the driver's condition—for example, OK or injured, able to continue driving, and so on.
- Extent of damage to vehicle and/or cargo
- Whether any assistance is needed—for example, a tow truck or another truck to transfer cargo
- Collect pictures of damage of Carrier's vehicles and any other vehicles involved in the accident
- If there is a witness, obtain the witness's information's (name, phone number etc.)

Depend of type of the accident Carrier will determine whether you need to conduct a postaccident drug & alcohol test.

Warning devices such as flares or reflective triangles should be positioned properly to warn other drivers of an accident.

65

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

- **The first device** should be positioned in the direction of approaching traffic, within 10 feet of the last vehicle involved in the accident, and on the traffic side. No flame-producing signal should ever be attached to any part of a truck or another vehicle!
- **A second device** should be placed about 100 feet behind the accident scene, facing approaching traffic, and in the center of the lane or shoulder where the truck and other vehicles involved in the accident are stopped.
- **The third device** should be placed about 100 feet in front of the accident scene and facing traffic approaching from the other direction.

Deductions – Failure to report an accident to the safety department may result in a deduction of $2,500 and possible termination. For each insurance claim the deductible shall be deducted based upon the actual value up to $10,000.


I have read and understand the above Carrier Unsafe Driving Policy. I also understand that it is my responsibility to comply with the policy and that non-compliance could result in deductions, termination, and/or legal action.


_____

Driver signature


Date: 06 / 26 / 2025
_____

66

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# CARRIER VEHICLE MAINTENANCE POLICY

Revised

January 11, 2024

67

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

Systematic maintenance of equipment is an essential element of our transport operation. Part 396 of the Federal Motor Carrier Safety Regulations ("FMCSRs") requires motor carriers to "inspect, repair and maintain all motor vehicles" under their control. Even if there were no federal regulations in place, regardless, an organized maintenance program helps ensure smooth operation. It is Carrier's, as defined in the Driver Independent Contractor Agreement executed between the parties, policy to keep all Carrier transportation equipment well maintained and in safe and efficient operating condition at all times.

Drivers are responsible for knowing the mechanical condition of their vehicles at all times, and for operating those vehicles correctly and efficiently.

For all of Carrier's vehicles Carrier maintains the following records:

- An identification of the vehicle including Carrier number (if so marked), make, serial number, year, and tire size. If the motor vehicle is not owned by the motor carrier of passengers, the record must identify the party providing or leasing the vehicle.
- A means to show the nature and due date of the various inspection and maintenance operations to be performed.
- A record of inspection, repairs, and maintenance showing their date and type.
- A record of tests conducted on pushout windows, emergency doors, and emergency door marking lights on buses.

Preventive maintenance ("PM") is an attitude and a commitment by our company to get the most out of transport equipment by investing in its maintenance on a regular basis, according to a planned schedule.

Our PM policy reflects a very modern attitude of conservation and of wise asset utilization. Without a doubt, it also saves money for a company that is committed to its principles. The PM philosophy would say: "if it's scheduled to be replaced, replace it whether or not it has failed."

In summary, a good PM program lowers repair frequency and lowers overall maintenance cost.

The service portion of PM is actually scheduled maintenance. Carrier will be given PM according to the following schedule.

- PM service every 20,000 miles
- Mid service every 10,000 miles in between PM services
- Truck and trailers looked over from bumper to bumper every 3rd PM or sooner if possible
- All defects that is a safety concern to be reported and fixed as soon as possible

Drivers will receive training on vehicle inspection procedures including how to prepare and submit a driver vehicle inspection report ("DVIR"). We expect drivers to spot developing problem situations before they get to the "breakdown" point. This on the road expertise of drivers should work together with the in-shop expertise of the maintenance department.

Communication is key between drivers and the maintenance department. Some basic guidelines should help drivers contribute the most information possible to the PM program. Drivers are expected to do complete and careful pre-trip and post-trip inspections of their vehicles.

Drivers are expected to treat Carrier's vehicles as their own. Observable vehicle abuse will not be tolerated. Discovery of unauthorized modifications or tampering with any Carrier vehicle will be reported to the driver's supervisor. Drivers are expected to report any problems they find accurately and in detail. Problems should be reported promptly.

Carrier is not responsible for loss or damage to personal effects left in vehicles prior to maintenance work being performed.

On the road, drivers are expected to spot and report potential maintenance problems:

- LISTEN for unusual or abnormal equipment sounds. Thumps, rattles, squeaks, bumps, squeals, and hisses all can signal the beginning of trouble. If things don't sound right, they should be reported to maintenance.
- SMELL for unusual odors that may signal trouble. Burning rubber, insulation, wood, scorched fabric or hot oil or other fluid can all mean problems. Diagnosis can be made early with a good sense of smell.
- FEEL changes in the vehicle's response. Steering, braking, shifting, and other handling operations all have unique "feels" in a particular vehicle. If the vehicle doesn't seem to behave the way it should, it should be reported promptly. Little problems cost much less to fix and cause less downtime.
- OBSERVE the equipment carefully when you make your required routine inspections. Defects in wiring, lights, cables, tires, splash guards, locks, air lines, coupling devices, fifth wheels, tarps and fasteners, landing gear, brakes and various accessories should all be carefully noted and reported to the maintenance department.

68

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

❖ **Annual Inspection Policy**

Our company is committed to following an annual commercial vehicle inspection program. DOT regulations require commercial motor vehicles to undergo a thorough inspection at least annually, but Carrier requires such inspection to be done every 3 months. All equipment items not meeting the minimum standards must be repaired before the vehicle is put back into service. Our annual inspection policy will help avoid DOT penalties and provide support for a sound inspection and maintenance program.

Only inspectors qualified under Sec. 396.19 of the FMCSR are allowed to perform an annual inspection.

**Vehicle inspection criteria**

Each driver must be satisfied that equipment is in proper working condition prior to operating a vehicle. Drivers must use National Safety Code Standard 13, Schedule 1, Truck, Tractor and Trailer to inspect the vehicles.

The schedule lists minor defects and major defects of the following components:

- Air brake system
- Cab
- Cargo securement
- Coupling devices
- Dangerous goods
- Driver controls
- Driver seat
- Electric brake system (if applicable)
- Emergency equipment and safety devices
- Exhaust system
- Frame and cargo body
- Fuel system
- General vehicle condition
- Glass and mirrors
- Heater/Defroster
- Horn
- Hydraulic brake system (if applicable)
- Lamps and reflectors
- Steering
- Suspension system
- Tires
- Wheels, hubs, and fasteners
- Windshield wiper/washer

Each of these major component areas has subsidiary components that are required to be inspected as part of the annual vehicle inspection. Any equipment items not meeting minimum standards must be repaired before the vehicle can be put back in service. Each driver must be satisfied that cargo is properly distributed and secured. The vehicle's cargo or other objects must not obscure the driver's view or interfere with the driver's movement.

69

**Annual inspection documentation**

The qualified inspector performing the inspection must prepare a report which includes the following information:

- ➤ the inspector's name
- ➤ the name of the motor carrier operating the vehicle
- ➤ the date of the inspection
- ➤ vehicle identification
- ➤ a list of the components inspected and designation of any components not meeting inspection standards
- ➤ certification that the inspection is accurate, complete, and complies with the regulations.

Either an annual inspection sticker must be affixed to the vehicle or the inspection report maintained in the vehicle.

A copy of the annual inspection report must be carried on the vehicle. Driver must send the original or a copy of the annual vehicle inspection report to Carrier's facility.

❖ **Maintenance Record**

Driver must provide copy of receipt for all repairs that he/she done on the truck or trailer. You will want to set up and maintain maintenance records not just because they are required by the regulations, but because they can help you decide if your maintenance program is working. The records can also help you determine where you are having vehicle problems and how much it is really costing you to operate a specific piece of equipment.

Failure to submit maintenance record may result in a $300 deduction for each month maintenance records are not received.

❖ **Roadside Inspection Reports**

Any driver who receives a roadside inspection report must deliver it to Carrier. Carrier will examine the roadside inspection report. Within 15 days after the inspection, Carrier will sign the report to certify that all violations have been corrected, and return it to the address indicated.

Failure to report Roadside Inspection to the safety department may result in a $300 deduction.

Failure to submit original documentation of Driver/vehicle examination reports with proof for truck/trailer repair may result in a $300 deduction.

**Non-Compliance with Policy**

In a proactive effort to prevent our company FMCSA safety measurement system performance profile from having a negative impact that will prevent our brokering and shipping partners from doing business with us as a team, Carrier may take the following action:

- 1st Offense for an Out-Of-Service Violation a deduction up to $500.
- 1st Offense for a Non Out-of-Service Violation a deduction up to $300.
- 2nd Offense for an Out-Of-Service Violation a deduction up to $1,000.
- 2nd Offense for an Non Out-Of-Service Violation a deduction up to $600.
- 3rd Offense for an Out-Of-Service Violation a deduction up to $1,500 and/or termination.
- 3rd Offense for a Non Out of Service Violation a deduction up to $900.

Rewards Incentives & Compliance Program

USDOT Level 1 Inspection with no violations Contractor will receive $500.
USDOT Level 2 Inspection with no violations Contractor will receive $300.
USDOT Level 3 Inspection with no violations Contractor will receive $200.

Carrier strictly forbids the operation of an out-of-service vehicle until the required repairs are completed. A driver who violates this policy will be subject to termination.

70

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

❖ **Driver Vehicle Inspection Reports**

Carrier is committed to following a strong daily inspection program. DOT regulations require commercial motor vehicles to be inspected every day they are operated. Our daily inspection procedures will help avoid DOT penalties and provide a sound basis for a good inspection and maintenance program. Daily inspection of vehicles will help prevent small problems from becoming big problems.

**Driver Pre-trip Inspection**

Each driver must be satisfied that equipment is in proper working condition prior to operating a vehicle. This includes the following equipment:

> ➢ Service brakes, including trailer brake connections
> ➢ Parking (hand) brake
> ➢ Steering mechanism
> ➢ Lighting devices and reflectors
> ➢ Tires
> ➢ Horn
> ➢ Windshield wipers
> ➢ Rear vision mirrors
> ➢ Wheels and rims
> ➢ Coupling devices
> ➢ Emergency equipment

Each driver must also be satisfied that cargo is properly distributed and secured. The vehicle's cargo or other objects must not obscure the driver's view or interfere with the driver's movement. The driver will also review the last completed Driver's Vehicle Inspection Report (if and when such a report was required) to verify that any needed repairs were made to the vehicle. If an authorized signature certifies that defects were corrected or that correction was unnecessary, the driver shall sign the third signature line of the form. If the defects noted were not acknowledged by an authorized signature, the driver shall not drive the vehicle until the defects are handled appropriately.

**Driver post-trip inspection report**

When a driver is done operating a vehicle for the day (including any trailers), he/she must inspect the vehicle and report any safety-related defects or deficiencies so repairs can be made before the vehicle is driven again. Drivers of property-carrying vehicles must prepare and submit an inspection report even if there are no defects or deficiencies to report. The vehicle must be identified on the report. The regulations require that any defects in the following equipment items be noted:

> ➢ Service brakes including trailer brake connections
> ➢ Parking (hand) brake
> ➢ Steering mechanism
> ➢ Lighting devices and reflectors
> ➢ Tires
> ➢ Horn
> ➢ Windshield wipers
> ➢ Rear vision mirrors
> ➢ Coupling devices
> ➢ Wheels and rims
> ➢ Emergency equipment

71

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

The driver must also note any other defects that would affect the safe operation of the vehicle or result in its mechanical breakdown. The report must also indicate if no defects are found. The driver must sign the report.

- ➢ No defects: When no safety-related problems are reported by the driver, the driver submits the inspection report to the safety department.
- ➢ Defects: When a driver reports safety related problems, the driver must submit all copies to the safety department. A certified shop will sign the report indicating that repairs have been made or are not required to be made. The vehicle inspection report must also be signed by the driver to operate the vehicle.

Driver signature

Date: 06 / 26 / 2025

72

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# CARRIER HOURS OF SERVICE POLICY

Revised

January 11, 2024

73

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

The Federal Motor Carrier Safety Administration ("FMCSA'), a stand-alone Department of Transportation ("DOT") agency, has developed a detailed set of rules designed to keep roads safe by ensuring drivers limit the long hours they spend behind the wheel. These Hours-of-Service regulations apply to all DOT regulated commercial motor vehicle operators in the US.

It's important to note that the ELD compliance mandate is an extension of the Hours-ofService rules, attempting to create an easier system for tracking and manage records of duty status ("RODS'). As of December 2017, all vehicles subject to the ELD mandate must record Hours of Service electronically to maintain DOT compliance.

❖  What Are the HOS Regulations For?

The Hours of Service (HOS) regulations are intended to keep tired drivers off the road for the safety of drivers and others on the road.

These rules cap the number of hours a driver can be on the road in any given duty cycle so that—in theory—tired drivers are given enough time to rest, eat, sleep, and otherwise be refreshed before they get back on the road.

❖  ELDs

Electronic Logging Devices ("ELDs") are digital log-recording devices that automatically capture your D ("Drive") statuses and do a whole bunch of other things (such as allowing you to electronically transfer your logs during an inspection) to comply with the FMCSA's December 18, 2017 ELD mandate.

❖  Hours of Service Regulations

For property-driving commercial motor vehicles ("CMVs"), here are some of the most important Hours-of-Service ("HOS") rules to remember, as provided by the FMSCA:

**14-Hour Shift Limit**: Commercial Driver's License ("CDL") drivers may not drive beyond the 14th consecutive hour after coming on duty, but can resume driving after the 10th consecutive, off-duty hour. Once you start your workday (ON or D status), your clock officially begins counting down and cannot be stopped. Beyond that 14-hour window, you can still work ("ON-duty time") but you can't legally drive again until you take a 10-hour break.

**11-Hour Driving Limit**: Drivers may drive a maximum of 11 hours within the 14-hour window, after 10 consecutive, off-duty hours. Within your 14-hour workday, you can drive for up to 11 hours.  (The extra 3 hours are for breaks, meals, showers, etc.)

**30-Minute Breaks**: Drivers may not drive if 8 hours have passed since the last off-duty period of at least 30 consecutive minutes. Operators can perform non-driving tasks after 8 hours without a break, but cannot drive. Depending on your ruleset, you may be required to take a 30-minute break for every 8 hours of ON-duty time. The best way to handle this is to schedule your break 6 – 8 hours into your shift.  This optimizes your time so that you only have to take one 30-minute break in your day. If you take your break early, you may have to take two breaks

**60/70-Hour Limit**: Drivers may not drive after 60/70 hours on duty in 7/8 consecutive days. Operators can restart a 7/8 consecutive day period after taking 34 or more consecutive, off-duty hours. Once every 7/8 days you can perform a 34-hour restart.  This just means that you are OFF duty for a full 34 hours.  Once you have spent this time OFF, you will gain your full 60/70 hours back to start a new 60/70-hour duty cycle.

❖  **Duty Statuses**

You've got four different duty statuses, logged on one of four lines:

- Drive ("D")
- ON
- OFF
- Sleeper Berth ("SB")

74

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

## D

This status is for when you are behind the wheel driving faster than 5 MPH (effectively any time you're driving).

## ON

This is any time you are working but not driving over 5 MPH. This includes, but is not limited to, to following:

- Pre-Trip Inspection
- Filing paperwork
- Loading or unloading
- Supervising loading or unloading
- Responsible for a load in general
- Fueling
- Roadside inspection

## OFF

This is any time you spend that you do not meet the requirements for any of the other statuses (that is, whenever you're not ON, Driving, or in the Sleeper Berth).

## SB

This is any time that you are in the sleeper berth.

### ❖ Exemptions

With ELDs there are a few exemption statuses.

Whereas you may have been able to record your personal driving on the OFF line on paper logs, or considered yourself ON or OFF while in a yard, there's now the added data with ELDs to show whenever you've been driving, and you have to account for this time.

### Exemption Statuses

ELD exemptions cannot be applied after the fact.

### Yard Move ("YM")

Yard Move (YM) can be applied any time you're driving off of public roads. This exemption will keep you ON duty while you are driving over 5 MPH so you aren't losing any of your Drive time while driving around on a company's lot.

### Personal Conveyance ("PC")/Personal Use

75

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

PC can be applied any time you're driving for personal reasons and not advancing the load you're hauling. This would be for driving to and from dinner after you've checked into a hotel, finding the nearest safe place to park for a break after your delivery, etc.

It's important to remember these rules, as well as how you will track them.

❖ **Disciplinary Action**

You must comply with the hours of service rules, comply with the maximum drive times and keep your ELD records accurate.

Do NOT unplug the ELD and continue to drive.

A violation of the hours of service rules or a false ELD will result in the following discipline actions:

- First offence: a verbal warning & a $300 deduction
- Second offence: a written warning & $600 deduction
- Third offence: a 2-day suspension & $900 deduction
- Fourth offence: termination

If you are placed out of service for an hours of service violation during a DOT roadside inspection, that may result in the following discipline actions:

- First offence: a verbal warning & $500 deduction
- Second offence: a written warning & $1000 deduction
- Third offence: termination & $1500 deduction

_Vu Guw_
_____

Driver signature

Date: 06 / 26 / 2025
_____

76

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# PAST EMPLOYMENT SAFETY HISTORY REQUEST

FROM: Crena Transportation Services LLC
ADDRESS: 21 E State St, Suite 200,Columbus OH 43215
PHONE: 3129154837

The person named herein has applied to Crena Transportation Services LLC
for employment in a safety-sensitive position.

I, the listed applicant below, hereby authorize the following company(s) to release all records of employment, including assessments of my job performance, ability, fitness and drug testing results to Crena    I hereby release this company, and its employees, officers, directors, and agents from any and all liability of any type as a result of providing the following information to the above-mentioned company. The applicant's signature on this form releases all liability of you and your company.  Information is being requested in accordance with 49 CFR Parts 40, 382 and 391.

Company name:  ROCKET EXPD LLC

_____          06 / 26 / 2025
          Applicant's Signature                                     Date

Name of Applicant: Kyle Jordan Smith                Social Security Number: 108828608

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# PAST EMPLOYMENT SAFETY HISTORY REQUEST

FROM: Crena Transportation Services LLC
ADDRESS: 21 E State St, Suite 200,Columbus OH 43215
PHONE: 3129154837

The person named herein has applied to Crena Transportation Services LLC
for employment in a safety-sensitive position.

I, the listed applicant below, hereby authorize the following company(s) to release all records of employment, including assessments of my job performance, ability, fitness and drug testing results to Crena    I hereby release this company, and its employees, officers, directors, and agents from any and all liability of any type as a result of providing the following information to the above-mentioned company. The applicant's signature on this form releases all liability of you and your company.  Information is being requested in accordance with 49 CFR Parts 40, 382 and 391.

Company name: __JB hunt_____

_____                _____06 / 26 / 2025_____
Applicant's Signature                                                     Date

Name of Applicant: Kyle Jordan Smith_____        **Social Security Number:** 108828608_____

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

Crena Transportation Services LLC

# GENERAL CONSENT FOR LIMITED QUERIES OF THE FMCSA DRUG AND ALCOHOL CLEARINGHOUSE

Employee Name  Kyle Jordan Smith

Driver's License Number  104896994                                                State SC       Country US

I, Kyle Jordan Smith                                          , hereby provide consent to Crena Transportation Services LLC
_____ to conduct a limited query of the FMCSA Commercial Driver's License Drug and Alcohol Clearinghouse (Clearinghouse) to determine whether drug or alcohol violation information about me exists in the Clearinghouse.

My consent is for unlimited number of limited queries for my employment application processing and the duration of my employment with  Crena Transportation Services LLC

I understand that if the limited query conducted by Crena Transportation Services LLC indicates that drug or alcohol violation information about me exists in the Clearinghouse, FMCSA will not disclose that information to  Crena Transportation Services LLC           without first obtaining additional specific consent from me.

I further understand that if I refuse to provide consent for Crena Transportation Services LLC    to conduct a limited query of the Clearinghouse, Crena Transportation Services LLC           must prohibit me from performing safety-sensitive functions, including driving a commercial motor vehicle, as required by FMCSA's drug and alcohol program regulations.

Employee Signature            _____

Date of                                          06 / 26 / 2025

Employer Name                  Crena Transportation Services LLC

Employer Address              21 E State St, Suite 200,Columbus OH 43215

*STORE IN MED-STOP EMPLOYEE DOCUMENTS - DO NOT FAX TO MED-STOP*

Instructions: Section 382.703(a) of the Title 49 CFR, states "No employer may query the Clearinghouse to determine whether a record exists for any particular driver without first obtaining that driver's written or electronic consent." The type of consent required depends on the type of query. For a limited query, a general consent is required. This will be obtained outside the Clearinghouse. Employers may obtain a multi-year general consent from the driver for limited queries. For a full query, the driver must provide specific consent to the employer prior to each full query. This consent must be provided electronically within the Clearinghouse.

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

# PAST EMPLOYMENT SAFETY HISTORY REQUEST

FROM: Crena Transportation Services LLC
ADDRESS: 21 E State St, Suite 200,Columbus OH 43215
PHONE: 3129154837

The person named herein has applied to Crena Transportation Services LLC
for employment in a safety-sensitive position.

I, the listed applicant below, hereby authorize the following company(s) to release all records of employment, including assessments of my job performance, ability, fitness and drug testing results to Crena    I hereby release this company, and its employees, officers, directors, and agents from any and all liability of any type as a result of providing the following information to the above-mentioned company. The applicant's signature on this form releases all liability of you and your company.  Information is being requested in accordance with 49 CFR Parts 40, 382 and 391.

Company name:  Tesla Inc
_____

_____     06 / 26 / 2025
Applicant's Signature                          Date

Name of Applicant: Kyle Jordan Smith            Social Security Number: 108828608

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb

| Form **W-9**<br>(Rev. October 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification**<br><br>▶ Go to *www.irs.gov/FormW9* for Instructions and the latest Information. | **Give Form to the**<br>**requester. Do not**<br>**send to the IRS.** |
|---|---|---|

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Kyle  Jordan Smith

**2** Business name/disregarded entity name, if different from above

MARY LOIS CHARITIES

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

[✓] Individual/sole proprietor or single-member LLC  [ ] C Corporation  [ ] S Corporation  [ ] Partnership  [ ] Trust/estate

[ ] Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

[ ] Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

2950 E North ST APT 600L

**6** City, state, and ZIP code

Greenville, SC, 29615

Requester's name and address (optional)

**7** List account number(s) here (optional)

*Print or type. See Specific Instructions on page 3.*

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN,* later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

| 1 | 0 | 8 | – | 8 | 2 | – | 8 | 6 | 0 | 8 |

or

Employer identification number

| 8 | 8 | – | 2 | 2 | 5 | 0 | 4 | 1 | 8 |

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| Sign<br>Here | Signature of<br>U.S. person ▶ | *[signature]* | Date ▶ | 06 / 26 / 2025 |

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9.*

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X    Form **W-9** (Rev. 10-2018)

Doc ID: 0df015394cbcac07e1f7bbe4ff37ed57bb279cdb